UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


THE SANITARY BOARD OF THE CITY
OF CHARLESTON, WEST VIRGINIA,
a municipal utility,

       Plaintiff,

v.                                    Civil Action No. 2:18-cv-01100

COLONIAL SURETY COMPANY, a
Pennsylvania corporation; and
PARTNERRE INSURANCE COMPANY OF
NEW YORK, a New York corporation,

       Defendants.

and

COLONIAL SURETY COMPANY, a
Pennsylvania Corporation,

       Third-Party Plaintiff,

v.

TRI-STATE PIPELINE, INC., an Ohio
corporation; and ERIC D. TAYLOR,

       Third-Party Defendants and
       Fourth-Party Plaintiffs,

v.

BURGESS & NIPLE, INC., an Ohio
corporation,

       Fourth-Party Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

Pending is a motion to dismiss, filed October 11, 2018 by The Sanitary Board of the City of Charleston, West Virginia ("the Sanitary Board" or "Owner"), seeking to dismiss the crossclaim complaint filed by third-party defendant and fourth-party plaintiff Tri-State Pipeline, Inc. ("Tri-State," "Contractor," or "Bidder").[1]

## I.    Facts and Procedural Background

This case arises from a project to improve the sewer systems of Charleston, West Virginia. Specifically, according to the crossclaim complaint, "[o]n or about July 26, 2016, the [Sanitary Board] accepted bids for Contracts 15-1 'Porters Branch & Spring Branch Sanitary Sewer Improvement' and 15-2 'Callie Road & Anderson Heights Road Sanitary Sewer Improvements'. These contracts involved gravity sewer line replacement, manhole installation, house service connections, restoration of pavement and other related work." Crossclaim ¶ 2. As part of the bidding process, the Sanitary Board "provided

---

[1] Also pending is a motion to dismiss Tri-State's fourth-party complaint, filed October 22, 2018 by fourth-party defendant Burgess & Niple. Because the motions seek to dismiss two separate complaints, the court addresses them in separate orders.

prospective bidders with the project design prepared by [Project Engineer Burgess & Niple, Inc., ("Burgess & Niple" or "Engineer"),] including plans, specifications, bid documents, and other contract documents, also prepared by [Burgess & Niple] for the [Sanitary Board]." Id. ¶ 4. According to Tri-State, "[t]hese bidding documents were intended to provide a 'road map' for prospective bidders to allow reasonable anticipation of the conditions in the work area and to allow them to prepare accurate bids for the work." Id.

Tri-State submitted a bid, "[i]n specific reliance upon the information provided by [the Sanitary Board.]" Id. ¶ 5. The Sanitary Board accepted Tri-State's bid and on September 22, 2016, the parties entered into an agreement for the completion of both projects for a contract price of $9,876,186.44. Id. ¶ 6, see also The Agreement, Motion to Dismiss, ECF # 28 Ex. C. The contract had a start date of on or about October 10, 2016, and provided that substantial completion should be achieved in 330 calendar days, with final completion 30 days thereafter. Id. ¶ 8. Burgess & Niple acted as the project engineer as well as the Sanitary Board's onsite representative during the construction project. Id. ¶ 7.

3

Tri-State immediately suffered delays in its performance, allegedly "as a direct result of the [Sanitary Board]'s failure to timely and adequately perform its obligations under its contract, including, but not limited to, a failure to adequately and timely approve submittals, failure to make timely payment for materials and work provided, [and] failure to address and provide compensation for changed work and for extra work resulting from unforeseen or changed site conditions[.]" Id. ¶ 9. Specifically, Tri-State alleges in paragraph 10 that the Sanitary Board breached its obligations under the contract by:

a. failing to provide accurate and adequate plans, specifications and contract documents adequate to perform the contract work;

b. interfering with, altering and controlling Tri-State's planned means, methods, techniques, sequences and procedures of construction;

c. issuing unjustified stop work orders without adequate cause and without compensating Tri-State for resulting delays and costs;

d. requiring Tri-State to comply with the direction of the City Engineer of the City of Charleston in contravention of the specifications included in the contract documents without compensating Tri-State for resulting delays and costs;

e. failing to timely and adequately review and approve Tri-State's requests for additional compensation and time resulting from the [Sanitary Board]'s delays and changes in the work;

> f. failing to compensate Tri-State for delays and
> expenses resulting from the Owner's failure to provide
> proper easements;
>
> g. failing to compensate Tri-State for extra work
> resulting from changed site conditions;
>
> h. failing to compensate Tri-State for delays, extra
> work and added expense resulting from unmarked and
> mismarked existing underground utilities;
>
> i. failing to compensate Tri-State for delays and
> extra work resulting from owner caused changes in its
> manner and method of performance;
>
> j. failing to compensate Tri-State for delays, extra
> work and added expense resulting from faulty or
> leaking existing underground utilities; and
>
> k. failing to compensate Tri-State for delays and
> extra costs associated with interference by other
> contractors operating in its work area.

Id. ¶ 10. Tri-State alleges that it suffered "at least 57 instances of changed work, delays, unforeseen or changed site conditions[,]" for each of which it submitted claims to the Sanitary Board that were denied. Id. ¶ 11. For such claims, section 10.05 of the contract's general conditions requires that all claims be referred to the engineer, Burgess & Niple, for decision, and that written notice be delivered "by the claimant to Engineer and the other party to the Contract promptly (but in no event later than 30 days) after the start of the event giving rise thereto." General Conditions, ECF # 28, Ex. A at 7-8.

Tri-State alleges that "the [Sanitary Board] had adequate and timely notice [as to each claim Tri-State submitted] as the [Sanitary Board]'s own actions were the direct cause of the delay and/or extra work, the [Sanitary Board] had actual notice of the events giving rise to the claim through its on-site representatives who were on site daily during the course of Tri-State's work and who kept a daily record of events occurring on the Project, and through written and oral communications with Tri-State and the [Sanitary Board]'s project representatives." Crossclaim ¶ 12. Tri-State further alleges that the Sanitary Board, "[t]hrough its conduct during the course of Tri-State's work, including orally directing work different from that specified in the contract documents without utilizing the formal change order process set forth in the contract documents, . . . waived its right to rely on the formal written notice and claims provisions in the contract[.]" Id. ¶ 13.

Eventually, according to Tri-State, "[d]espite Tri-State's diligent performance of its obligations under its contract with the [Sanitary Board] in the face of delays, extra work and added costs directly resulting from the acts or inactions of the [Sanitary Board] and unforeseen or changed site

conditions, the [Sanitary Board] wrongfully terminated its contract with Tri-State without adequate cause." Id. ¶ 16.

Tri-State alleges that "[a]s a direct, proximate and foreseeable result of the [Sanitary Board]'s material breaches of its contract and its wrongful termination, Tri-State has suffered a substantial financial loss, including the cost of performing additional work directed by the [Sanitary Board], extra costs resulting from delays and lost productivity, extended overhead costs and lost profits." Id. ¶ 17, see also ¶ 14.

Following these events, the Sanitary Board commenced this action on June 29, 2018 against Colonial Surety Company, the surety on the project, and PartnerRe Insurance Company of New York, the re-insurer surety on the project, invoking the court's diversity jurisdiction. See Original Complaint, ECF # 1. Thereafter, on August 28, 2018, defendants Colonial Surety Company and PartnerRe Insurance Company of New York filed an answer to the complaint, accompanied by a third-party complaint by Colonial Surety Company against third-party defendants Tri-State and Eric D. Taylor, Tri-State's president. See Answer and Third-Party Complaint, ECF # 16. Then, on September 20, 2018, the third-party defendants filed an answer to the third-party

complaint, along with the instant crossclaim[2] by Tri-State
against the plaintiff and the fourth-party complaint by Tri-
State against Burgess & Niple, Inc.  See Answer, Crossclaim and
Fourth-Party Complaint, ECF # 22.

Tri-State brings its claim for breach of contract,
seeking judgment against the Sanitary Board in the amount of
$5,000,000.00, "or such other amount as will fully and fairly
compensate it for the Cross-Claim Defendant's breach of its
contract with Cross-Claimant, together with all other relief as
may be necessary to do justice in this matter."  Id., WHEREFORE
clause.

On October 11, 2018, the Sanitary Board filed its
motion to dismiss Tri-State's claim against it under Rule
12(b)(6).  ECF # 28.  Tri-State filed a response on October 25,

---

[2] Under Rule 14, a third-party defendant "may . . . assert
against the plaintiff any claim arising out of the transaction
or occurrence that is the subject matter of the plaintiff's
claim against the third-party plaintiff."  Fed. R. Civ. P.
14(a)(2)(D).  Although the Sanitary Board is not a co-party with
Tri-State, and Tri-State's claim against it is thus not
technically a "crossclaim," see Rule 13(g), the court
nonetheless uses the term as the parties do.  The parties do not
dispute that Tri-State properly asserted its claim and that it
arises out of the same transaction or occurrence that is the
subject matter of the Sanitary Board's claim against Colonial
Surety Company.

2018, ECF # 32, to which the Sanitary Board replied on November 1, 2018, ECF # 36.

## II.  Motion to Dismiss Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 12(b)(6) correspondingly provides that a pleading may be dismissed when there is a "failure to state a claim upon which relief can be granted."

To survive a motion to dismiss, a pleading must recite "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007); see also Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009) (quoting Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008)).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555 (citation omitted).

"In resolving a motion pursuant to Rule 12(b)(6)[,] a district court cannot consider matters outside the pleadings without converting the motion into one for summary judgment."

Occupy Columbia v. Haley, 738 F.3d 107, 116 (4th Cir. 2013)
(citing Fed. R. Civ. P. 12(d)). "A court may, however, consider
a 'written instrument' attached as an exhibit to a pleading, 'as
well as [documents] attached to the motion to dismiss, so long
as they are integral to the complaint and authentic.'" Id.
(alteration in original) (internal citation omitted) (quoting
Fed. R. Civ. P. 10(c) and Phillips v. Pitt Cty. Mem'l Hosp., 572
F.3d 176, 180 (4th Cir. 2009)).

A district court's evaluation of a motion to dismiss
is underlain by two principles. First, the court "must accept
as true all of the factual allegations contained in the
[pleading]." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citing
Twombly, 550 U.S. at 555-56). Such factual allegations should
be distinguished from "mere conclusory statements," which are
not to be regarded as true. Iqbal, 556 U.S. at 678 ("[T]he
tenet that a court must accept as true all of the allegations
contained in a complaint is inapplicable to legal
conclusions."). Second, the court must "draw[] all reasonable
factual inferences . . . in the [nonmovant's] favor." Edwards
v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).

To state a breach of contract claim, a plaintiff must allege: 1) the existence of a valid contract; 2) that plaintiff has performed under that contract; 3) that defendant breached or violated its duties under that contract, and 4) that plaintiff was injured as a result.  Executive Risk Indem., Inc. v. Charleston Area Medical Center, Inc., 681 F.Supp.2d 694, 721 (S.D.W.Va. 2009).  The parties do not dispute the existence of a valid contract.

Under West Virginia law, which is controlling here, "the function of a court is to ascertain the intent of the parties as expressed in the language used by them" in their contract.  Zimmerer v. Romano, 223 W.Va. 769, 679 S.E.2d 601, 610 (2009) (per curiam) (quoting Davis v. Hardman, 148 W.Va. 82, 133 S.E.2d 77, 81 (1963)).  Generally, "[a] valid written instrument which expresses the intent of the parties in plain and unambiguous language . . . will be applied and enforced according to such intent."  Arnold v. Palmer, 224 W.Va. 495, 686 S.E.2d 725, 733 (2009) (brackets in original) (citations omitted).

The contract documents at issue here consist of the "Agreement," ECF # 28 Ex. C, signed by both parties, as well as documents incorporated in the Agreement, including pertinently the "General Conditions," ECF # 28 Ex. A, the "Instructions to Bidders," ECF # 28 Ex. B, and the "Supplementary Conditions," ECF # 28 Ex. D. The court considers each of these documents in its analysis inasmuch as they are integral to the crossclaim and the parties do not dispute their authenticity. See Phillips, 572 F.3d at 180.

In its motion, the Sanitary Board first argues that it lacks any duty under the contract with respect to Tri-State's alleged damages. Specifically, the Sanitary Board claims that it did not breach the contract as to the allegations pertaining to its provision of plans and specifications for the project or for problems arising from existing underground facilities -- crossclaim paragraphs 10(a), 10(h), and 10(j) -- because Tri-State either waived or assumed the liability for the damages related to those claims.

Paragraph 10(a) and any similar allegation in the complaint pertains to the Sanitary Board's failure "to provide accurate and adequate plans, specifications and contract documents adequate to perform the contract work[.]" In essence,

Tri-State contends that the Sanitary Board, in providing the documents prepared by Burgess & Niple, created an implied warranty that the documents were accurate and adequate to complete the project.  Indeed, Tri-State alleges that the provided documents were meant to serve as a "road map," that would "allow reasonable anticipation of the conditions in the work area and to allow [the bidders] to prepare accurate bids for the work."  Crossclaim ¶ 4.

The Sanitary Board, on the other hand, contends that Tri-State waived this implied warranty, or otherwise assumed the risk that the provided documents would be inaccurate.

Tri-State relies on United States v. Spearin, 248 U.S. 132 (1918) in asserting that the contract contained an implied warranty under which the Sanitary Board had a duty to provide accurate and adequate documents.  The Court in Spearin held: "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications."  Id. at 136.  Although Spearin was based on state law and the West Virginia Supreme Court of Appeals has never cited it, see Federal Group, Inc. v. Callas Contractors, Inc., No. 3:08-CV-156, 2009 WL 10690430, at *4 (N.D.W. Va. Aug.

31, 2009) (discussing the applicability of <u>Spearin</u> in West Virginia), it nonetheless makes practical sense that when a party to a contract provides documents upon which another party is to rely, the party providing the documents warrants that they are accurate.  Indeed, in a somewhat similar case, the West Virginia Supreme Court of Appeals held that such a duty existed between the party preparing the documents itself and the contractor, despite the absence of privity of contract:

> we expressly hold that a design professional (e.g. an architect or engineer) owes a duty of care to a contractor, who has been employed by the same project owner as the design professional and who has relied upon the design professional's work product in carrying out his or her obligations to the owner, notwithstanding the absence of privity of contract between the contractor and the design professional, due to the special relationship that exists between the two.

<u>E. Steel Constructors, Inc. v. City of Salem</u>, 209 W. Va. 392, 401, 549 S.E.2d 266, 275 (2001).  It thus seems reasonable that the owner, who is in privity of contract with the contractor, would similarly be deemed to warrant that the documents upon which the contractor is to rely, as prepared by the engineer for the owner, are reasonably accurate and adequate.

The Sanitary Board, however, points to several portions of the contract documents to support its assertion that Tri-State waived its claim as to the provided documents.

Section 4.1 of the Instructions to Bidders, which is incorporated into the Agreement, see Agreement at 5, makes it Tri-State's responsibility, as a bidder, to examine and correlate its knowledge of the site with the information provided by the Sanitary Board:

> 4.1. It is the responsibility of each BIDDER before submitting a Bid:
>
> 4.1.1. To examine thoroughly the Contract Documents and other related data identified in the Bidding Documents (including "technical data" referred to below and appendices);
>
> 4.1.2. To visit the Site to become familiar with and satisfy BIDDER as to the general, local, and Site conditions that may affect cost, progress, performance, or furnishing of the Work;
>
> . . .
>
> 4.1.4. To study and carefully correlate BIDDER'S knowledge and observations with the Contract Documents and such other related data; and
>
> 4.1.5. To promptly notify ENGINEER/ARCHITECT of all conflicts, errors, ambiguities, or discrepancies which BIDDER has discovered in or between the Contract Documents and such other related documents and/or Site conditions.

Instructions to Bidders at 3. Indeed, section 4.2 informed the bidders, including Tri-State, that certain testing had not been performed for the project:

4.2. Explorations and tests of subsurface conditions at or contiguous to the Site were not performed for this Project.

Id. And pursuant to section 4.5, Tri-State was made responsible for conducting any such additional testing:

4.5. Before submitting a Bid, each BIDDER will be responsible to obtain such additional or supplementary examinations, investigations, explorations, tests, studies, and data concerning conditions (surface, subsurface, and Underground Facilities) at or contiguous to the Site or otherwise, which may affect cost, progress, performance, or furnishing of the Work or which relate to any aspect of the means, methods, techniques, sequences, or procedures of construction to be employed by BIDDER and safety precautions and programs incident thereto or which BIDDER deems necessary to determine its Bid for performing and furnishing the Work in accordance with the time, price, and other terms and conditions of the Contract Documents.

Id. at 4.

Additionally, in the Agreement itself, Tri-State acknowledged that the plans and specifications provided to it may not be complete:

7.4. CONTRACTOR has carefully studied all reports of explorations and tests of subsurface conditions at or contiguous to the site and all drawings of physical conditions in or relating to existing surface or subsurface structures at or contiguous to the site (except Underground Facilities) which have been identified in the Supplementary Conditions as provided in paragraph 4.02A of the General Conditions. CONTRACTOR accepts the determination set forth in paragraph 4.02 of the Supplementary Conditions of the extent of the "technical data" contained in such reports and drawings upon which CONTRACTOR is entitled to rely as provided in paragraph 4.02 of the General

Conditions. CONTRACTOR acknowledges that such reports and drawings are not Contract Documents and may not be complete for CONTRACTOR'S purposes. . . .

Agreement at 3-4. Also therein, Tri-State assumed the responsibility for conducting any additional testing to ensure the completeness of the provided documents:

7.5. CONTRACTOR has obtained and carefully studied (or assumes responsibility for having done so) all such additional supplementary examinations, investigations, explorations, tests, studies, and data concerning conditions (surface, subsurface, and Underground Facilities) at or contiguous to the Site or otherwise which may affect cost, progress, performance, or furnishing of the Work or which relate to any aspect of the means, methods, techniques, sequences, and procedures of construction to be employed by CONTRACTOR and Safety precautions and programs incident thereto. CONTRACTOR does not consider that any additional examinations, investigations, explorations, tests, studies, or data are necessary for the performance and furnishing of the Work at the Contract Price, within the Contract Times, and in accordance with the other terms and conditions of the Contract Documents.

Id. at 4.

Further, under section 4.02 of the Supplementary Conditions, Tri-State agreed not to make any claim against the Sanitary Board based on incompleteness of the provided documents:

[4.02.A.]2. Contractor may not rely upon or make any claim against Owner or Engineer, or any of their Related Entities with respect to:

17

a. The completeness of such reports ["of explorations
and tests of subsurface conditions at or contiguous to
the Site that Engineer has used in preparing the
Contract Documents"] and drawings for Contractor's
purposes, including, but not limited to, any aspects
of the means, methods, techniques, sequences, and
procedures of construction to be employed by
Contractor, and safety precautions and programs
incident thereto; or

b. Other data, interpretations, opinions, and
information contained in such reports or shown or
indicated in such drawings; or

c. Any Contractor interpretation of or conclusion
drawn from any 'technical data' or any such other
data, interpretations, opinions or information.

Supplementary Conditions at 4-5 (quotation marks omitted,
bracketed addition from id. at 4.02.A.1). Tri-State does not
assert that it performed any additional testing to verify the
completeness of the provided documents, but rather apparently
submitted a bid in sole reliance on the provided documents.
Following commencement of the project, Tri-State allegedly
encountered inaccuracies in those documents which hindered its
performance.

While Tri-State agreed to conduct additional and
supplementary testing to ensure the completeness of the
documents, and indeed agreed not to make any claims as to the
completeness thereof, the court finds it important to consider
the distinction between accuracy and completeness. Additional
or supplementary testing to retrieve any information in addition

to that which is provided is a reasonable request but does not necessarily place it within Tri-State's responsibility to test the accuracy of the documents themselves.  Moreover, to the extent Tri-State was made responsible for correlating its knowledge of the project site with that provided in the documents and reporting any errors, such does not constitute an assumption on Tri-State's part of the risk that the documents were inaccurate, but rather may reasonably be construed as a safety measure to ensure that Tri-State had closely studied the provided documents.  While Tri-State agreed not to bring any claims as to the completeness of the provided documents, the court finds, when construing all facts alleged in the crossclaim in favor of Tri-State, as the court must at this stage, the contract lacks sufficient language that would indemnify the Sanitary Board in the event it provided not simply incomplete, but inaccurate, documents.

As for the allegations contained in 10(h) and 10(j) regarding underground facilities and utilities, however, the Agreement states:

> 7.4. . . . CONTRACTOR acknowledges that OWNER and ENGINEER/ARCHITECT do not assume responsibility for the <u>accuracy</u> or completeness of information and data shown or indicated in the Contract Documents with respect to Underground Facilities at or contiguous to the site.

Agreement at 4 (emphasis added).  Additionally, the General

Conditions state:

> [4.04.A.]2.  the cost of all of the following will be
> included in the Contract Price, and Contractor shall
> have full responsibility for:
> a. reviewing and checking all such information and
> data [regarding underground facilities];
> b. locating all Underground Facilities shown or
> indicated in the Contract Documents;
> c. coordination of the Work with the owners of such
> Underground Facilities, including Owner, during
> construction; and
> d. the safety and protection of all such Underground
> Facilities and repairing any damage thereto resulting
> from the Work.

General Conditions at 3.  Notwithstanding that apparent waiver,

the contract allowed for the amendment of the contract in the

event the information provided regarding underground facilities

was proven inaccurate:

> [4.04.B.] 1.  If an Underground Facility is uncovered
> or revealed at or contiguous to the Site which was not
> shown or indicated . . . , Contractor shall, promptly
> after becoming aware thereof and before further
> disturbing conditions affected thereby or performing
> any Work in connection therewith . . . , identify the
> owner of such Underground Facility and give written
> notice to that owner and to Owner and Engineer.
> Engineer will promptly review the Underground Facility
> and determine the extent, if any, to which a change is
> required in the Contract Documents to reflect and
> document the consequences of the existence or location
> of the Underground Facility. During such time,
> Contractor shall be responsible for the safety and
> protection of such Underground Facility.
>
> 2. If Engineer concludes that a change in the Contract
> Documents is required, a Work Change Directive or a
> Change Order will be issued to reflect and document

> such consequences. An equitable adjustment shall be
> made in the Contract Price or Contract Times, or both,
> to the extent that they are attributable to the
> existence or location of any Underground Facility that
> was not shown or indicated or not shown or indicated
> with reasonable accuracy in the Contract Documents and
> that Contractor did not know of and could not
> reasonably have been expected to be aware of or to
> have anticipated. If Owner and Contractor are unable
> to agree on entitlement to or on the amount or extent,
> if any, of any such adjustment in Contract Price or
> Contract Times, Owner or Contractor may make a Claim
> therefor as provided in Paragraph 10.05.

Id. at 3-4. Tri-State's allegation that the Sanitary Board
failed to compensate for the inaccuracies of the provided
information as to underground facilities could thus be
considered a breach of contract when construing all facts in
Tri-State's favor, because the contract provided for a change in
contract price in such instances.

    Moreover, in the event Tri-State and the Sanitary
Board sought to reach an agreement on an adjustment in price or
schedule but could not do so, Tri-State was able to submit a
claim under section 10.05.  It is unclear if any of the fifty-
seven claims that Tri-State filed pertained to underground
facilities.  Drawing all reasonable inferences in Tri-State's
favor, however, the court finds it reasonable to assume that
Tri-State filed a claim for adjustment of the contract as to the
issues encountered with underground facilities.

The court thus turns to the Sanitary Board's second argument: that Tri-State failed to satisfy the conditions precedent to bringing its fifty-seven denied claims. In addition to any claims brought pertaining to underground facilities, Tri-State's allegations regarding denied claims are found in ¶ 10(c), (d), (e), (f), (g), (i), and (k), as well as ¶ 11, as the court can best determine when construing the crossclaim in Tri-State's favor. The allegations pertain to the Sanitary Board's failure to provide extra compensation due to changed conditions or delays occurring during the course of the project.

Per the terms of the contract, which the court must enforce, see Arnold, 224 W.Va. 495, "[t]he Contract Price may only be changed by a Change Order." See General Conditions at 9. In order to obtain such a change order, the requesting party was required to submit, in writing, a claim to the project engineer, Burgess & Niple, within thirty days of the event giving rise thereto. See id. at 7-8 (10.05). Indeed, "[a] decision by Engineer [was] required as a condition precedent to any exercise by Owner or Contractor of any rights or remedies either may otherwise have under the Contract Documents or by Laws and Regulations in respect of such Claims." Id.

Tri-State does not contend that it complied with the formal requirements of the contract in filing claims for change orders.  Instead, Tri-State claims that "the [Sanitary Board] had adequate and timely notice [as to each claim] as the [Sanitary Board]'s own actions were the direct cause of the delay and/or extra work[;] . . . [the Sanitary Board's] on-site representatives . . . were on site daily during the course of Tri-State's work and . . . kept a daily record of events occurring on the Project[;] and through written and oral communications with Tri-State and the [Sanitary Board]'s project representatives."  Crossclaim ¶ 12.  Tri-State further alleges that "[t]hrough its conduct during the course of Tri-State's work, including orally directing work different from that specified in the contract documents without utilizing the formal change order process set forth in the contract documents, the [Sanitary Board] waived its right to rely on the formal written notice and claims provisions in the contract[.]"  <u>Id.</u> ¶ 13.

"'Ordinarily, where a construction contract contains language to the effect that its terms cannot be changed without the written consent of the parties thereto, then such written consent is required unless this condition is waived by the parties by their conduct or through circumstances that justify

23

avoiding the requirement.'" **J.F. Allen Corp. v. Sanitary Bd. of City of Charleston**, 237 W. Va. 77, 82 (2016) (quoting **Pasquale v. Ohio Power Co.**, 186 W. Va. 501, Syl. Pt. 1. (1991)). In **J.F. Allen**, the West Virginia Supreme Court of Appeals found that under a contract with pertinently identical terms, the contractor alleged sufficient facts to show that the Sanitary Board had waived the written notice requirement for claims. **Id.** Specifically, the court found it sufficient that "the complaint alleged that the parties modified other provisions in the contract pertaining to paving and restoration of homeowners' properties through a subsequent oral agreement." **Id.**

Here, too, the crossclaim alleges that the Sanitary Board had orally directed work different from that in the contract. Crossclaim ¶ 13. Additionally, when construed in Tri-State's favor, the complaint asserts that the Sanitary Board and Burgess & Niple, its on-site representative, had the requisite written notice because "on-site representatives who were on site daily during the course of Tri-State's work . . . kept a daily record of events occurring on the Project," and because "Tri-State and the [Sanitary Board]'s project representatives" shared "written and oral communications." Crossclaim ¶ 12. Accordingly, one could find that Tri-State had

in fact provided timely written notice of its claims or that the Sanitary Board had otherwise waived the formal claims requirements of the contract.[3] Tri-State's crossclaim thus adequately states a plausible claim for breach of contract due to the Sanitary Board's alleged failure to timely address the submitted claims and denial thereof.

Finally, the Sanitary Board contends that Tri-State is not entitled to relief as to the allegation found in ¶ 16, which states: "Despite Tri-State's diligent performance of its obligations under its contract with the [Sanitary Board] in the face of delays, extra work, and added costs directly resulting from the acts or inactions of the [Sanitary Board] and unforeseen or changed site conditions, the [Sanitary Board] wrongfully terminated its contract with Tri-State without adequate cause."

Under section 15.02 of the general conditions, the Sanitary Board was able to terminate the contract for cause.

_____

[3] The court notes, however, that this analysis is based solely on the facts presented in the crossclaim. In its briefing, the Sanitary Board sets forth that the fifty-seven claims at issue were not submitted until eighty days after the Sanitary Board's termination of Tri-State, a fact which would bear on this court's analysis herein but that may not be considered by the court at this stage.

15.02 states that any of the following events would justify termination for cause:

> [15.02.A.]1. Contractor's persistent failure to perform the Work in accordance with the Contract Documents (including, but not limited to, failure to supply sufficient skilled workers or suitable materials or equipment or failure to adhere to the Progress Schedule established under Paragraph 2.07 as adjusted from time to time pursuant to Paragraph 6.04);
>
> 2. Contractor's disregard of Laws or Regulations of any public body having jurisdiction;
>
> 3. Contractor's repeated disregard of the authority of Engineer; or
>
> 4. Contractor's violation in any substantial way of any provisions of the Contract Documents.

General Conditions at 21. If one or more of those events occurred, the Sanitary Board was authorized, after providing the contractor with seven days' written notice, to:

> [15.02.B.]1. exclude Contractor from the Site, and take possession of the Work and of all Contractor's tools, appliances, construction equipment, and machinery at the Site, and use the same to the full extent they could be used by Contractor (without liability to Contractor for trespass or conversion);
>
> 2. incorporate in the Work all materials and equipment stored at the Site or for which Owner has paid Contractor but which are stored elsewhere; and
>
> 3. complete the Work as Owner may deem expedient.

Id. If the Sanitary Board proceeded as provided in 15.02.B, Tri-State was not entitled to receive further payment until the project was completed:

> [15.02.C.] Contractor shall not be entitled to receive
> any further payment until the Work is completed. If
> the unpaid balance of the Contract Price exceeds all
> claims, costs, losses, and damages . . . sustained by
> Owner arising out of or relating to completing the
> Work, such excess will be paid to Contractor. If such
> claims, costs, losses, and damages exceed such unpaid
> balance, Contractor shall pay the difference to Owner.
> Such claims, costs, losses, and damages incurred by
> Owner will be reviewed by Engineer as to their
> reasonableness and, when so approved by Engineer,
> incorporated in a Change Order. When exercising any
> rights or remedies under this Paragraph, Owner shall
> not be required to obtain the lowest price for the
> Work performed.

Id. Alternatively, "[n]otwithstanding Paragraphs 15.02.B and 15.02.C, Contractor's services will not be terminated if Contractor begins within seven days of receipt of notice of intent to terminate to correct its failure to perform and proceeds diligently to cure such failure within no more than 30 days of receipt of said notice." Id. at 22 (15.02.D).

The Sanitary Board sets forth two reasons why the breach of contract claim for wrongful termination should be dismissed: the events leading up to the termination justified a termination for cause; and Tri-State is not entitled to any payments until the project has been completed in full. Tri-State responds that the Sanitary Board is improperly relying on its own wrongful termination of the contract to bar Tri-State's claims, which would "have the practical effect of allowing the

Sanitary Board to materially breach and refuse to perform its contract for any reason, or for no reason, with impunity as long as it labeled its conduct as a 'termination for cause[.]'" Resp. at 13. Tri-State alleges that "the 'termination for cause' was, in fact, without adequate cause and was improper and constituted a breach on the part of the Sanitary Board[.]" Id.

In its crossclaim, Tri-State has set forth sufficient facts to establish that its failure to timely perform under the contract was due to the Sanitary Board's own alleged breaches. Specifically, it alleges that the Sanitary Board failed to approve claims for each of the fifty-seven alleged instances of "changed work, delays, unforeseen or changed site conditions[,]" Crossclaim ¶ 11, and repeatedly orally directed work different from or in addition to that required under the contract, id. ¶ 10(b), 10(d), and 13. One could thus determine that the Sanitary Board's termination of Tri-State's participation in the contract was wrongful and a breach of its own contractual obligations. Tri-State has adequately stated a claim that the Sanitary Board breached the contract on this ground.

Accordingly, Tri-State has sufficiently stated a claim for breach of contract in its crossclaim, which cannot be dismissed under Rule 12(b)(6).

### IV. Conclusion

For the foregoing reasons, it is ORDERED that the Sanitary Board's motion to dismiss be, and it hereby is, denied.

The Clerk is directed to forward copies of this order to all counsel of record and any unrepresented parties.

ENTER: May 28, 2019

John T. Copenhaver, Jr.
Senior United States District Judge