UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

THE SANITARY BOARD OF THE CITY
OF CHARLESTON, WEST VIRGINIA,
a municipal utility,

        Plaintiff,

v.                         Civil Action No. 2:18-cv-01100

COLONIAL SURETY COMPANY, a
Pennsylvania corporation; and
PARTNERRE INSURANCE COMPANY OF
NEW YORK, a New York corporation,

        Defendants.

and

COLONIAL SURETY COMPANY, a
Pennsylvania Corporation,

        Third-Party Plaintiff,

v.

TRI-STATE PIPELINE, INC., an Ohio
corporation; and ERIC D. TAYLOR,

        Third-Party Defendants and
        Fourth-Party Plaintiffs,

v.

BURGESS & NIPLE, INC., an Ohio
corporation,

        Fourth-Party Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

Pending is plaintiff the Sanitary Board of the City of Charleston, West Virginia's ("the Sanitary Board") motion for summary judgment, filed March 15, 2021 (ECF No. 341).  This opinion addresses this motion insofar as it seeks summary judgment on the breach of contract crossclaim by third-party defendant and fourth-party plaintiff Tri-State Pipeline, Inc. ("Tri-State") against the Sanitary Board as well as the Sanitary Board's corresponding breach of contract counterclaim against Tri-State.[1]

## I.   General Background

This case arises from a project to improve the sewer systems of Charleston, West Virginia.  On July 26, 2016, third-party defendant and fourth-party plaintiff Tri-State Pipeline, Inc. ("Tri-State") submitted a $5,296,542.44 bid for the Sanitary Board's "Contract 15-1" concerning "Porter's Branch and Spring Branch Sanitary Sewer Improvements," and a $4,579,644.00 bid for the Sanitary Board's "Contract 15-2" concerning "Callie Road and Anderson Heights Sanitary Sewer

---

[1]    Even though Tri-State's "crossclaim" is not asserted against a co-party as one might expect under Federal Rule of Civil Procedure 13(g), the parties uniformly refer to it as a crossclaim and the court accordingly refers to it as such.  <u>See</u> ECF No. 71, at 8 n. 2.

Improvements." ECF No. 341-1. Craig D. Richards, Director of Engineering Services for fourth-party defendant Burgess & Niple, Inc. ("Burgess & Niple"), the Sanitary Board's engineer for the project (sometimes referred to as "Engineer"), sent a letter dated August 9, 2016, to Eric D. Taylor, Tri-State's president, stating that it appeared that Tri-State's proposed surety, Colonial Surety Company ("Colonial"), had an underwriting limitation of $3,162,000, which would be insufficient to underwrite performance and payment bonds for the projects. ECF No. 341-2.

By letter dated August 9, 2016, Colonial "certif[ied]" to Burgess & Niple that it "[would] be Co-Surety with PartnerRe Insurance Company of New York," bringing a combined "underwriting capacity for single projects of up to $10,000,000.00." ECF No. 341-3. PartnerRe likewise sent email confirmation to Burgess & Niple and the Sanitary Board on August 26, 2016:

> Per your request, I am sending you this email as confirmation that PartnerRe is the lead reinsurer and co-surety partner with Colonial Surety Company. We have enjoyed a 10 year relationship with Colonial and stand firmly alongside the Company on all co-surety bonds written. This email is written confirmation that Partner Reinsurance Company of the US remains committed to supporting Colonial Surety as the co-surety on bonds written on behalf of Tri-State Pipeline. PartnerRe will step in on the bonds in the event that Colonial Surety is unable to meet its

3

> obligation. I trust this email will meet your request
> for written documentation.

ECF No. 341-4, at 2; ECF No. 341-5.

The Sanitary Board entered into a contract with
Tri-State for the performance of the project, comprised of
Contracts 15-1 and 15-2, on September 22, 2016.  ECF No. 341-7.
The total contract price was $9,876,186.44.  Id. at 2.  The
project was to be "substantially complete within 330 days and
ready for final payment within 360 days after the date the
Contract Time commence[d] to run as provided in the Notice to
Proceed . . . ."  Id. at 2.  The contract contained "time is of
the essence" and liquidated damages clauses, the latter of which
provided for payments of $2,000 "for each consecutive calendar
day after the time specified in paragraph 3.1 [which provides
the substantial completion and final completion deadlines], or
any proper extension thereof granted by OWNER for completion and
readiness for final payment."  Id.  The contract named Burgess &
Niple as the "Engineer/Architect" to act as the "representative"
of the Sanitary Board, the "Owner" under the contract.  Id. at
1.

The contract also incorporated by reference various
documents, two of which, the "General Conditions" and
"Supplementary Conditions," are particularly relevant here.  See
ECF No. 341-7.  The General Conditions refer to the "Standard

**4**

General Conditions of the Construction Contract," a 2007 standardized document, which was prepared by the Engineers Joint Contract Documents Committee and published by the American Council of Engineering Companies, Associated General Contractors of America, American Society of Civil Engineers, and the National Society of Professional Engineers.  ECF No. 341-9; ECF No. 341-10.  The Supplementary Conditions are also a 2007 standardized document prepared by the Engineers Joint Contract Documents Committee, which supplement or replace certain of the General Conditions.  See ECF No. 341-10.

Colonial issued a performance bond bearing Bond No. CSC 223760 and a payment bond bearing Bond No. CSC–223760 on September 22, 2016 (the date the contract was signed), both of which were in the penal sum of $9,876,186.44 and were made for the benefit of the Sanitary Board.  ECF No. 341-11.  The same day, PartnerRe, through its attorney-in-fact, Philip Shepard,[2]

---

[2]    Philip Shepard signed the certificate of reinsurance as attorney-in-fact for both Colonial, his employer, and PartnerRe, the reinsurer for whom he was given power of attorney.  ECF No. 341-12, at 1-2.

5

signed a certificate of reinsurance in the amount of
$9,376,186.44.  ECF No. 341-12, at 1.[3]

The notice to proceed was issued by the Sanitary Board
on October 4, 2016, with commencement of the project to begin on
or before October 10, 2016.  ECF No. 341-8, at 1.  This in turn
set September 5, 2017, and October 4, 2017, as substantial
completion and final payment deadlines, respectively.  Id.; see
also ECF No. 341-7, at 2.

Work at the site of the project was delayed by
Tri-State until February 1, 2018.  See ECF No. 343-2, at
212:11-13.  Delay at the outset was occasioned by issues of
manhole submittal approval and manhole delivery.[4]  See, e.g., ECF
No. 351-6, at 46.  The submittals, which were given to Burgess &
Niple ("Engineer") by Tri-State for approval of manhole
specifications, were initially provided by Tri-State to the
Engineer on September 23, 2016, prior to the notice to proceed
on October 4, 2016.  See ECF No. 351-6, at 46; ECF No. 351-20,

---

[3]    For simplicity, the court refers to Colonial and PartnerRe
collectively as "the sureties."  The court recognizes that the
status of PartnerRe as a surety is at issue in this case, see,
e.g., ECF No. 339, but this matter will be taken up by further
opinion.

[4]    The court refers not to manhole covers, but rather precast
concrete manholes through which the sewer lines would run after
the manholes and pipes were installed in the ground.  See, e.g.,
ECF No. 349, at 3.

at 113:18-23.  Based on the testimony of Time Haapala, the
Sanitary Board's Operations Manager and Rule 30(b)(6) designee,
and the report of Bryon L. Willoughby, P.E., Tri-State's expert,
it appears that these submittals were returned by the Engineer
to Tri-State for revision on October 11, 2016 (7 days after the
notice to proceed of October 4, 2017), resubmitted to Burgess &
Niple by October 16, 2016, and approved by the Engineer 17 days
later on November 2, 2016.  See ECF No. 351-6, at 46; ECF No.
351-20, at 113:18-114:16.  In relation to manhole submittal
approval, Richards stated that he did not know whether the
Burgess & Niple standard for manholes included in the project
design could be measured and that "it could be" a subjective
determination.  ECF No. 351-26, at 82:6-23.

        The manholes were ordered by Tri-State on November 3,
2016, but not delivered by its chosen manufacturers until
December 1, 2016, whereupon some of the manholes
delivered - those manufactured by Foster Supply, Inc. and,
potentially, some manufactured by Premier Precast - were
rejected for nonconformity with the approved submittals.  See
ECF No. 343-3, at 168:13-169:12; 351-6, at 46; ECF No. 351-20,
at 114:11-115:12.  Willoughby states that "three out of [the]
five" manhole deliveries on December 1, 2016, were rejected.
ECF No. 351-6, at 46.

Case 2:18-cv-01100   Document 467   Filed 08/27/21   Page 8 of 93 PageID #: 8705


When asked during his deposition whether Tri-State was able to "start working on the manholes [it] had," _i.e._, those that conformed with the submittals, Taylor responded: "No because . . . you have a truck bring five manholes and there might be one of them that we could use, so you had to send that back." ECF No. 343-2, at 39:21-40:4. This response, of course, does not actually explain why the contractor was unable to begin work with the manholes that did conform with the submittals.

Taylor asserts in his affidavit, which was produced during summary judgment motions briefing on April 5, 2021, seven months after his deposition, that Burgess & Niple rejected the delivered manholes. See ECF No. 349-2, at ¶ 5. Jim Downey, the Sanitary Board's project engineer, testified during his deposition that the defective manholes did not conform with the drawings for the approved submittals and further stated that he, John Moore (a Burgess & Niple resident project representative), and Timm Utt (an engineer of Burgess & Niple) inspected the nonconforming manholes while Moore and Utt were responsible for informing Tri-State that they would be rejected. See ECF No. 343-3, at 168:13-169:12. Haapala stated during his testimony that Tri-State rejected the nonconforming manholes. See ECF No. 351-20, at 115:6-21. Haapala further testified that the period of time between the November 3, 2016 ordering of manholes and

December 1, 2016 delivery seemed long and that the decision to return certain manholes after delivery for failure to conform with specifications was reasonable.  ECF No. 351-20, at 114:21-115:21.

There were monthly job progress meetings for the project, the first of which was held on November 1, 2016, and the last of which was on December 5, 2017.  See ECF No. 358-3. The minutes for these meetings were prepared by Utt and distributed to Taylor and other Tri-State employees throughout the contractor's work on the project.  See id.  The minutes of the job progress meeting held on March 7, 2017, indicate that, after 5 months under the 12-month contract, less than 1% of pipe installation was complete.  As of that date, 317 of 29,176 linear feet of pipe, including service lateral pipe, for Contract 15-1 had been installed while 96 of 25,198 linear feet of pipe for Contract 15-2, including service lateral pipe, had been installed.  ECF No. 358-3, at 24.  This equates to .76% of the total pipe to be installed during the project.

A March 7, 2017 memorandum for the "Porters Hollow Sewer Replacement Project File" composed by Downey documents a discussion held following the job progress meeting that same date.  It states, in relevant part:

9

> Tim Haapala, PE (CSB); Timm Utt (B&N); and Jim Downey
> (CSB) had a private meeting with Eric Taylor following
> the project progress meeting.  The meeting was in the
> Engineering Department Map Room at approximately 1:00
> p.m.
>
> . . .
>
> Tim let Eric know that we are all concerned that
> almost half of the contract time has expired and
> only 1% of the work has been done. Tim told Eric that
> if he had been delayed by actions of B&N or by the CSB
> that there were clauses in the contract that would
> allow him to submit claims and regain the time.  Eric
> told Tim that all of the delays to date had been of
> either Eric's own doing or due to Foster Supply not
> delivering acceptable manhole bases.  He said that
> there was nothing he could claim and neither B&N or
> the CSB had anything to do with the delays.
>
> . . .
>
> Eric assured us that he has the means and ability to
> complete the work within the contract time and while
> he is getting a late start on it, he will be adding
> crews and laying a lot of pipe starting very soon.

ECF No. 343-6, at 10 (internal footnote added).

      After reading this memorandum during his deposition,
Taylor conceded that Haapala, the Sanitary Board's Operations
Manager and Rule 30(b)(6) designee, had expressed concerns over
Tri-State's work on the project during the March 7, 2017 meeting
and that Haapala had advised him that the contract contained
provisions to allow Tri-State to submit claims and "regain
time."  ECF No. 343-6, at 384:14-24.  During his deposition,
Taylor stated that he had "no way of knowing" whether he advised

10

the Sanitary Board and Burgess & Niple that Tri-State "had the
means and ability to complete the work within the contract time"
as of that meeting and likewise testified that he could not
recall stating during the meeting that there was nothing to
claim and that he could not recall stating that the
manhole-delivery problems were not the fault of the Sanitary
Board or Burgess & Niple.  Id. at 385:13-22.  Taylor did not
deny either statement in his deposition.

          The manhole problems are estimated by Tri-State's
expert, Willoughby, to have caused 115 days' worth of delays to
the project.  ECF No. 351-6, at 46.  Assuming Tri-State began
working on February 1, 2017, as testified by Utt, ECF No. 343-2,
at 212:11-13, 114 days would have elapsed between the October
10, 2016 start date for the project and February 1, 2017.

          The late start was also occasioned by the delayed
submission by Tri-State of preconstruction videos to document
the condition of areas of work prior to the beginning of pipe
installation in those areas.  See ECF No. 343-2, at 211:12-18.
Taylor acknowledged during his deposition that such videos were
required by the contract, which provided specifications for the
videos.  ECF No. 343-2, at 22:5-7, 23:6-8.  Taylor also noted
that the videos "[h]ad to be done before [we] got to work in the
area."  Id. at 21:16-17.  The first batch of preconstruction

videos, which were created by a third-party hired by Tri-State, were rejected by Burgess & Niple.  See id. at 21:21-23.  Taylor stated that "[i]t's possible" that the videos were rejected for not conforming with the contract's specifications, although he did not remember for certain why they were rejected.  See id. at 21:24-22:11.  Tri-State itself re-filmed the preconstruction videos, whereupon they were ultimately accepted by Burgess & Niple.  See id. at 22:17-24:9; ECF No. 343-2, at 211:10-21.

Downey and Utt testified that the video issue resulted in a delay of Tri-State's ability to begin work on the project. ECF No. 343-2, at 211:4-8; ECF No. 343-3, at 166:18-22.  The exact length of the delay is not clear from the record, although Willoughby indicates that Moore testified that Tri-State could not begin work until "February 2017" due to the lack of acceptable preconstruction videos.  See ECF No. 351-6, at 46. This would roughly correspond with the delay he attributed to the manhole submittal and delivery problems.  It would also account for Tri-State's failure to proceed promptly with the manholes received December 1, 2016 that were deemed acceptable.

It is apparent that Tri-State's delayed provision of acceptable preconstruction videos and its failure to commence work with acceptable manholes resulted in its doing very little to get the project underway during the first four months of the

contract.  The delay may also be due to a Nitro Sanitary Board job that Tri-State had not completed as of May 31, 2017, on which date the Nitro Sanitary Board sent Tri-State a letter requiring certain items to be accomplished prior to final completion and final payment for that project.  <u>See</u> ECF No. 409-3.

In addition to Tri-State's slow start, Tri-State was issued six stop work orders during its work on the project, which are summarized as follows:

1. City of Charleston Building Permit Violation - 6/12/17, non-compliance with Road Restoration on Porter Road and Woodcliff Drive[,] effective 6/13/17. This is a violation of City Code (Building Permit).

2. Charleston Sanitary Board - 8/4/17, non-compliance with WV/NPDES General Water Pollution Control Permit[,] effective 8/7/17.  [Porter Road]

3. Charleston Sanitary Board - 8/18/17, non-compliance with timeliness of pavement replacement[,] effective 8/19/17. This is a violation of City Code (Building Permit).  [Callie Road and Louden Heights Road]

4. Charleston Sanitary Board - 10/4/17, non-compliance with dust control effective 10/5/17.  [Near Holz Elementary School]

5. Charleston Sanitary Board - 10/20/17, non-compliance with timeliness of pavement replacement effective 10/21/17. This is a violation of City Code (Building Permit).  [Callie Road, Bendview Drive/Woodcliff Drive, and Hampton Road]

6. Charleston Sanitary Board - 11/10/17, defective work associate[d] with restoration of pavement replacement[,] effective 11/10/17. This was a modification to the Stop Work Order issued on

    10/20/17. This is a violation of City Code (Building
    Permit).  [Hampton Road]

See ECF No. 341-33, at 3, 5; see also ECF No. 341-16 through ECF

No. 341-26.  The June 12, 2017 stop work order was issued by the

City of Charleston ("the City") while the remaining five were

issued by Burgess & Niple on behalf of the Sanitary Board.  See

ECF No. 341-16 through ECF No. 341-26.

        The four pavement restoration-related stop work orders

concerned unrepaired or poorly repaired pavement at the

locations noted above.  The initial stop work order, issued June

12, 2017 by the City, concerned a violation of "Section 115 of

the 2015 FBC Code," which is not defined or explained on the

order.  See ECF No. 341-16.  However, Burgess & Niple, which had

been notified that the City planned to enter the order prior to

its issuance, sent Taylor a letter dated June 9, 2017, informing

him of the City's intentions and instructing Tri-State to

"complete pavement restoration as referenced on Plan Sheet D-04,

Contract 15-1 and Plan Sheet D-05, Contract 15-2" and the "Note

Applicable to Types A-1, A-2, A-3, C and WVDOT Trench Pavement

Restorations" contained in such Plan Sheets.  ECF No. 341-17.

This note reads as follows:

        NOTE APLICABLE TO TYPES A-1,A-2,A-3,CAND WVDOT TRENCH
        PAVEMENT RESTORATION: All areas where pavement has
        been removed shall be restored in accordance with
        these details within 14 calendar days or upon
        completion of three sections of sanitary sewer located

                              14

                    between four consecutive manholes, whichever results
                    in fewer calendar days following removal of pavement,
                    unless otherwise approved by the Owner.  Whenever
                    asphalt overlay is designated on the Plans, the
                    calendar day requirement stated within this note is
                    not applicable to the timing of the placement of the
                    asphalt overlay portion of the Work.

ECF No. 341-23.  Plan Sheets D-04 and D-05 are expressly

incorporated by reference in the contract as "Contract

Documents" that comprise a part of the entire agreement between

Tri-State and the Sanitary Board.  See ECF No. 341-7, at 5-6.

          The August 18, 2017 and October 20, 2017 stop work

orders likewise cited noncompliance with these provisions of

Plan Sheet D-04, Contract 15-1 and Plan Sheet D-05, Contract

15-2 as the justification for issuance of the order.  See ECF

No. 341-23; ECF No. 341-25.  The final November 10, 2017 stop

work order was a modification of the October 20, 2017 stop work

order.  See ECF No. 341-26.  In the final order, Burgess & Niple

noted that although Tri-State had "made progress" in restoring

the pavement at issue, certain portions of restored pavement,

including that on Hampton Road, were "defective" with respect to

contract "specification Section 32 10 01.02, 'Pavement and Walks.'"[5]  Id.

The two remaining stop work orders relate to environmental failures.  The October 4, 2017 stop work order (dust control) also tangentially related to pavement.  It cited noncompliance with "several provisions of the Contract, including the requirements involving dust control."  ECF No. 341-24, at 1.  The order was issued upon the Sanitary Board's receipt of "numerous complaints over the past few weeks regarding dust resulting from work, including from local residents and staff and others representing Holz Elementary School."  The order cited the need for Tri-State to remove dust "from areas where pavement restoration is complete" and to "control dust in areas where sewer pipe has been installed but the top of trench awaits full restoration of the pavement."  Id.

---

[5]    The parties do not cite to this specific contract specification in their briefs, and the court has not located it in their exhibits.  However, like the Plan Sheets, specifications and supplemental specifications "from Division 0 through Division 33" are incorporated by reference in the contract as Contract Documents such that they comprise a part of the agreement between Tri-State and the Sanitary Board.  See ECF No. 341-7, at 5.  One can infer that "specification Section 32 10 01.02" refers to a Division 32 specification falling within this range of documents incorporated by reference.

The August 4, 2017 stop work order related to erosion control.  On June 29, 2017, Burgess & Niple sent Tri-State a letter indicating that the Sanitary Board and the West Virginia Department of Environmental Protection had observed various on-site erosion-related deficiencies and that the Department of Environmental Protection informed the Sanitary Board that the notice of violation would issue in approximately two weeks.  ECF No. 341-20.  This June 29, 2017 letter instructed Tri-State to remedy the observed deficiencies to "insure compliance with General Permit No. WV0115924 and in accordance with Technical Specification 01 57 13, 'Erosion Control During Construction.'"[6] Id.

When Tri-State failed to do so, the West Virginia Department of Environmental Protection issued a July 10, 2017 notice of violation to the Sanitary Board for noncompliance with the terms and conditions of its WV/NPDES General Water Pollution Control Permit No. WV0115924, Registration No. WVR108238, specifically: "Section D.1 [of the permit] – failed to properly operate and maintain all facilities and systems of treatment and control: Silt fence had been improperly installed (i.e. not

---

[6]    Like "specification Section 32 10 01.02," one can infer from the contract and the context of this letter that "Technical Specification 01 57 13" is a specification incorporated by reference in the contract and made a part of the agreement.  See 341-7, at 5.

17

trenched in, properly joined).  Check dams [that] were
constructed of undersized stone."  ECF No. 341-21.

By virtue of Tri-State's failure to comply, the August
4, 2017 stop work order concerning erosion control cited this
notice of violation and also stated that Tri-State had failed to
comply with certain "specified requirements of Section 01 57 13,
Erosion Control During Construction," including:

> 1.  Where clearing and grubbing operations
> precede the installation of the sanitary sewer by more
> than seven calendar days in advance of commencement of
> trenching activities, temporary seeding & mulching or
> other approved methods of stabilization shall be
> performed to limit erosion.
>
> 2.  Where construction activities have either
> temporarily or permanently ceased for more than 7
> calendar days, temporary seeding & mulching or other
> approved methods of stabilization shall be performed
> to limit erosion.
>
> 3.  Where ingress and/or egress to construction
> site and other areas disturbed beyond the limits of
> sewer trenching and backfill activities has ceased for
> more than 7 calendar days, temporary seeding and
> mulching or other approved methods of stabilization
> shall be performed to limit erosion.

ECF No. 341-22.  In addition, the order stated: "where
construction activities have permanently ceased for more than 7
days, Permanent Grading & Seeding (Pay Item No. 127) and Erosion
& Sediment (E&S) control measures necessary to stabilize the
restored areas of work shall be performed."  Id.  The August 4,

2017 stop work order became effective on August 7, 2017.  <u>See</u>
<u>id.</u>

Two of the six stop work orders, the first one on June
12, 2017 and the second one on August 4, 2017, stopped all work
on the project until the pavement restoration and environmental
violations pertaining to these respective orders were
remediated.  <u>See</u> ECF No. 341-16; ECF No. 341-22.  The last four,
however, stopped work on compensable work under the contract,
<u>e.g.</u>, installing sewer pipes, while allowing certain non-
compensable maintenance work to continue.  <u>See</u> ECF No. 341-23
through ECF No. 341-26; ECF No. 358-8, at 122:7-23.

Willoughby states that in total, "70 days were lost
due to the stop work directives."  ECF No. 351-6, at 47.
Specifically, Willoughby opines that 8 days were lost to the
June 12, 2017 order, 10 days were lost to the August 4, 2017
stop work order, 6 days were lost to the August 18, 2017 stop
work order, 5 days were lost to the October 4, 2017 stop work
order, 21 days were lost to the October 20, 2017 stop work
order, and 20 days were lost to the November 10, 2017 stop work
order.  <u>Id.</u> at 46-47.  These figures generally correspond with
the number of days between the dates the stop work orders became
effective and the dates Tri-State was permitted to commence
installing pipes after remediating the problems identified in

the orders. See id.  However, with respect to the last stop work order, Willoughby states as follows:

> The sixth stop work notice was issued to Tri-State on November 10, 2017, and was effective this date for alleged defective work associated with restoration of pavement. This stop work directive was a modification of the fifth stop work notice. The Engineer rejected some of the work installed as part of the fifth stop work order.  All work was stopped and only a very minor length of pipe was installed between October 20, 2017, and November 29, 2017, at which time the Owner terminated the Contract.  Twenty days were lost to this stop work order through the date of termination.

Id. at 47.

Aside from Tri-State's persistent failure to perform in a good and workmanlike manner that led to the stop work orders, Tri-State had failed for 36 days to take action with respect to the erosion control problem from the time of the June 29, 2017 notice until the order of August 4, 2017, and it failed to adequately address the continuing Hampton Road problem from October 20, 2017 through November 29, 2017, resulting in the City having to do the job before the onset of winter.  Overall, the "70 days . . . lost" were the result of Tri-State's own default.

The court notes that two change orders formally altered the time to complete the project and total contract price.  The first, entered on July 11, 2017, and revised on November 6, 2017, increased the time to complete the project by two days, and increased the contract price by $4,162.41 to $9,880,348.85; and included a $2,269.91 increase of the contract price for costs associated with locating existing sewer line "AH9" (later referred to herein as "Claim 2").  See ECF No. 341-13; ECF No. 341-36; ECF No. 358-3, at 62.  This set a September 7, 2017 substantial completion deadline and an October 6, 2017 final completion deadline.  ECF No. 341-13.  The second change order, issued November 7, 2017, decreased the contract price by $788.00 to $9,879,560.85.  ECF No. 341-14.

The minutes for a July 11, 2017 job progress meeting state that a June 6, 2017 revised schedule, which was submitted by Tri-State following the meeting on that date, forecasted completion of Contract 15-1 71 days past the substantial completion deadline and completion of Contract 15-2 77 days past the substantial completion deadline.  ECF No. 341-28, at 2.

In letters dated June 30, 2017 and August 3, 2017, Burgess & Niple requested assurances from Tri-State that the project would be completed in accordance with the contract, and in particular, the substantial completion deadline.  ECF No.

341-29; ECF No. 341-30.  Burgess & Niple thereafter notified
Tri-State on September 7, 2017, that the Sanitary Board would
exercise its rights under the contract to deduct $2,000 per day
in liquidated damages from payments to Tri-State since, inter
alia, no assurances were given.  ECF No. 341-31.  The Sanitary
Board asserts that Tri-State did not respond to any of these
letters.  ECF No. 342, at 8.  Tri-State has not produced
evidence to rebut this claim.

On November 29, 2017, the Sanitary Board sent
Tri-State a notice of intent to terminate for cause, which
contained 6 1/2 single-spaced pages of reasons justifying for-
cause termination.  ECF No. 341-33.  Among the many reasons
given, the notice cited the stop work orders and failure to meet
the substantial completion and final completion deadlines as
justifications for termination.  Id. at 3, 5, 7.  In a December
6, 2017 response, Tri-State disputed the reasons purportedly
justifying for-cause termination and indicated that the
contractor was "attempting to correct alleged failures" in
accordance with the General Conditions.  ECF No. 349-1, at 2.
The Sanitary Board terminated the contract with Tri-State on
December 8, 2017, a date that fell three months past the
contract's substantial completion date and two months past the
final completion date, with roughly 40.6% of the work done.  ECF

No. 341-34; ECF No. 358-3, at 118-19.  In total, $3,225,323.42
was paid to Tri-State prior to termination.  ECF No. 341-38, at
5.  The Sanitary Board would ultimately be required to pay
another contractor, Pipe Plus, Inc. ("Pipe Plus"), $6,598,595.39
to finish the job, and to pay substantial additional sums for
the prolonged work to its Engineer and others.

By letter dated February 26, 2018, Taylor delivered to
Burgess & Niple a notice of "Formalization/Substantiation of
Claims/Change Order Requests."  ECF No. 341-36.  This document
included 57 claims requesting additional costs, totaling
$3,646,314.69, and additional time to complete the project,
totaling 456.20 days, all of which Tri-State related to problems
encountered during its work on the project.  Id. at 4.
Tri-State alleged in the letter that "both B&N and CSB were on
actual notice of the cause for each claim as well as the fact
that each would result in additional costs to Tri-State as well
as delays."  Id. at 2.

Burgess & Niple responded on March 23, 2018.  ECF No.
341-37.  The Engineer stated that no consideration was given to
Claims 1 through 7 inasmuch as they had already been considered
and "discharged by Engineer, prior to Owner's Contract
Termination, in accordance with Subarticle 10.05 of the General
Conditions of the Contract."  Id.  Claim 2, which sought an

additional $2,269.91 and a one-day extension, was granted, as earlier noted, by the July 11, 2017 change order.  See ECF No. 341-13; ECF No. 341-36; ECF No. 358-3, at 62.

With respect to the remaining 50 claims, Burgess & Niple provided responses, denying them as untimely.  See ECF No. 341-19, at 60:16-61:8; ECF No. 341-37.  The court notes, however, that while the March 23, 2018 letter indicates these responses were originally attached to that document, the document as it appears in the record does not have the responses attached.  See ECF No. 341-37.

Burgess & Niple also stated in the March 23, 2018 letter that, generally speaking:

> Engineer notes that Contractor appears to disagree with Owner's correspondence dated December 8, 2017 that the contract was terminated for cause pursuant to subarticle 15.02B.  Under Article 15, specifically subarticle 15.02C, Contractor is entitled to no further payment until the Work is completed and only if there is money remaining in the contract.

ECF No. 341-37.

The Sanitary Board thereafter re-bid the project on June 28, 2018, and a contract was awarded to Pipe Plus for a bid of $7,440,522.75. See ECF No. 342, at 10.  Pipe Plus completed the project for $6,598,595.39.  ECF No. 341-38, at 5. Accounting for change orders, Pipe Plus had a March 10, 2020 substantial completion date and April 7, 2020 final completion

date.  ECF No. 351-20, at 52:16-22.  Pipe Plus did not meet either deadline.  Id. at 52:23-53:4.  The exact date of the project's completion is not entirely clear, although it appears that Pipe Plus finished work shortly after September 28, 2020.  See ECF No. 341-7, at 3; ECF No. 351-20, at 56:21-57:1; ECF No. 351-21, at 308:1-309:21.

The Sanitary Board filed this action against the sureties on June 29, 2018.  ECF No. 1.  The sureties brought in Tri-State, which maintains, inter alia, a breach of contract crossclaim against the Sanitary Board.  See ECF No. 22.  The Sanitary Board maintains, inter alia, a breach of contract counterclaim against third-party defendant and fourth-party plaintiff Tri-State.  See ECF No. 76.  This opinion addresses the Sanitary Board's pending motion for summary judgment as to Tri-State, filed on March 15, 2021, insofar as that motion seeks summary judgment on these claims.[7]

---

[7]    The motion for summary judgment also requests summary judgment on the Sanitary Board's breach of contract claims regarding the performance and payment bonds alleged against the sureties as well as damages.  See ECF No. 342.  In addition, the sureties' motion for partial summary judgment (ECF No. 338), filed March 15, 2021, is pending.  Burgess & Niple's motion for summary judgment against Tri-State (ECF No. 334) and motion for partial summary judgment against Taylor (ECF No. 336), filed March 15, 2021, are the subject of an opinion and order entered this date.  The remaining issues in the Sanitary Board's motion, as well as any other summary judgment motion, will be addressed by separate opinion.

## II.  Legal Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party.  Anderson, 477 U.S. at 248.

Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  A party is entitled to summary judgment if the record, as a whole, could not lead a rational trier of fact to find for the non-moving party.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).  Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.

### III.  Analysis

The Sanitary Board seeks summary judgment on its breach of contract counterclaim against Tri-State and the corresponding crossclaim brought against it by Tri-State for breach of contract.  ECF No. 342.  The arguments are best broken into two separate but related groups: those concerning the propriety of the for-cause termination of Tri-State and those concerning the 57 claims submitted by Tri-State on February 26, 2018.

### A.  For-Cause Termination

The Sanitary Board first argues that it is entitled to judgment as a matter of law on its breach of contract counterclaim as well as Tri-State's crossclaim inasmuch as it properly terminated Tri-State for cause under the contract. Specifically, the Sanitary Board points to the General Conditions Article 15.02(A), which allows the Sanitary Board to terminate for cause "if any one or more of the following events will justify termination for cause":

> 1. Contractor's persistent failure to perform the Work in accordance with the Contract Documents (including, but not limited to, failure to supply sufficient skilled workers or suitable materials or equipment or failure to adhere to the Progress Schedule established under Paragraph 2.07 as adjusted from time to time pursuant to Paragraph 6.04);

27

2.   Contractor's disregard of Laws or Regulations of
any public body having jurisdiction;

3.   Contractor's repeated disregard of the authority
of Engineer; or

4.   Contractor's violation in any substantial way of
any provisions of the Contract Documents.

ECF No. 341-10, at 25.

        The Sanitary Board asserts that the six stop work
orders, cited in the notice of intent to terminate, ECF No.
341-33, at 5, are evidence of disregard of laws or regulations.
ECF No. 342, at 11-12 (citing ECF No. 341-16 through ECF No.
341-26).   The Sanitary Board cites the deposition testimony of
the sureties' expert, Fred L. Hypes, P.E., P.S., as support for
this proposition:

        Q: . . . [W]e looked at Paragraph 2 which states
        "Contractor's repeated disregard of laws or
        regulations of any public body having jurisdiction."
        Would you agree that any one or more violations such
        as those that are contained here for the stop work
        notices could fit that paragraph too?

        . . . .

        A: Clearly those related to the pavement are
        repetitive and could fit that.  I'm not so sure I
        agree with the NPD[E]S permit violations being
        numerous enough to rise to that, but clearly the
        pavement does or could.

        Q: Okay.  You're certainly not making, rendering an
        opinion that none of the itemized grounds for
        termination for cause in this . . . notice of intent
        to terminate letter, it's not your opinion that all of
        them were resolved; is that correct?

28

. . . .

A: It is not and I say as much in my report.
ECF No. 341-19, at 174:6-175:4.  The court also notes that the
notice of intent to terminate listed the stop work orders not
only as a ground for termination based on "Contractor's
disregard of Laws or Regulations of any public body having
jurisdiction," but also a ground for termination based on
"Contractor's persistent failure to perform the Work in
accordance with the Contract Documents (including, but not
limited to, failure to supply sufficient skilled workers or
suitable materials or equipment or failure to adhere to the
Progress Schedule established under Paragraph 2.07 as adjusted
from time to time pursuant to Paragraph 6.04)" under General
Conditions Article 15.02(A)(1).  See ECF No. 341-3, at 3-4.

The Sanitary Board also contends that even though the
pavement problems associated with several of the stop work
orders were resolved by the December 8, 2017 termination date,
the City was forced to fix the pavement conditions cited in the
final stop work order "[o]n or about December 4-5, 2017" since
Tri-State acknowledged, as early as August 3, 2017, that it
could not complete the paving until the Spring of 2018.  ECF No.
358, at 16.  Haapala indicated during his deposition that the
City completed the paving on December 4, 2017.  ECF No. 351-1,
at 151:1-6.  He testified during his deposition that although

29

the November 29th notice of intent to terminate allowed time to fix the conditions, Tri-State "didn't have anybody willing to [restore] the pavement" and "said they couldn't get it done" before the winter months, when driving over the poorly repaired segments would be more dangerous.  ECF No. 358-4, at 123:4-15, 152:10-22.  Haapala further described the condition of the defective pavement restoration during his deposition:

> [I]t was like driving on a washboard.  As I said, times I go out there you had to come to a crawl.  I mean, 5 miles per hour or you'd misalign your wheels on your car and it was so bad there were people - I'd go out on a job and they'd purposely get out of that lane of traffic, cross the double yellow line to avoid those areas.
>
> You could not drive over it safely without concern about your vehicle and with onset of winter coming, freeze and thaw, water, there would have been ponding issues, you know, ice puddles on it, bird baths during wet weather events.
>
> Manhole risers were sticking out of the ground.  It was uneven to where if you put a snow blade on it, you'd broke the blade of the plow probably. It was in terrible condition to leave as it was heading into the winter months and it was terrible even if it was spring or summer.  I mean, you just couldn't drive over it.

Id. at 123:4-22.

The "Spring of 2018" reference made by the Sanitary Board stems from an August 3, 2017, meeting concerning the project, during which the Sanitary Board requested that pavement be completed in the "Fall of 2017" while Tri-State informed that

its "plan [was] to finish asphalt paving in the Spring of 2018."
ECF No. 358-3, at 75.  During the same meeting, it was also
"[d]iscussed that Substantial Completion [of the project] would
not be provided until asphalt paving was complete."  Id.
Tri-State again informed the Sanitary Board, during the
September 12, 2017 job progress meeting, that it intended to
finish asphalt paving in the Spring of 2018.  Id. at 85.

The Sanitary Board further observes that by the time
the notice of intent to terminate issued on November 29, 2017,
Tri-State had already exceeded the substantial completion date
by eighty days and the final completion date by fifty days
while, it asserts, having only completed 39.2% of the entire
project.  Id. at 12-13.  The Sanitary Board notes that these
issues were raised in the notice of intent to terminate as
evidence of "persistent failure to perform the Work in
accordance with the Contract Documents" and "violation in any
substantial way of any provisions of the Contract Documents,"

wherein the parties agreed that "time is of the essence."[8]  Id.
at 5, 13 (citing ECF No. 341-7, at 2; ECF No. 341-33, at 4, 7).
The Sanitary Board additionally notes that Taylor estimated
during his deposition that only 40% of the main line pipe had
been installed prior to termination.  Id. (citing ECF No.
341-15, at 271:22-272:7).  On this point, the court observes
that Taylor estimated during his deposition that more than 40%,
or "roughly 50 percent," of the project had been completed,
including "service laterals . . . [and] manholes" in addition to
the main line pipe, of which 40% was installed.  ECF No. 341-15,
at 271:22–272:11.

---

[8]    Relatedly, one of the reasons for termination listed in the
November 29, 2017 notice of intent to terminate was that the
contractor provided "inadequate labor (number of work crews) to
meet the contract completion times" inasmuch as Tri-State
"routinely had 4 crews on the project" after informing the
Sanitary Board that it "planned for 6 pipe laying crews on [the]
project."  ECF No. 341-33, at 2.

    According to the January 3, 2017 job progress meeting
minutes, Tri-State advised that it had six crews available to
work on the project.   ECF No. 358-3, at 13.  The minutes for
the February 21, 2017, April 6, 2017, May 2, 2017, and June 6,
2017 job progress meetings indicate that Tri-State planned to
deploy fewer than six (either four or five) crews to install
pipes on Contract 15-1 and Contract 15-2 during the months
following those meetings.  See id. at 17, 30, 40, 49.  By
contrast, the minutes for the March 7, 2017, July 11, 2017,
August 3, 2017, September 12, 2017, October 3, 2017, November 7,
2017, and December 5, 2017 job progress meetings indicate that
Tri-State planned to deploy six crews to install pipes during
the months following those meetings.  See id. at 23-24, 58, 69,
80, 92, 107, 118.

The meeting minutes from a December 5, 2017 job progress meeting attended by representatives of Tri-State, the Sanitary Board, and Burgess & Niple, i.e., the last such meeting prior to the December 8, 2017 termination of Tri-State, indicate that 11,786 of 29,176 linear feet of pipe, including service lateral pipe, for Contract 15-1 had been installed and that 10,295 of 25,198 linear feet of pipe for Contract 15-2, including service lateral pipe, had been installed.  ECF No. 358-3, at 118-19.  These figures indicate that as of December 5, 2017, 40.6% of the total pipe to be installed had actually been installed and that 59.4% remained to be installed.

The Sanitary Board asserts that these failures justify summary judgment on the crossclaim and counterclaim between it and Tri-State.

In response, Tri-State disputes the argument that the for-cause termination was justified.  First, Tri-State asserts that the stop work orders were "unwarranted and excessive [in] number."  ECF No. 349, at 4.  In support, the contractor cites Taylor's affidavit, ECF No. 349-2, at ¶ 9, in which he stated:

> Tri-State was issued six stop work orders that were both unwarranted and unreasonable in scope and duration.  All but one of these stop work orders was issued by the Sanitary Board and each arose from circumstances beyond Tri-State's control or that were contributed to by the owner's own actions or inactions.

These stop work orders resulted in delays to the
project of at least 70 days.

Tri-State worked daily to maintain erosion
control measures that were damaged as a result of
weather events or as a result [] of the movement of
equipment around the job-site. The location and
maintenance of erosion control devices was determined
according to the contractor's means and methods.

The Contract documents did not include an Erosion
Control Plan. The imposition of Stop Work Orders
regarding erosion control all work on the project
[sic], and led, in turn, to further Stop Work Orders
relating to delayed pavement restoration.

ECF No. 349, at 4-5. Taylor cites no evidence to support any of

his claims respecting the six stop work orders or the erosion

control failures.

Tri-State argues in its response brief:

Because much of the project was performed in wooded
areas and on steep grades where access to working
areas was limited, erosion control would necessarily
be damaged or removed as equipment was moved in and
out of the work area. But Tri-State worked to fix
those issues on a daily basis. Pavement restoration
was delayed, in turn, by the work stoppages ordered
because of alleged deficiencies in erosion and
sediment control. During those work stoppages
Tri-State was not permitted to perform any other work
on the project, including pavement restoration. In
each case Tri-State worked diligently to address the
Sanitary Board's concerns and each was resolved prior
to the termination of the contract.

Id. at 10.

On the failure to complete the project by the relevant deadlines, the contractor asserts that this argument fails since Tri-State was entitled to more time to complete the work. Specifically, Tri-State contends in its brief:

> its progress was delayed by, among other things, the Owner's failure [to] timely review and approve submittals, the failure to approve manholes delivered to the project, the issuance of unjustified and overly broad Stop Work Orders, mismarked, unmarked, and leaking utilities, subsurface conditions found different including the existence of pervasive hard rock that had to be hammered or chipped out of trenches, changes in the work, the failure of the Sanitary Board to supply necessary easements, and improper direction of the work by resident project representatives, among other things.

Id. at 11.  In support of these points, Taylor's affidavit states:

> Tri-State's progress was delayed by the Sanitary Board and Burgess & Niple's failure to timely review and approve submittals for the project. For example, manhole submittals were not approved until 40 days after the submittal was presented and pipe and related

material submittals were not approved until at least
60 days after presentation.[9]

Even after approval of submittals for manholes
Tri-State's commencement of its work was significantly
delayed by the repeated and improper rejection of
manholes delivered to the site by Tri-State's
suppliers. These materials were rejected by Burgess &
Niple's representatives, not by Tri-State Pipeline. As
a result of these repeated and unjustified rejections,
Foster Supply, Inc., a regular supplier of precast
manholes to the Sanitary Board for use on other
projects and one of Tri-State's primary suppliers on
this project, withdrew and refused to supply manholes
for the project.

As a result of delayed approval of submittals and
improper rejection of materials delivered to the
project, Tri-State's commencement of its installation
work was delayed by nearly 4 months.

During Tri-State's performance of its work on the
project it suffered additional costs and delays as a
result of, among other things, the following:

- Changes in the work.
- Extra work.
- Mismarked or unmarked, or leaking existing
  underground utilities.

---

[9]    Although Taylor does not elaborate on the materials delays
apart from the manholes, Tri-State has indicated in a subsequent
brief, without citing to evidence, that approval for submittals
of unspecified stone materials ordered from Shamblin Stone and
Martin Marietta and "pipe and fittings" ordered from Ferguson
Waterworks was not obtained until late December 2016.  See ECF
No. 454.

The court notes that the minutes of a December 6, 2016 job
progress meeting state that review of the Ferguson Waterworks
submittals was completed by that early December date.  See ECF
No. 358-3, at 7.  The minutes of a January 3, 2017 job progress
meeting indicate that the Martin Marietta submittals were
completed as of that date as well and that the Shamblin Stone
submittals had already been resubmitted.  See id. at 13.

> • A landslide in the area of Anderson Heights
> Road that affected access to portions of the
> work.
> • Other conditions restricting access to portions
> of the work.
> • The lack of necessary easements.
> • Improper work stoppages.
> • Improper rejection of materials delivered to
> the project.
> • Mandated work sequence changes and other
> improper direction of Tri-State's work
> by the Project Engineer.
> • Underground obstructions and subsurface
> conditions found different, including far more
> hard rock than could have been anticipated.

ECF No. 349-2, at ¶¶ 4-7.

Aside from the reference to the Anderson Heights Road landslide, none of these "additional costs and delays" are specified in Taylor's affidavit. See id. Some of these matters were addressed in Taylor's deposition, including the assertion that the Sanitary Board failed to procure three easements (two on "15W10, Parcel 3 and 4" and one behind a house number 26 on Brittany Woods Road), ECF No. 349-4, at 393:12-394:1, the stop work orders, id. at 394:23-395:15, the lack of access to portions of city streets, id. at 395:20-396:3, mismarked or unmarked utility lines, id. at 399:8-401:13, a prior leak from an existing sewer line, id. at 402:17-403:4, and a gas leak, id. at 404:21-407:23.

Tri-State further asserts that Burgess and Niple's resident project representatives "improperly directed Tri-State's work resulting in extra costs and delays," ECF No. 349, at 4-5, and Taylor's affidavit provides:

> Burgess & Niple and its resident project representatives improperly directed Tri-State's work throughout the course of its performance resulting in additional costs, lost efficiency and delays.
>
> During the performance of Tri-State's work Burgess & Niple maintained multiple resident project representatives onsite daily to observe and record the progress of the work. These RPRs maintained daily, written reports documenting problems encountered during construction of the work. Such issues were also discussed with RPRs on-site. As such, B&N had actual contemporaneous knowledge of the circumstances giving rise to each of Tri-State's claims including, but not limited to, change in extra work, mismarked, unmarked, or leaking existing underground utilities, subsurface obstructions and rock encountered, and restricted access to work areas.
>
> Burgess & Niple commonly required Tri-State to proceed with changed and extra work without properly executed work change directives or approved change orders but repeatedly advised Tri-State's onsite personnel that Tri-State would be paid for changed or extra work.

ECF No. 349-2, at ¶¶ 8, 10-11.  Again, the affidavit is without specification.

For their part, the sureties have offered extensive briefing on why summary judgment in favor of the Sanitary Board is inappropriate on the issue of for-cause termination.  <u>See</u> ECF

No. 351.  For the sake of concision, the court mentions only the particularly pertinent arguments and evidence relating thereto.

As to the stop work orders, the sureties assert that the Sanitary Board waived any right to terminate based on these orders since all of them were resolved prior to the December 8, 2017 termination.  ECF No. 351, at 7.  In support, the sureties cite the deposition testimony of Haapala, who acknowledged that the pavement problems related to the stop work orders were completed by December 4, 2017, prior to the December 8, 2017 termination date.  ECF No. 351, at 7-9 (citing ECF No. 351-1, at 145:10-147:19, 148:16-149:5, 151:1-22).  Taylor's affidavit likewise states:

> All deficiencies alleged by the Sanitary Board or Burgess and Niple during the performance of Tri-State's work, including those alleged deficiencies that led to stop work orders, were resolved prior to termination, except the delayed completion of the work. The Sanitary Board and Burgess and Niple expressed satisfaction with completed work.

ECF No. 349-2, at ¶ 12.  The sureties, like Taylor, neglect to note that Tri-State's failure to restore the pavement following the last stop work order and, in part, the one before the last one, compelled the City to do so before winter set in.

The sureties also note that Pipe Plus, Tri-State's successor as contractor for the project, encountered erosion problems similar to those associated with the August 4, 2017

stop work order, cited above, inasmuch as the West Virginia
Department of Environmental Protection issued a notice of
violation relating to the WV/NPDES General Water Pollution
permit.  ECF No. 351, at 8.  The sureties point out that Pipe
Plus was not terminated for the State environmental violation.
ECF No. 351, at 8.  Haapala testified that the notice of
violation was issued on January 11, 2019, while Pipe Plus was
engaged, but that it did not result in a stop work order since
Pipe Plus fixed the issue immediately.  ECF No. 351-1, at
80:15-87:10.  As noted earlier, Tri-State had 36 days-notice in
which it failed to take action, resulting in the August 4, 2017
erosion control order.

        The sureties point to assertions disputing the scope
or effect of the stop work orders.  ECF No. 351, at 18-19.  For
instance, Taylor testified that claims for "additional time or
costs" relating to the stop work orders were "well documented in
the field," but did not cite anything to support this statement.
ECF No. 351-4, at 395:11-14.  In addition, the sureties' expert,
Hypes, testified that, in his experience, "work stoppages . . .
are extremely infrequent and . . . they have typically been in a
particular area to deal with a particular problem and not done
on a project wide basis," a point he made with respect to "the
project wide repercussions" of the stop work orders.  ECF No.

351-5, at 147:9-17.  Hypes also testified that in his opinion, the efforts of the Sanitary Board could have been more "progressive" on the issue of work stoppages, by limiting the stoppages to particular areas and giving Tri-State the option to bring in another contractor to remediate the problems, which would be deducted from Tri-State's payment, if Tri-State did not itself perform the necessary remedial work.  Id. at 113:8-21. There is no suggestion that Tri-state ever requested the Sanitary Board to solve such problems, created by Tri-State, in the extra-contractual manner posed by Hypes.

On the issue of completion time, the sureties point to the conclusions of their expert, Hypes, supporting the argument that Tri-State was entitled to more time to complete the project. ECF No. 351, at 13-19.  Generally speaking, Hypes states in a September 16, 2020 expert report to counsel for the sureties that upon the review of relevant documents by his firm, Dunn Engineers, Inc.:

> It is also clear that extenuating circumstances, beyond the control of Tri-State, arose during the course of the project that materially altered both the costs incurred by Tri-State, and their production rates and that the CSB and B&N were well aware of these circumstances from their inception. Those circumstances, in our opinion, entitled Tri-State to additional time and compensation.

ECF No. 351-7, at 2.  Aside from the Anderson Heights Road landslide, those circumstances included unspecified changes by

the Engineer to construction drawings, the stop work orders
(which were clearly within Tri-State's control), and unknown
"water, sewer and storm sewer conflicts," that are not listed in
Hypes' report.  Id.  Hypes testified during his deposition that
"work change directives, field orders, changed drawings,
interference with utilities, [the] existence of the coal mine
[near McKnoll Road] and I think rerouting with that, [and] the
Anderson Heights Road [landslide], [] clearly were not in the
control of Tri-State nor could they have anticipated them."  ECF
No. 351-5, at 132:14-19.  Hypes testified that he reached his
opinions based on his review of Tri-State's 57 claims; yet, he
acknowledged that he did not investigate the merits of any of
those claims.  Id. at 135:13-136:1.  Hypes supports none of this
with independent evidence.

     Hypes further states in this report:

          Another factor that was considered in developing the
     opinion that Tri-State is (or was) due additional time
     and compensation was the time that the subsequent
     contractor, Pipe Plus, Inc., took to complete the
     remainder of the project (approximately 60% of the
     original 55,000 LF of pipe and appurtenances).  If the
     original 330 days [sic, 360 days] allowed Tri-State was
     deemed to be adequate to install the 55,000 LF of pipe
     and to complete all of the associated restoration
     (including the special lawn restoration and paving),
     then it should follow that installing the remaining
     33,000 LF (60% of the original bid quantity) could have
     been accomplished in an additional 330 days [sic, 360
     days]; despite the experience and expertise of Pipe Plus,
     it couldn't be done.  In fact, the completion project
     continued for another year (2 years total).  This
     observation is not meant to impugn the work of Pipe Plus

> in any way; it does however, strongly suggest that the
> original contract completion period of 330 days [sic, 360
> days] was unrealistic and wholly inadequate to perform
> the entire scope of work that Tri-State was engaged to
> perform. Tri-State should have, therefore, been granted
> additional time to complete their work, instead of being
> terminated.

Id. at 3.  Suffice to note that Tri-State was not merely

"allowed" but agreed to the period of 360 days specified in the

contract for completion of the work.  With only 40% of the work

done in 14 months as of termination, it is not surprising that a

new contractor engaged to complete the job would require a

greater period of time than would have been needed had it

undertaken to do the work from the beginning.

        The sureties also point to various evidence

documenting the on-site involvement of the Sanitary Board and

Burgess & Niple.  ECF No. 351, at 22.  For example, Downey, the

Sanitary Board's project engineer, testified that he would be

on-site "almost daily" and that the purpose of such visits was

to "observe where the contractor was working on that day, to

observe how cleanup was going, to observe how they were treating

customers' property, and just a basic site visit to – so I would

know what – where they were."  ECF No. 351-2, at 58:8-17.

Haapala testified that it was a responsibility of Burgess &

Niple "to administer the contract and have resident

representatives on site on a daily basis observing the work . .

. ."  ECF No. 351-1, at 61:3-9.  Timm Utt, an employee of

43

Burgess & Niple in charge of the engineer's day-to-day work on the project, testified that he was aware of "what was taking place on th[e] project on a day-to-day basis" due to his communications with the on-site resident project representatives, Tri-State, and the Sanitary Board, that he was aware of how much pipe was installed each day of work on the project, and that he calculated the total progress monthly. ECF No. 354-25, at 157:4-158:6. Of course, it was both prudent and responsible for these representatives to observe the contractor's progress or failure under this nearly $10 million contract.

According to the sureties, the factors noted by them justify delays to the completion of the project, of which, they assert, the Sanitary Board and Burgess & Niple had contemporaneous knowledge and which establish Tri-State's entitlement to more time to complete the project instead of for-cause termination. ECF No. 351, at 19-23. The sureties argue that the Sanitary Board has waived its right to rely on the formalities of the contract (or General Conditions) regarding written notice of claims pertaining to delays and corresponding time extensions or has effectively amended the contract inasmuch as it had actual notice of the incidents causing delay, failed to adhere to contract provisions, ordered

additional work outside the contract, and acquiesced to extra work performed by Tri-State.  Id.

On these latter points, Hypes, apart from noting in his September 16, 2020 report that the City Engineer closed Anderson Heights Road due to the landslide, states in that report:

> [c]hanges were also made by [Burgess & Niple] to the construction drawings during the course of the project that altered access, caused work to be stopped and crews and equipment to be relocated, changed installation conditions (i.e., added depth or changed digging conditions), and eliminated sections of the sewers that were to be installed after clearing and grubbing had been completed (but for which no payment was made because that work was 'incidental to the cost of the pipe' and no pipe was installed) . . . . [S]everal unknown water, sewer and storm sewer conflicts were encountered that increased Tri-State's costs and decreased their production.  All of these changes were known to both the CSB and Burgess & Niple, as many (if not most) of them occurred through or at the direction of those two parties, and representatives of Burgess & Niple were on the work sites continuously with Tri-State and observed the changed conditions and the delays that Tri-State was encountering.  Since Tri-State performed additional work, incurred additional costs and had its production slowed (or stopped) as a direct result of actions taken by Burgess & Niple or the CSB, change orders should have been issued to provide additional time, compensation or both.

ECF No. 351-7, at 2.  Once again, this statement of multiple conclusions is not accompanied by factual support of any one of them.

The sureties also cite to a passage in the expert
report of Tri-State's expert Charles Dutill, II, P.E., D.F.E.
ECF No. 351-22.  The sureties do not explain this citation in
any regard, but it seems that they allude to a passage of
Dutill's report for support of their proposition that the
Sanitary Board and Burgess & Niple did not adhere to the claim
notice conditions of the contract, thereby waiving reliance
thereon.  This passage, in which Dutill recites points from a
"Summary of Project prepared by Eric Taylor of Tri-State" and
offers conclusions based thereon, states:

> The Summary of Project prepared by Eric Taylor of
> Tri-State Pipeline was reviewed. The following is
> relevant . . . . At the pre-construction meeting of
> October 4, 2016, with regard to written notice for
> claims, it was agreed that this would not be
> utilized on the contract unless the Contractor
> requested it. It was further agreed that potential
> claims would be reviewed during monthly progress
> meetings.  According to a document mentioned
> previously in the notes within this Summary of
> Project, it was identified that notice would need
> to be provided to the Engineer within 30 days of
> the event. It is my opinion that, in a significant
> majority of the cases within the 57 claims, the
> Engineer had such notice by virtue of their
> involvement with the project well within the 30-day
> identified period.
>
> It was further indicated at the meeting that, as it
> related to written substantiation for claims,
> that would only be required if the written notice
> for the claim was utilized or if the use of
> written notice was subsequently requested by the
> Engineer. All of this makes the decision by

> Burgess & Niple to not review any of the 57 claims
> because they were not issued within 30-days of
> the given event suspect.

ECF No. 351-17, at 10-11. This statement appears to be premised on multiple levels of hearsay. But even Taylor's "Summary" cited by Dutill, which appears elsewhere in the record of this case, actually states with respect to written substantiation (as distinguished from written notice) that it would be "used in conjunction with contractor written notice for [a] claim or at the request of the Engineer."[10] ECF No. 385-1, at 2.

The record demonstrates that Burgess & Niple and the Sanitary Board consistently requested written substantiation for claims. The minutes of the job progress meetings composed by Utt reflect continued admonishments to Tri-State to timely follow the General Conditions' protocol for written documentation of claims, which includes a substantiation requirement as set forth in Article 10.05(B) and as discussed more fully in the succeeding section of this opinion and order. The February 21, 2017 minutes state:

> Contractor asked to submit paperwork for claims in
> accordance with Contract Documents.

---

[10] It is not clear when this Summary, which includes typed notes regarding the project and handwritten notes in the margins, was prepared. See ECF No. 385-1. The typed notes document events that occurred during Tri-State's work on the project, but the handwritten notes include a "1/21/20" notation on the first page. See id. at 1.

ECF No. 358-3, at 20.  The March 7, 2017 minutes state:

> Contractor directed to provide written documentation
> of claims in accordance with the Contract Document
> General Conditions.

ECF No. 358-3, at 26.  And Haapala indisputably told Taylor on

March 7, 2017, that he could submit claims under the contract to

regain lost time after the job progress meeting on the same

date.  The job progress meeting minutes for April 6, 2017, May

2, 2017, June 6, 2017, July 11, 2017, August 3, 2017, September

12, 2017, October 3, 2017, November 7, 2017, and December 5,

2017, contain the following:

> Contractor directed to provide written documentation of
> claims in accordance with the Contract Document General
> Conditions.  Written protocol for filling a claim must
> be followed, within the specified time frame, and
> claims not made in accordance with the protocol &
> specified time will be denied.

Id. at 35, 44, 53, 62, 73, 85, 97, 111, 121.  Notably, the

minutes for all of these job progress meetings were distributed

to Tri-State employees, including Taylor.  See id. at 21, 28,

37, 46, 55, 65, 77, 89, 101, 113, 123.  Thus, Burgess & Niple

and the Sanitary Board, month after month after month, held

Tri-State to the claim protocols, including the written

substantiation requirement, found in the General Conditions,

consistent with the Taylor Summary's statement.

As will be seen later herein, only Claims 1 through 7, being the only ones filed prior to termination of the contract in December 2017, purported to comply to any degree with the contract time requirements of each written notice and written substantiation, while the remaining 50 claims did not.

Breach of contract claims necessarily require proof of a party's breach "of . . . duties or obligations" to survive summary judgment and be submitted to a jury. McNeely v. Wells Fargo, N.A., 115 F. Supp. 3d 779, 789 (S.D. W. Va. 2015). The question of breach as it pertains to the current discussion is whether there is evidence to suggest that the December 8, 2017 termination of Tri-State from the project was wrongful.

The court turns to the issue of the stop work orders, and first addresses the waiver argument. "Under West Virginia contract law . . . the 'waiver' of a contract right is 'defined as the voluntary, intentional relinquishment of a known right.'" Parsons v. Halliburton Energy Servs., Inc., 785 S.E.2d 844, 850 (W. Va. 2016) (quoting Hoffman v. Wheeling Sav. & Loan Ass'n, 57 S.E.2d 725, 735 (1950)). "A waiver may be express or may be inferred from actions or conduct, but all of the attendant facts, taken together, must amount to an intentional relinquishment of a known right." Id. at 851.

49

Here, it cannot be said that the Sanitary Board waived its right to terminate Tri-State on account of the stop work orders. The court notes that the notice of intent to terminate listed the stop work orders as grounds for termination under General Conditions Article 15.02(A)(1), "Contractor's persistent failure to perform the Work in accordance with the Contract Documents" as well as Article 15.02(A)(2), "Contractor's disregard of Laws or Regulations of any public body having jurisdiction."

In total, six stop work orders issued, four of which directly concerned pavement restoration. The first of these was issued on June 12, 2017 by a governmental body not involved in the project, the City, and Burgess & Niple instructed Tri-State to comply with the "Note Applicable to Types A-1, A-2, A-3, C and WVDOT Trench Pavement Restorations" found in Plan Sheet D-04 of Contract 15-1 and Plan Sheet D-05 of Contract 15-2, which as noted, were incorporated by reference in the contract. The August 18, 2017 and October 20, 2017 stop work orders issued by Burgess & Niple likewise cited noncompliance with these provisions. The final stop work order, issued on November 10, 2017, was a modification of the October 20, 2017 order and again stopped work on the project due to defective pavement

restoration, being "defective" with respect to contract "specification Section 32 10 01.02, 'Pavement and Walks.'"

In addition, the August 4, 2017 stop work order stated that Tri State had failed to comply with certain "specified requirements of Section 01 57 13, Erosion Control During Construction" and also cited the notice of violation of the WV/NPDES General Water Pollution Control Permit as grounds for the issuance of the order.  And the October 4, 2017 stop work order cited noncompliance with contractual provisions concerning dust control, which also related to pavement restoration inasmuch as the dust was present on portions of pavement that had been restored as well as areas that awaited pavement restoration after the installation of pipes.

A clear pattern emerges from this sequence of events. Tri-State repeatedly failed to comply with legal and contractual obligations, and Burgess & Niple, on behalf of the Sanitary Board, requested compliance with the law and with the contract documents.  It is true that the Sanitary Board did not immediately terminate Tri-State after any one of many instances of noncompliance, but the repeated insistence on compliance plainly demonstrates a lack of waiver of the right to terminate based on the stop work orders and the conditions that necessitated them.  At any rate, the repeated directives found

in the stop work orders do not evidence a voluntary and
intentional relinquishment of the right to terminate based on
Tri-State's noncompliance with the law or contractual
obligations.

This point is furthered by Hypes' own testimony
regarding the pavement-related stop work orders.  While Hypes
disagreed that the sole violation of the WV/NPDES permit could
fit General Conditions Article 15.02(A)(2), he admitted in his
deposition that the repetitive stop work orders concerning
pavement restoration accorded with this provision.

And although Hypes generally disputes the necessity of
stop work orders that result in work stoppages on the entirety
of the project, this point pertains to the reasonableness of the
stop work orders' effect on project progress, i.e., delays in
installing pipes, rather than the conditions that prompted the
stop work orders, namely, disregard for the law and
noncompliance with contract documents.  In other words, while
Hypes disputes the necessity to halt progress on the project
through the issuance of stop work orders, he does not dispute
that conditions existed to justify the issuance of the stop work
orders.  Hypes himself conceded as much during his deposition,
testifying that the stop work orders "were not simply
fabrications of the Sanitary Board or Burgess & Niple, but had

52

some underlying cause[s] for things that either <u>Tri-State hadn't</u>
<u>done completely or hadn't done at all</u>."  ECF No. 351-5, at
148:6-9 (emphasis added); <u>see</u> <u>also</u> <u>id.</u> at 149:7-16 (Hypes
stating that "clearly these weren't someone's daydreams on the
part of the Sanitary Board or Burgess & Niple, so there were
some underlying issues that caused the development of work
stoppages and I don't mean to be coy with that, but clearly if
it got to the point where . . . the Sanitary Board and/or
Burgess & Niple . . . found it necessary to do that . . . there
was something amiss in the field.").

        Indeed, the only "evidence" that purports to challenge
the grounds for issuing the stop work orders is Taylor's
affidavit statement that the orders were "unwarranted" and
"arose from circumstances beyond Tri-State's control or that
were contributed to by the owner's own actions or inactions,"
being assertions without any supporting evidence.  Even these
assertions are only detailed with respect to the August 4, 2017
stop work order concerning erosion control insofar as Taylor
purports to claim that the contract did not provide for an
Erosion Control Plan, whereas that stop work order specifically
cites noncompliance with "Section 01 57 13, Erosion Control
During Construction," which as indicated <u>supra</u>, at 17 n. 6,

ostensibly refers to a specification incorporated by reference in the contract itself.  See ECF No. 341-7, at 5; 341-22.

Taylor also states that this stop work order led to the stop work orders relating to delayed pavement restoration but does not explain how this was the case.  In truth, pavement problems predated the erosion-related stop work order — that stop work order was issued on August 4, 2017 and became effective on August 7, 2017, while the first stop work order concerning pavement restoration was issued by the City on June 12, 2017.  And the pavement restoration problems persisted after the issues underlying the August 4, 2017 stop work order were remediated.  Willoughby states that 10 days of work were lost to the erosion-related stop work order and that pipe installation resumed on August 17, 2017 after Tri-State complied with the directives of the order.  ECF No. 351-6, at 47.  Three stop work orders concerning pavement restoration, those issued on October 4, 2017, October 20, 2017, and November 10, 2017, took effect long after the August 4, 2017 stop work order was remediated. There is no ostensible link between the August 4, 2017 stop work order and these later stop work orders.

And importantly, the facts averred by Taylor do not actually address all bases for the August 4, 2017 stop work order.  He does not discuss the fact that this order was

premised, in part, on the West Virginia Department of
Environmental Protection's issuance of a notice of violation of
the WV/NPDES General Water Pollution Control Permit or
acknowledge that Burgess & Niple instructed Tri-State to comply
with the permit (and technical specification 01 57 13) as early
as June 29, 2017, inasmuch as the Department of Environmental
Protection planned to issue the notice of violation.

Accordingly, Taylor's affirmations that the stop work
orders were "unwarranted" and "arose from circumstances beyond
Tri-State's control or that were contributed to by the owner's
own actions or inactions" amount to nothing other than
self-serving, conclusory statements.  Self-serving and
conclusory statements in affidavits, without more, are not
sufficient to defeat summary judgment.  See, e.g., Malghan v.
Evans, 118 F. App'x 731, 733 (4th Cir. 2004) (citing Williams v.
Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989); Evans v.
Techs. App. & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996)
(citing Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975 (4th
Cir. 1990)).

Moreover, it is undisputed that Tri-State did not cure
the dangerous pavement conditions that prompted the final stop
work order of November 10, 2017.  Willoughby states that the
order had the effect of delaying progress on the project for 20

days, roughly corresponding with the period elapsing from
November 10 until the date of the notice of intent to terminate
issued on November 29, 2017.  The defective pavement restoration
identified in the November 10, 2017 stop work order was
accordingly not remediated by Tri-State prior to the issuance of
the notice of intent to terminate.  The contractor had on August
3, 2017, and September 12, 2017, previously made representations
that the pavement conditions would not be fully remediated until
Spring of 2018, and there is no indication of an attempt to cure
within the 7-day window between the issuance of the notice of
intent to terminate and actual termination as provided by
Article 15.02(D).  Indeed, the City, rather than Tri-State,
stepped in to fix the pavement on December 4, 2017, before the
onset of winter.  Tri-State is not entitled to credit for what
its own failure compelled the City to cure.

        Finally, it is of no consequence that Pipe Plus was
not issued a stop work order or terminated when the Department
of Environmental Protection entered a notice of violation
relating to the WV/NPDES General Water Pollution permit during
its work on the project, a violation that Pipe Plus, unlike
Tri-State, promptly cured.  The question is whether Tri-State
was properly terminated for cause as set out in Article 15.02 of

the General Conditions incorporated in <u>its</u> contract with the Sanitary Board.

Based on the foregoing, the court finds no dispute as to material facts regarding the for-cause termination of Tri-State.  The evidence does not suggest that the Sanitary Board voluntarily waived its right to terminate based on the stop work orders or otherwise improperly terminated Tri-State with respect to such orders.

Article 15.02(A) allows for-cause termination premised on the "Contractor's persistent failure to perform the Work in accordance with the Contract Documents" and the "Contractor's disregard of Laws or Regulations of any public body having jurisdiction."  ECF No. 341-10, at 25.  Article 15.02(A) expressly provides that "any <u>one</u> or more" of these events "<u>will</u>" justify for-cause termination.  <u>Id.</u> (emphasis added).  Accordingly, the Tri-State failures that led to the stop work orders were sufficient to justify the termination of Tri-State, by virtue of which the court finds summary judgment appropriate in favor of the Sanitary Board on the issue of for-cause termination notwithstanding any other grounds for termination.

Nevertheless, nothing illustrates Tri-State's "persistent failure to perform the Work in accordance with the Contract Documents" better than its inability to complete more

than roughly 40% of the work by the time of Tri-State's termination, which occurred three months after the substantial completion deadline and two months after the final completion deadline of a twelve-month contract.  When asked during his deposition whether the initial 330-day substantial completion and 360-day final completion deadlines provided enough time to complete the project, Willoughby, Tri-State's own expert, testified that he believed they did.  See ECF No. 341-9, at 73:9-13.   Tri-State agreed to these deadlines when it entered into the contract, and it was contractually bound to adhere to them.

    If the circumstances were such that extensions of these contractual deadlines were necessary, the contractor could have sought them through the claim protocols, including the written substantiation requirement, of Article 10.05 of the General Conditions.  See ECF No. 341-10, at 7-8.  Tri-State submitted only the first seven of its 57 claims for additional time and compensation prior to its December 8, 2017 termination. See, e.g., ECF No. 358-3.  Written notice and substantiation of Claims 8 through 57 were indisputably submitted for the first time on February 26, 2018. See, e.g., ECF No. 343-7, at 26; ECF No. 351-6, at 17; ECF No. 358-3.

Claims 1 through 7 involved easement issues (Claims 1, 5, and 7), the location of Line AH9 (Claim 2), the Anderson Heights Road landslide (Claim 3), the McKnoll Road coal mine (Claim 4), and the gas leak (Claim 6).  See ECF No. 341-36; ECF No. 343-5, at 1-34.  But as set forth more fully in the succeeding section of this opinion and order, only three of the seven claims submitted prior to the termination of Tri-State, Claims 1, 2, and 3 appear to have sufficiently complied with Article 10.05's claim protocols even if it could be said that the Sanitary Board or Burgess & Niple had actual notice of the circumstances underlying the claims.  Claim 2, which was addressed by Change Order No. 1, was granted prior to Tri-State's termination.

Notably, Tri-State's first seven claims did not request additional time for the manhole and preconstruction video problems or any delays associated with submittals concerning other materials.  See ECF No. 341-36, at 4.  Indeed, it seems that the manhole delays that occurred over a year earlier were not the subject of claims made by Tri-State until it submitted Claim 12 of the 57 claims on February 26, 2018. See id.

And Taylor has conceded that Haapala expressed concerns over Tri-State's work on the project on March 7, 2017, and advised him that he could submit claims to regain time, which Taylor declined.  There is ample evidence to conclude that Taylor assured Haapala, Downey, and Utt on March 7, 2017, that the contract could be completed within the time specified by the contract.  Taylor did not deny making such a representation. The delays as of March 7, 2017 were substantial; less than 1% of the total pipe to be installed on the project was actually installed by March 7, 2017, roughly five months after Tri-State was scheduled to begin work on the project under the notice to proceed.  Yet Tri-State made no formal attempt prior to termination to recoup the time lost at the beginning of the project.

Since it is undisputed that Tri-State did not fulfill its obligations under the contract prior to the justified for-cause termination on December 8, 2017, the Sanitary Board is generally entitled to summary judgment on the issue of breach with respect to its breach of contract counterclaim alleged against Tri-State.  The Sanitary Board's damages arguments with respect to this claim will be assessed by a forthcoming opinion. In addition, summary judgment on the issue of breach as to Tri-State's breach of contract crossclaim is granted in favor of

the Sanitary Board insofar as the crossclaim asserts that the Sanitary Board wrongfully terminated Tri-State.

### B.   The 57 Claims

In addition to the dispute regarding Tri-State's termination, the propriety of denying the 57 claims for payment and additional time extensions comprises a substantial portion of the breach of contract crossclaim asserted by Tri-State. Indeed, Taylor stated during his deposition that, to his knowledge, Tri-State was only "suing over" the 57 claims.  ECF No. 341-15, at 429:3-9.

The crossclaim alleges: "During the course of the Project, Tri-State had at least 57 instances of changed work, delays, unforeseen or changed site conditions that resulted in a financial loss to Tri-State in the amount of $3,646,314.69 and caused 456.20 days of delay.  Tri-State submitted claims as to each such instance, all of which were denied by the CSB in breach of its obligations under its contract with Tri-State." ECF No. 22, at 6-7, ¶ 11.

Contrary to Tri-State's contention, the contractor was not owed any payment on the claims when these claims were made on February 26, 2018.  As the Sanitary Board points out, ECF No. 342, at 10, Burgess & Niple's March 23, 2018 letter responding

to the claims stated that Tri-State was "entitled to no further payment until the Work is completed and only if there is money remaining in the contract" under Article 15.02(C) of the General Conditions.  ECF No. 341-37, at 1.  Article 15.02(C) provides that after proper for-cause termination:

> Contractor shall not be entitled to receive any further payment until the Work is completed.  If the unpaid balance of the Contract Price exceeds all claims, costs, losses, and damages (including but not limited to all fees and charges of engineers, architects, attorneys, and other professionals and all court or arbitration, or other dispute resolution costs) sustained by the Owner arising out of or relating to completing the Work, such excess will be paid to the Contractor.  If such claims, losses, and damages exceed such unpaid balance, Contractor shall pay the difference to Owner.  Such claims, costs, losses, and damages incurred by Owner will be reviewed by Engineer as to their reasonableness and, when so approved by Engineer, incorporated by Change Order. When exercising any rights or remedies under this Paragraph, Owner shall not be required to obtain the lowest price for the Work performed.

ECF No. 341-10, at 25-26.  Thus, to the extent Tri-State suggests that the Sanitary Board, through Burgess & Niple, breached the contract after the for-cause termination by not immediately paying the claimed amounts, such an argument has no merit.

Further, Article 15.02 plainly indicates that Tri-State was not entitled to additional time after for-cause termination on December 8, 2017.  Article 15.02(B)(1) and (3) provide that following an event justifying for-cause

termination, "Owner may after giving Contractor (and surety) seven days written notice of its intent to terminate the services of the Contractor": "exclude Contractor from the Site . . . ."; and "complete the Work as Owner may deem expedient." ECF No. 341-10, at 25.  Simply put, for-cause termination operates to terminate the contractor, and Article 15.02 provides no guarantee of reinstatement upon a showing of entitlement to additional time.  And as stated in the preceding section, the for-cause termination, whether premised on the stop work orders or the persistent failure to perform the work within the agreed upon time or both, was justified.

As for the timeliness of the 57 claims under the General Conditions' claim procedures, Article 10.05 of the General Conditions provides a mechanism for making claims for adjustments to "Contract Price" and "Contract Times":[11]

A. Engineer's Decision Required: All Claims, except those waived pursuant to Paragraph 14.09,[12] shall be

---

[11]  Per Article 1.01(A)(13), "Contract Price" includes, as relevant here, "[t]he moneys payable by Owner to Contractor for completion of the work in accordance with the Contract Documents as stated in the Agreement . . . ."  ECF No. 341-9, at 8.  Under Article 1.01(A)(14) of the General Conditions, "Contract Times" include "[t]he number of days or the dates stated in the Agreement to: (i) achieve Milestones, if any; (ii) achieve Substantial Completion; and (iii) complete the Work so that it is ready for final payment as evidenced by Engineer's written recommendation of final payment."  ECF No. 341-9, at 8.

[12]  Article 14.09, entitled "Waiver of Claims," provides only that "[t]he making and acceptance of final payment will

referred to the Engineer for decision.  A decision by
Engineer shall be required as a condition precedent to
any exercise by Owner or Contractor of any rights or
remedies either may otherwise have under the Contract
Documents or by Laws and Regulations in respect of
such Claims.

B. Notice: Written notice stating the general nature
of each Claim shall be delivered by the claimant to
Engineer and the other party to the Contract promptly
(but in no event later than 30 days) after the start
of the event giving rise thereto.  The responsibility
to substantiate a Claim shall rest with the party
making the Claim. Notice of the amount or extent of
the Claim, with supporting data shall be delivered to
the Engineer and the other party to the Contract
within 60 days after the start of such event (unless
Engineer allows additional time for claimant to submit
additional or more accurate data in support of such
Claim) . . . . The opposing party shall submit any
response to Engineer and the claimant within 30 days
after receipt of the claimant's last submittal (unless
Engineer allows additional time).

C.  Engineer's Action: Engineer will review each claim
and, within 30 days after receipt of the last
submittal of the claimant or the last submittal of the
opposing party, if any, take one of the following
actions in writing:

    1.  deny the Claim in whole or in part;

    2.  approve the claim; or

    3.  notify the parties that the Engineer is
    unable to resolve the Claim if, in the Engineer's
    sole discretion, it would be inappropriate for
    the Engineer to do so.  For purposes of further
    resolution of the Claim, such notice shall be
    deemed a denial.

---

constitute" waiver of certain claims by the Sanitary Board
against Tri-State and vice-versa.  ECF No. 341-10, at 24.
Inasmuch as final payment was not made, this provision is not
relevant to the present analysis.

> D.   In the event that Engineer does not take action on
> a Claim within said 30 days, the Claim shall be deemed
> denied.
>
> E.   Engineer's . . . action . . . or denial . . . will
> be final and binding upon Owner and Contractor, unless
> Owner or Contractor invoke the dispute resolution
> procedure set forth in Article 16 within 30 days of
> such action or denial.
>
> F. No Claim for an adjustment in Contract Price or
> Contract Times will be valid if not submitted in
> accordance with this Paragraph 10.05.

ECF No. 341-10, at 7-8 (emphasis added).  The dispute resolution

procedure alluded to in Article 10.05 is found in Article 16.01

of the Supplementary Conditions and provides for resolution of

claim disputes by negotiation, and if that fails, arbitration

(if the parties agree) or court proceedings.  Id. at 46.

        The claims procedures set forth in Article 10.05 are

straightforward.  Claims for adjustment in Contract Price or

Contract Times must be pursued in accordance with the Article's

provisions.  Under the Article, there are separate 30 and 60-day

deadlines for submitting written notice of a claim and

substantiating the amount and extent of a claim with supporting

data.  Indeed, Taylor and Hypes have each acknowledged in

deposition testimony that the notice and substantiation

requirements are, in fact, separate requirements.  ECF No.

341-19, at 137:11-22; ECF No. 358-1, at 133:10-19, 431:3-8.  The

Engineer's decision, or lack thereof, within 30 days of the last

submittal by the claimant or opposing party becomes final unless

a party acts within 30 days thereafter to institute dispute resolution proceedings.

The Sanitary Board contends that the 57 claims were untimely under the General Conditions inasmuch as they were not submitted in writing until February 26, 2018, 80 days after Tri-State was terminated from the project. ECF No. 342, at 14-15. Tri-State largely does not assert that the claims were timely, but rather argues that the contract's formal claims procedures were modified or waived inasmuch as it contends that the Sanitary Board and/or Burgess & Niple had actual notice of the events underlying the claims and, at times, directed changed or extra work. ECF No. 349, at 14. The Sanitary Board replies that no oral modification or waiver occurred, that Tri-State's arguments only pertain to the notice requirement of Article 10.05(B), and that even if the notice requirement of Article 10.05(B) was satisfied by actual notice, the contractor failed to comply with the substantiation requirement found therein. ECF No. 358, at 3-13.

The "general rule" of contract interpretation is that a "valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." Arnold v. Palmer, 686

S.E.2d 725, 733 (W. Va. 2009) (quoting Syl. pt. 1, <u>Sally-Mike</u>
<u>Properties v. Yokum</u>, 332 S.E.2d 597 (1985)).  As noted above,
waiver of the right to rely on a contractual provision requires
voluntary and intentional relinquishment of such a right.  <u>See</u>
<u>Parsons</u>, 785 S.E.2d at 850.  Oral modifications of contractual
provisions are also possible.  To establish an oral modification
of a written contract, a party must show by "clear and positive
evidence that there was a meeting of the minds on the
alteration."  <u>Troy Min. Corp. v. Itmann Coal Co.</u>, 346 S.E.2d
749, 606 (W. Va. 1986) (internal quotation marks omitted)
(citing Syl. pt. 4, <u>Bischoff v. Francesa</u>, 56 S.E.2d 865 (1949)).
The modification "must be so specific and direct that it leaves
no doubt that the parties intended to change what they
previously solemnized by formal contract."  <u>Id.</u> (citing
<u>Gloeckner v. School Dist.</u>, 175 A.2d 73 (1961); 17A C.J.S.
Contracts § 377 (1943)).  "[E]ven when that burden is met," the
resulting modified contract "will be held to depart from the
first only to the extent that its terms are inconsistent with
the written document."  <u>Id.</u> (citing <u>Wyckoff v. Painter</u>, 115
S.E.2d 80, 84 (1960)).

        Tri-State relies to a considerable extent on a recent
case from the Supreme Court of Appeals of West Virginia, <u>J.F.</u>
<u>Allen Corp. v. Sanitary Bd. of City of Charleston</u>, 785 S.E.2d

627 (W. Va. 2016).   Like this case, <u>J.F. Allen Corp.</u> involved a
dispute between a contractor installing sewer pipes as a part of
a contract with the Charleston Sanitary Board ("CSB").   <u>Id.</u>   The
plaintiff contractor in that case completed the project
contemplated by the contract, and "[a]fter final payment was
made[,] submitted a written request seeking additional
compensation from CSB for extra, non-contractual work that it
maintains was required by CSB and for increased costs that
resulted from numerous delays and disruptions encountered during
the project." <u>Id.</u> at 629.   The Sanitary Board refused this
request, and litigation ensued, during which the trial court,
acting on a motion to dismiss, dismissed the contractor's claim,
finding, <u>inter</u> <u>alia</u>, that the contractor did not give timely
written notice of the claim under the contract.   <u>Id.</u> at 630.

        Assessing the dismissal on appeal, the Supreme Court
of Appeals found that:

> the circuit court erroneously concluded J.F. Allen's
> claims were barred because no written request for
> additional compensation was submitted before final
> payment was made under the contract.   In concluding
> the claims were untimely, the circuit court relied
> upon a provision in the contract requiring written
> notice of a claim no later than thirty days after the
> start of the event giving rise to the claim.   However,
> the complaint alleged that CSB had actual notice
> through its onsite representative who documented each
> event as it occurred.   The circuit court wholly
> ignored the fact that such documentation could
> constitute a written notice if viewed in the light

>       most favorable to J.F. Allen.  Furthermore, the
>       complaint asserted that CSB waived the written notice
>       requirement by failing itself to comply with the
>       provision.

Id. at 632.  The court accordingly determined that construction

"contract provisions providing for timely written notice of

changes or claims can be amended, waived or abrogated by the

conduct of the parties." Id.  Relatedly, the court stated:

"Ordinarily, where a construction contract contains language to

the effect that its terms cannot be changed without the written

consent of the parties thereto, then such written consent is

required unless this condition is waived by the parties by their

conduct or through circumstances that justify avoiding the

requirement." Id. (quoting Syl. Pt. 1, Ground Breakers, Inc. v.

City of Buckhannon, 422 S.E.2d 519 (1992)).

       J.F. Allen Corp. is distinguishable from the posture

and circumstances of this case for a number of reasons.  First,

it involved a motion to dismiss, and as the court itself

cautioned, "whether elements of [a] contract were waived or

amended by the parties" depends on the evidence after discovery.

Id. at 634.  Second, the contractor in that case was not

terminated for cause, but instead completed its work under the

contract.  Third, and most significantly, the opinion contains

no discussion of the necessitation of complying, after notice

given, with claim substantiation requirements under the contract

such as those prescribed in the Tri-State contract.  Thus, J.F. Allen Corp. is applicable only to the extent the notice requirement of Article 10.05(B) is at issue for a claim submitted thereunder and only then if the evidence supports waiver, modification, or abrogation by the conduct of the parties.

Assuming that the Sanitary Board or its representative Burgess & Niple had actual notice of the events underlying all 57 claims, there is no evidence to support a broad waiver or oral modification of the contract such that timely substantiation was not necessary.  Tri-State understood that substantiation separate and apart from notice was necessary. Indeed, Taylor agreed during his deposition that the notice and substantiation requirements were "not the same thing" and that compliance with the notice requirement would not satisfy the substantiation requirement.  ECF No. 341-19, at 137:11-22.  And as explained in the preceding section, the job progress meeting minutes from February 21, 2017 through December 5, 2017, which were distributed to Taylor and Tri-State, reflect continued admonishments that the contractor abide by the claim protocols found in Article 10.05(B).  See supra, at 47-48.

And to the extent Dutill's opinion regarding the necessity of compliance with written claim protocols or Taylor's Summary on which it is based, see supra, at 46-47, should be credited at all, they are not material inasmuch as compliance with Article 10.05 was repeatedly requested by Burgess & Niple and Tri-State attempted, to some degree, to comply with Article 10.05(B).  Indeed, as set forth herein, Tri-State itself submitted written notices regarding the first seven claims prior to its termination.  Several of these claims, namely, Claims 1 (Line SB1 easement), 2 (Line AH9, granted July 11, 2017), 3 (Anderson Heights Road landslide), and 6 (gas leak) were appropriately substantiated by Tri-State under Article 10.05(B) by June 6, 2017 (Claims 1 and 2), July 20, 2017 (Claim 3), and September 13, 2017 (Claim 6).  See ECF No. 341-13, at 9; 343-5, at 6; ECF No. 358-2, at 5; ECF No. 452-3.

Further, Tri-State's suggestion that the contract was broadly modified by the conduct of the Sanitary Board or Burgess & Niple is problematic.  Tri-State relies on the affidavit of Taylor to establish that the Sanitary Board and Burgess & Niple required changed work without adherence to the contract's formal procedures for change orders or work change directives.  See ECF No. 349, at 5.  Taylor's April 5, 2021 affidavit states:

71

> Burgess & Niple commonly required Tri-State to proceed
> with changed and extra work without properly executed
> work change directives or approved change orders but
> repeatedly advised Tri-State's onsite personnel that
> Tri-State would be paid for changed or extra work.

ECF No. 349-2, at ¶ 11.

But when asked during his earlier July 22, 2020
deposition about whether Tri-State was "required to do more than
the plans and specs required," Taylor responded that he was "not
saying that" and indicated that Burgess & Niple was "nitpicky"
and "would dig at certain little things," such as directing the
contractor "to take the silt fence down to get [Tri-State's]
machine up and down the road."  ECF No. 358-1, at 68:2-16.  When
pressed further on the "nitpicky" comment, Taylor responded that
there "may have been some valid non[-]compliance issues," and he
agreed that "[i]t's the engineer's job to say you're not doing
this according to the plans and specs" and that it was
Tri-State's job to fix issues of noncompliance with "plans and
specs."  Id. at 86:1-23.

As the Sanitary Board argues, ECF No. 358, at 12, the
relevant portion of Taylor's affidavit should be afforded no
weight under the sham-affidavit rule.  For the sham-affidavit
rule to apply, there must be a bona fide inconsistency between
the averments of the affiant and his prior deposition testimony.
See, e.g., Kinser v. United Methodist Agency for the Retarded —

72

_W. N.C., Inc._, 613 F. App'x 209, 210-11 (4th Cir. 2015); _Spriggs_
_v. Diamond Auto Glass_, 242 F.3d 179, 185 n. 7 (4th Cir. 2001).
Here, the earlier deposition testimony of Taylor plainly
indicates that Tri-State was not required to do more than the
contract plans and specifications required, that it was
appropriate for the engineer to require compliance with the
plans and specifications, and that it was Tri-State's obligation
to comply with the Engineer's directives.

Taylor's later affidavit is inconsistent with this
testimony and cannot be relied upon to create a dispute of
material fact as to a broad modification of the contract and its
General Conditions by the conduct of the Sanitary Board or its
representative Burgess & Niple.  As discussed herein, the only
potentially substantive evidence of modification of the claim
protocols through "changed or extra work" outside the contract
concerns the Line SB1 easement issue underlying Claim 1.  See
_infra_, at 77-81.  And even then, Tri-State complied with the
substantiation requirement for that claim.  See _id._

The court also observes that the substantiation
requirement is not inconsequential.  Under Article 10.05(B), it
is the means by which the contractor illustrates the costs it
has incurred as a result of circumstances underlying a claim and
justifies the additional compensation to which it may be

entitled.  This is not only clear from the text of Article 10.05(B), but also the written substantiations submitted for the 57 claims on February 26, 2018.  See ECF No. 343-5.  For example, the "Contractor Written Notice for Claim 1" submitted on February 26, 2018, as well as the 56 other claims submitted on that date, contains no dollar-amount figures or calculations for costs or compensation associated with the claims.  See id. By contrast, Claim 1's substantiation as presented in the February 26, 2018 submission includes a chart that outlines specific labor, equipment, and materials costs, all of which aggregate to a subtotal of $36,323.14.  Id. at 8.  Added to this amount are "15% Overhead & Profit," making a subtotal of $41,771.62, which is then added to $1,462.01 "1.5% Bond Fee + 2% B&O Tax" to reach a total amount for Claim 1 of $43,233.62.  Id. Similar chart-form calculations are provided in the substantiations for the other 56 claims submitted on February 26, 2018.  See ECF No. 343-5.  These exhibits demonstrate that even if the Sanitary Board or Burgess & Niple had actual notice of the circumstances surrounding every claim, there is no conceivable way that the Engineer could effectively evaluate whether the contractor was entitled to the compensation without written substantiation of those claims.

74

In summary, the General Conditions set forth a detailed protocol for submitting claims by written notice (30 days) and substantiation (60 days). Even if notice is assumed, Tri-State was obligated to follow the substantiation procedure under the contract, and the contractor was held to comply therewith while it was working on the project. There is no evidence to support a broad waiver or modification of the claim procedures insofar as substantiation is concerned.

In addition, to its arguments concerning waiver or modification of the General Conditions' claim protocols, Tri-State asserts that it is entitled to compensation for unspecified claims concerning unmarked or mismarked underground facilities under General Conditions Article 4.04(B). ECF No. 349, at 15-16. That provision states as follows:

> 1. If an Underground Facility is uncovered or revealed at or contiguous to the site which was not shown or indicated, or not shown or indicated with reasonable accuracy in the Contract Documents, Contractor shall, promptly after becoming aware thereof and before further disturbing conditions affected thereby or performing any Work in connection therewith (except in an emergency as required by Paragraph 6.16.A), identify the owner of such Underground Facility and give written notice to that owner and to Owner and Engineer. Engineer will promptly review the Underground Facility and determine the extent, if any, to which a change is required in the Contract Documents to reflect and document the consequences of the existence or location of the Underground Facility. During such time Contractor

shall be responsible for the safety and protection of
such Underground Facility.

2. If Engineer concludes that a change in the Contract
Documents is required, a Work Change Directive or a
Change Order will be issued to reflect and document
such consequences. An equitable adjustment shall be
made in the Contract Price or Contract Times, or both,
to the extent that they are attributable to the
existence or location of any Underground Facility that
was not shown[,] or not shown indicated with
reasonable accuracy[,] in the Contract Documents and
that Contractor did not know of and could not
reasonably have been expected to be aware of or to
have anticipated. If Owner and Contractor are unable
to agree on entitlement to or on the amount or extent,
if any, of any adjustment in the Contract Price or
Contract Times, Owner or Contractor may make a Claim
therefor as provided in Paragraph 10.05.

ECF No. 341-9, at 19-20.  Tri-State argues that "[i]t is
certainly clear that no such Change Orders were issued adjusting
the Contract price or time" after unmarked or mismarked
underground utilities were discovered.  ECF No. 349, at 16.
Tri-State also contends that Burgess & Niple did not investigate
the unmarked or mismarked underground utilities it encountered
even though such problems were documented by the Engineer's
resident project engineers.  Id. at 16.

However, the Engineer has discretion to determine
whether a change order is necessary under Article 4.04(B).  And
as the Sanitary Board points out, ECF No. 358, at 14, Article
4.04(B) instructs the contractor or the owner to make a claim
under Article 10.05 if no agreement can be reached as to an
adjustment of Contract Times or Contract Price.  Thus, Tri-State

was not automatically entitled to an extension of time or additional compensation.  It needed to comply with the requirements of Article 10.05, including substantiation, as discussed herein.

Turning to the claims themselves, it is clear that Claims 8-57 were not noticed or substantiated in writing prior to their submission on February 26, 2018.  See ECF No. 343-7, at 26; ECF No. 351-6, at 17; ECF No. 358-3.  These claims, which in total requested $2,509,445.62 in additional compensation and 332.70 days of additional time, were noticed and substantiated in writing for the first time on February 26, 2018, 80 days following the proper for-cause termination of Tri-State.  Thus, they were untimely under the General Conditions.  Insofar as Tri-State's crossclaim asserts breach of contract for failure to compensate it on these claims, 8-57, summary judgment is appropriate in favor of the Sanitary Board.

Claims 1-7 were originally made by Tri-State prior to termination.  Claim 1, "Line SB1 – Mobilization & Demobilization," which sought $43,233.62 and 30 additional days to be added to the project, ECF No. 341-36, at 4, is discussed in the minutes of a June 6, 2017 job progress meeting.  ECF No. 358-3, at 53.  The August 3, 2017 minutes state that "Engineer has completed review for Claim No. 1 – Substantiation for

Claim," although this notation is not further explained. <u>Id.</u> at 73.

Tri-State has provided, albeit in a July 2, 2021 filing, an undated "Written Summary of Contractor Claim No. 1," in which Burgess & Niple concluded that Claim 1 was worth $10,247.71 and three additional days of contract time.[13]   ECF No. 452-1.  This document indicates that Burgess & Niple requested demobilization on Line SB1 on April 23, 2017 so that the Sanitary Board "could secure revised easements/right[s] of entry for affected parcels of land," whereupon Tri-State moved the crew assigned to Line SB1 on April 24, 2017 and was subsequently notified that it could remobilize to Line SB1 on May 22, 2017. <u>Id.</u> at 1, 3.  The document is stamped as a draft, and it is not clear whether it was conveyed to Tri-State while it was working on the project.  <u>See</u> <u>id.</u>

---

[13]   The Written Summary is not signed by a Burgess & Niple employee, but it is apparent that it was drafted by the Engineer.  For example, it uses language granting additional compensation and additional days, <u>e.g.</u>, "Total Compensation awarded for Contractor Written Claim No. 1 is $10,247.71" and "Total Days granted for Contractor Written Claim No. 1 is 3 days," which is the province of the Engineer under Article 10.05.  ECF No. 453-1, at 2-3.  In addition, it cites to the reports of Burgess & Niple's resident project representatives as sources for its determination.  <u>See</u> <u>id.</u> at 3.

Ultimately, Burgess & Niple informed Tri-State by letter dated August 10, 2017, that Claim 1 would not be reviewed.  See ECF No. 452-2.  The letter noted that the Engineer had prompted Tri-State's demobilization from Line SB1:

> On Sunday April 23, 2017 the Engineer, by email communication, requested consideration by the Contractor to relocate a Work Crew that was working on Contract 15-1, Line SB1 to another line segment on the referenced project . . . . Contractor confirmed, by email communication, on Sunday April 23, 2017, the Work Crew on Line SBI would mobilize to Contract 15-2, Line AH2 on Monday April 24, 2017.

Id.  Nevertheless, Burgess & Niple declined to review the claim inasmuch as the event giving rise to it occurred on April 23, 2017, the date of demobilization from Line SB1, and the notice of the claim was not received until June 6, 2017 during the job progress meeting on that date, more than 30 days after the claim arose.  ECF No. 452-2.

This letter did not reject Claim 1 on the basis of failure to timely substantiate the claim.  See id.  The exact date of Claim 1's substantiation is unclear, but the substantiation for this claim submitted by Tri-State on February 26, 2018, bears a June 6, 2017 date.  See ECF No. 343-5, at 9. June 6, 2017 would fall within the 60-day window to substantiate the claim inasmuch as it arose on April 23, 2017.

The June 6, 2017 job progress meeting minutes documenting Claim 1 indicate that Tri-State was admonished to follow the claim protocols found in Article 10.05(B), which includes the 30-day written notice deadline.  But Burgess & Niple had actual notice of the circumstances underlying the claim and, in fact, initiated Tri-State's demobilization from Line SB1 on April 23, 2017.  Moreover, Claim 1 was ostensibly substantiated.  Claim 1, as resubmitted on February 26, 2018, suggests that substantiation was made on June 6, 2017, a date which would fall within the 60-day window to substantiate it. The August 3, 2017 job progress meeting minutes indicate that it was substantiated, and the Written Summary of Contractor Claim No. 1 demonstrates that Burgess & Niple was able to assess and value the claim as meriting $10,247.71 and a three-day of contract extension at some point prior to determining that its June 6, 2017 notice was untimely.

As for Article 10.05(E) and the corresponding dispute resolution procedure, Tri-State employee Kyle Kelley indicated in a September 5, 2017 email to Utt that Tri-State "would like to dispute the denial of all claims in question" under Article 16.  ECF No. 358-2, at 4.  Such a request was made within 30 days of Burgess & Niple's August 10, 2017 letter indicating that Claim 1 would not be reviewed.  In his September 7, 2017

response, Utt stated that "[y]our request for Dispute Resolution, based upon Article 16 of the Contract Documents, will be addressed by a separate correspondence in the near future." Id. at 3.  The minutes for a September 12, 2017 job progress meeting state that "Contractor has requested Dispute Resolution, Article 16 of the General Conditions (modified by the Supplemental General Conditions) for all claims denied through September 6, 2017."  ECF No. 358-3, at 85.  The record does not reflect any further action on this matter prior to Tri-State's December 6, 2017 response to the Sanitary Board's notice of intent to terminate, in which the contractor requested, inter alia, an "immediate meeting" with the Sanitary Board and Burgess & Niple to discuss outstanding claims for additional time and compensation.  See ECF No. 349-1, at 2.

Viewing the evidence in the light most favorable to Tri-State, the nonmovant, the court concludes that its breach of contract crossclaim may go forward with respect to Claim 1 inasmuch as Burgess & Niple had actual notice of the claim, the claim was substantiated, and Tri-State invoked the dispute

resolution procedure within 30 days of the August 10, 2017 letter indicating that the Engineer would not review the claim.[14]

Claim 2, "Line AH9 – Hand Work - Proposed Main Marked Incorrectly," ECF No. 341-36, at 4, was incorporated in the first change order issued on July 11, 2017, and revised on November 6, 2017.  See ECF No. 341-13; ECF No. 341-36; ECF No. 358-3, at 62.  Claim 2 was actually substantiated by Tri-State on June 6, 2017 and effectuated by Burgess & Niple and the Sanitary Board for $2,269.91 and one additional day.  See ECF No. 358-1, at 134:7-24; ECF No. 358-3, at 61-62.  Claim 2 has thus been resolved and discharged.

The July 11, 2017 job progress meeting minutes indicate that Claim 5, "Line AH9 – Field Order No. 5 – Hand Work, Work Stopped due to Unsigned/Modified Easements," ECF No. 341-36, at 4, was submitted by that date.  ECF No. 358-3, at 61. The minutes also document a relationship between Claim 2 and Claim 5:

> Contractor Written Notice for Claim No.
> 5 - Contractor was not notified that new easements

---

[14]    The court offers no comment as to the actual value of Claim 1.  The claim itself asserted entitlement to $43,233.62 and 30 days of additional time, ECF No. 341-36, at 4, Burgess & Niple valued the claim as being worth $10,247.71 and three days of additional time, ECF No. 452-1, at 2-3, and Willoughby concludes that it is worth $42,063 (with no opinion as to how many additional days it is worth), ECF No. 351-6, at 22.

> were needed to perform the work on Line AH9 after
> Station 9+18, until after the work had been started
> for a second time on 6/20/2017.  Claim emailed to
> Engineer and Owner at same time.
>
> Submitted Substantiation for Claim is same document
> used on Claim No. 2.

ECF No. 358-3, at 61.  The substantiation forms for Claims 2 and 5 submitted by Tri-State on February 26, 2018 are duplicates even though the claim notices indicate they address separate issues concerning Line AH9.  See ECF No. 343-5, at 9-12, 23-26. And as earlier noted, Claim 2 was substantiated on June 6, 2017, prior to the June 20, 2017 date regarding Claim 5 provided in the minutes.  This further indicates that the claims may not be the same.

But even assuming Claim 5 is separate from Claim 2, there is no indication that Tri-State sought to resubmit non-duplicate written substantiation after July 11, 2017, and the contractor did not invoke the dispute resolution procedure within 30 days of being informed it had submitted the inadequate duplicate.  Accordingly, the court concludes that the breach of contract crossclaim may not proceed as to Claim 5.

Claim 3, "Line AH1 — Anderson Heights (Land Slide/Slip)," which sought $347,549.76 and 31.50 additional days, ECF No. 341-36, at 4, is reflected in the minutes of a July 11, 2017 job progress meeting.  ECF No. 358-3, at 62.

Willoughby opines: "The landslide prevented hauling through the slide area due to the road being closed.  After the slide, traffic [was] forced to go all one way.  This resulted in lost time primarily associated with getting residents to and from driveways."  ECF No. 351-6, at 22.  He does not quantify this "lost time."  See id.

Tri-State has produced more evidence regarding the handling of this claim in its July 2, 2021 filing.  An internal August 8, 2017 memorandum composed by Utt states that Burgess & Niple received the substantiation for Claim 3 on July 20, 2017.  ECF No. 452-3.  Utt also sent an August 10, 2017 email to Downey of the Sanitary Board conveying "his comments . . . to date" on Claim 3.  ECF No. 452-4, at 1.  This email states that written substantiation was submitted in accordance with Article 10.05(B).  Id.  Utt noted that the substantiation included supporting documentation providing a summary and calculation for the $347,549.76 requested in Claim 3 but did not, however, include a summary or calculation for the additional 31.50 days requested therein.  Id.  The Utt email proceeds to note how the substantiation's supporting documentation did not provide justifications for various issues, e.g., 225 hours claimed for 2 laborers, 2 drivers, a pipe layer, and a supervisor, which would ostensibly pertain to both the costs and additional time claimed

by Tri-State.  See id.  In any event, the record does not
reflect any communication from Burgess & Niple to Tri-State as
to whether Claim 3 was granted or denied or whether the
substantiation it deemed to be filed in accordance with Article
10.05(B) was inadequate.  It appears the claim would have been
deemed denied under Article 10.05(D) on August 19, 2017, i.e.,
30 days after the submission of the July 20, 2017
substantiation.

Utt's internal memorandum demonstrates that
substantiation was received by Burgess & Niple on July 20, 2017,
and Utt's August 10, 2020 email to Downey acknowledges
substantiation in accordance with Article 10.05(B).  Utt may
have believed there were inadequacies in the supporting
documentation for Claim 3, but he nevertheless expressly noted
that Tri-State had complied with the claim protocols set forth
in Article 10.05(B).  Moreover, the record does not suggest that
Utt or any other Burgess & Niple representative reached out to
Tri-State to attempt to resolve the inadequacies in the
supporting documentation after reviewing the substantiated Claim
3.  Tri-State's invocation of the Article 16 dispute resolution
procedure occurred within 30 days of August 19, 2017, i.e., the
date Claim 3 would have been deemed denied, as documented in
Kelley's September 5, 2017 email to Utt and the September 12,

2017 job progress meeting minutes.  Accordingly, the court concludes that Tri-State's crossclaim may proceed as to Claim 3.[15]

Claim 4, "Line CR2 – Cease Use of McKnoll Lane – Coalmine under Road," which sought $215,219.34 and 16 additional days, ECF No. 341-36, at 4, is reflected in the minutes of a July 11, 2017 job progress meeting.  ECF No. 358-3, at 61. Willoughby indicates that progress was delayed and additional costs incurred due to Tri-State's inability to use McKnoll Road to access its work installing Line CR2.  ECF No. 351-6, at 23. Todd Kolb, a Tri-State employee, and Haapala indicated in their depositions that the access problem was related to a coal mine entrance under the road.  See ECF No. 351-1, at 68:17-22; ECF No. 351-23, at 4-15.  Kolb and Utt recalled that Tri-State constructed a separate access road to access Line CR2 (and according to Utt, Line CR3 as well), which was apparently located off-road. ECF No. 351-23, at 77:4-78:24; ECF No. 351-25, at 118:19-23; see also ECF No. 351-24, at 69:17-70:8 (John Moore

---

[15]    Again, the court does not offer any finding regarding the actual value of Claim 3.  The claim itself requested $347,549.76 and 31.50 additional days to be added to the contract.  ECF No. 341-36.  Utt's August 10, 2017 email to Downey does not ascribe any particular value to the claim in terms of additional compensation or time.  See ECF No. 452-4.  Willoughby opines that the claim is worth $317,317 but does not state how much additional time it is worth.  ECF No. 341-36.

of Burgess & Niple stating that he recalled the construction of an access road but did not know its purpose).  Tri-State has produced no evidence of Claim 4's timely written substantiation or any other negotiations regarding this claim.  Without evidence of timely written substantiation, the court concludes that the failure of Burgess & Niple to grant Claim 4 (the Engineer either denying it outright or failing to act on it, resulting in it being deemed denied) was appropriate.

Claim 6, "Line AH1 Gas Line Relocation (Work Stopped/Safety Issue/Gas Company)," which sought $42,937.94 and 8 additional days, is referenced in the minutes of an August 3, 2017 job progress meeting.  ECF No. 358-3, at 73.  Moore testified during his deposition that he had smelled a gas leak near the intersection of Anderson Heights Road and Somerlayton Road, the leak seemed like it had been in existence since the beginning of the project, and he would expect such a leak to affect the schedule of a contractor who was ordered to stop working and evacuate the area.  ECF No. 351-24, at 71:7-72:16. Regarding this incident, Willoughby opines: "After exposing a gas line, it was determined that multiple leaks existed; forcing crews to vacate the area.  The crews moved to other available work areas."  ECF No. 351-6, at 24.  Moore testified that he did not recall whether Tri-State was directed to suspend work in the

affected area while repairs were made.  See ECF No. 351-24, at 71:18-21.  Downey likewise indicated that he could not recall whether Tri-State was instructed by Burgess & Niple to suspend work in the affected area or whether it did so of its own prerogative, but he did state that the Sanitary Board did not instruct Tri-State to take such action.  See ECF No. 351-22, at 177:1-15.  Taylor testified that, as one might expect, the gas company maintaining the line, Mountaineer Gas, directed Tri-State to leave the area while the line was being repaired.  ECF No. 349-4, at 404:21-405:3.

The copy of Claim 6 resubmitted on February 26, 2018, indicates that Claim 6 arose on July 7, 2017.  See ECF No. 343-5, at 27-28.  Tri-State employee Kyle Kelley requested an extension of time to substantiate Claim 6 by email on September 5, 2017.  ECF No. 358-2, at 3-4.  Utt responded by email on September 7, 2017, granting an extension to 5:00 p.m. on September 13, 2017, for Claim 6 and noting that "[t]his extension is given only for Claim No. 6 and should be considered as a onetime only approval."  Id. at 3.

Kelley submitted substantiation for Claim 6 by email on September 13, 2017 at 6:47 p.m.  ECF No. 358-2, at 5.  This demonstrates substantial compliance with the new substantiation deadline of 5:00 p.m.  See Syl., W. Va. Human Rights Comm'n v.

Smoot Coal Co., Inc., 412 S.E.2d 749 (W. Va. 1991) (per curiam)
("Where before the time has expired for the performance of a
contract, there has been such a substantial compliance therewith
by a party thereto, that gross injustice would be done him by
denying him relief, equity will grant him relief as from a
forfeiture.") (quoting Syl. Pt. 6, Eastern Oil Co. v. Coulehan,
64 S.E. 836 (1909)).  Nevertheless, Burgess & Niple declined to
review Claim 6 by letter dated September 13, 2017, inasmuch as
the claim was not submitted by the 5:00 p.m. deadline.  ECF No.
452-6.

          Still, the Article 16 dispute resolution procedure was
invoked by Kelley on September 5, 2017, and again by Tri-State
at the September 12, 2017 job progress meeting, prior to the
September 13, 2017 submission of Claim 6's substantiation and
Burgess & Niple's response thereto on the same date.
Accordingly, Tri-State did not invoke the dispute resolution
procedure within 30 days of the Engineer's September 13, 2017
decision.  Since Tri-State did not comply with the dispute
resolution procedure required by the contract, the court
concludes that the breach of contract crossclaim may not proceed
as to Claim 6.

          Claim 7, "Line PB1, PB4, PB5, PB6 Chatsworth Lane
Ingress/Egress Cease & Desist Order & Emails," which sought

$483,388.59 and 36 additional days, ECF No. 341-36, at 4, is referenced in the minutes of an August 3, 2017 job progress meeting.  ECF No. 358-3, at 73.  Willoughby, Tri-State's own expert, determined that Claim 7 was "not justified."  ECF No. 351-6, at 25 (emphasis added).  He reached this conclusion inasmuch as the contract's plans "indicated Chatsworth Lane to be a private road."  Id.  Utt's deposition testimony supports this point: "[T]he contract documents showed there being no easement or no right of way to Chatsworth Lane."  ECF No. 351-25, at 122:5-7.  Relatedly, Haapala testified that the bid documents did not designate Chatsworth Lane as a private road inasmuch as they "had an actual drawing that showed where the permanent temporary easements were and access easements, but we [did not] delineate private road, public road on the drawings."  ECF No. 351-1, at 70:16-20.  Thus, any effect of the inability to use Chatsworth Lane on Tri-State's progress was contemplated by the year-long contract that Tri-State formed with the Sanitary Board.

Tri-State asserts that Claim 7 arose on June 2, 2017. See ECF No. 452, at 7.  Kelley requested an extension of time to substantiate Claim 7 in his September 5, 2017 email to Utt.  ECF No. 358-2, at 3-4.  Utt declined to extend the time to substantiate Claim 7 inasmuch as the initial notice was not

submitted within 30 days of the event giving rise to the claim
as set forth in Article 10.05(B).  Id.

        Although Claim 7 was effectively denied on notice
grounds, the claim's period for substantiation would have
elapsed on August 1, 2017, assuming Tri-State is correct that
the claim arose on June 2, 2017.  Thus, the time for
substantiation elapsed more than one month prior to Kelley's
September 5, 2017 request for a substantiation extension on that
claim.  In addition, Willoughby, Tri-State's own expert,
concedes that there was no merit to Claim 7, and the testimonies
of Utt and Haapala support such a conclusion.  With no evidence
to the contrary, Claim 7 was appropriately denied and discharged
by the Engineer.

        In summary, there is evidence of notice, timely
written substantiation, and invocation of the dispute resolution
procedure prescribed by the contract with respect to Claims 1
and 3.  The court accordingly concludes that summary judgment is
inappropriate as to Tri-State's breach of contract crossclaim
insofar as it concerns Claims 1 and 3.  The court likewise
concludes that summary judgment in favor of the Sanitary Board
is warranted to the extent Tri-State's breach of contract
crossclaim is premised on the failure to pay Claims 4, 5, 6, and
7 as well as Claims 8 through 57 inasmuch as the record

evidences deficiencies of notice, timely written substantiation, or dispute resolution procedure for each of those claims. Further, summary judgment in favor of the Sanitary Board is warranted insofar as the breach of contract crossclaim is premised on Claim 2 since that claim was granted and effectuated by Change Order No. 1.

The court notes, however, that even if Claims 1 and 3 had been granted prior to Tri-State's termination, they would not have been sufficient to enable Tri-State to meet the contractual substantial completion and final completion deadlines. Claim 1 asserts entitlement to 30 days of additional time (although Burgess & Niple considered it to be worth three days) while Claim 3 asserts entitlement to 31.50 days of additional time. Had these extensions been granted and instituted by change order, the September 7, 2017 substantial completion deadline and October 6, 2017 final completion deadline would have been extended to November 8, 2017, and December 7, 2017, respectively. Tri-State had only completed roughly 40% of the project when it was terminated on December 8, 2017. Thus, assuming Claims 1 and 3 should have been granted for the amount of time requested by Tri-State, termination for cause would have been warranted on the basis of a failure to complete the project within the time mandated by the contract.

## IV.   Conclusion

Accordingly, it is ORDERED that the Sanitary Board's motion for summary judgment (ECF No. 341) be, and it hereby is, GRANTED to the extent set forth herein.  Specifically, summary judgment is granted in favor of the Sanitary Board regarding the propriety of Tri-State's termination and the issue of Tri-State's breach of contract.  In addition, Tri-State's breach of contract crossclaim against the Sanitary Board is dismissed except to the extent it asserts entitlement to compensation associated with Claims 1 and 3.  The remaining arguments raised in connection with the Sanitary Board's motion for summary judgment, including those concerning its damages and the sureties, as well as the three other motions for summary judgment, will be addressed by separate opinion.

The Clerk is directed to transmit copies of this memorandum opinion and order to all counsel of record and any unrepresented parties.

ENTER:   August 27, 2021

John T. Copenhaver, Jr.
Senior United States District Judge