UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


THE SANITARY BOARD OF THE CITY
OF CHARLESTON, WEST VIRGINIA,
a municipal utility,

        Plaintiff,

v.                            Civil Action No. 2:18-cv-01100

COLONIAL SURETY COMPANY, a
Pennsylvania corporation; and
PARTNERRE INSURANCE COMPANY OF
NEW YORK, a New York corporation,

        Defendants.

and

COLONIAL SURETY COMPANY, a
Pennsylvania Corporation,

        Third-Party Plaintiff,

v.

TRI-STATE PIPELINE, INC., an Ohio
corporation; and ERIC D. TAYLOR,

        Third-Party Defendants and
        Fourth-Party Plaintiffs,

v.

BURGESS & NIPLE, INC., an Ohio
corporation,

        Fourth-Party Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

Pending are fourth-party defendant Burgess & Niple, Inc.'s ("Burgess & Niple" or "the Engineer") motion for summary judgment (ECF No. 334) and motion for partial summary judgment (ECF No. 336), both of which were filed March 15, 2021.  The former motion generally requests summary judgment on the fourth-party professional negligence claim alleged against it by third-party defendant and fourth-party plaintiff Tri-State Pipeline, Inc. while the latter motion requests partial summary judgment on which claims, if any, Eric D. Taylor, president of Tri-State, brings in his individual capacity.

## I.  General Background

This case arises from a project to improve the sewer systems of Charleston, West Virginia.  In February of 2014, the Sanitary Board of the City of Charleston, West Virginia ("the Sanitary Board" or "the Owner") and Burgess & Niple, an engineering firm, entered into an agreement whereby the engineer would provide professional services for the design and management of the "Porter's Hollow Area Wastewater System Improvements."  <u>See</u> ECF No. 348-14.  On July 26, 2016, third-party defendant and fourth-party plaintiff Tri-State Pipeline, Inc. ("Tri-State") submitted a $5,296,542.44 bid for the Sanitary Board's "Contract 15-1" concerning "Porter's Branch

and Spring Branch Sanitary Sewer Improvements," and a
$4,579,644.00 bid for the Sanitary Board's "Contract 15-2"
concerning "Callie Road and Anderson Heights Sanitary Sewer
Improvements."  ECF No. 341-1.

The Sanitary Board entered into a contract with
Tri-State for the performance of the project, comprised of
Contracts 15-1 and 15-2, on September 22, 2016.  ECF No. 341-7.
The total contract price was $9,876,186.44.  Id. at 2.  The
project was to be "substantially complete within 330 days and
ready for final payment within 360 days after the date the
Contract Time commence[d] to run as provided in the Notice to
Proceed . . . ."  Id. at 2.  The contract named Burgess & Niple
as the "Engineer/Architect" to act as the "representative" of
the Sanitary Board.  Id. at 1.

The contract also incorporated by reference various
documents, one of which, the "General Conditions," is relevant
here.  See ECF No. 341-7.  These General Conditions refer to the
"Standard General Conditions of the Construction Contract," a
2007 standardized document, which was published by the American
Council of Engineering Companies, Associated General Contractors
of America, American Society of Civil Engineers, and the
National Society of Professional Engineers.  ECF No. 341-9; ECF
No. 341-10.

3

The notice to proceed issued on October 4, 2016, with commencement of the project to begin on or before October 10, 2016.  ECF No. 341-8, at 1.  This in turn set September 5, 2017, and October 4, 2017, as substantial completion and final payment deadlines, respectively.  Id.; see also ECF No. 341-7, at 2.

Work at the site of the project was delayed by Tri-State until February 1, 2018.  See ECF No. 343-2, at 212:11-13.  Delay at the outset was occasioned by issues of manhole submittal approval and manhole delivery.[1]  See, e.g., ECF No. 351-6, at 46.  The submittals, which were given to Burgess & Niple by Tri-State for approval of manhole specifications, were initially provided by Tri-State to the Engineer on September 23, 2016, prior to the notice to proceed on October 4, 2016.  See ECF No. 351-6, at 46; ECF No. 351-20, at 113:18-23.  These submittals were returned by the Engineer to Tri-State for revision on October 11, 2016, resubmitted to Burgess & Niple by October 16, 2016, and approved by the Engineer on November 2, 2016.  See ECF No. 351-6, at 46; ECF No. 351-20, at 113:18-114:16.  The manholes were ordered by Tri-State on November 3, 2016, but not delivered by its chosen manufacturers

---

[1]    The court refers not to manhole covers, but rather precast concrete manholes through which the sewer lines would run after the manholes and pipes were installed in the ground.  See, e.g., ECF No. 349, at 3.

until December 1, 2016, whereupon three out of five loads of
manholes delivered - those manufactured by Foster Supply, Inc.
and, potentially, some manufactured by Premier Precast - were
rejected for nonconformity with the approved submittals.  See
ECF No. 343-3, at 168:13-169:12; 351-6, at 46; ECF No. 351-20,
at 114:11-115:12.

When asked during his deposition whether Tri-State was
able to "start working on the manholes [it] had," i.e., those
that conformed with the submittals, Taylor responded: "No
because . . . you have a truck bring five manholes and there
might be one of them that we could use, so you had to send that
back."  ECF No. 343-2, at 39:21-40:4.  This response, of course,
does not actually explain why the contractor was unable to begin
work with the manholes that did conform with the submittals.

Taylor asserts in his affidavit, which was produced on
April 5, 2021, seven months after his deposition, that Burgess &
Niple rejected the delivered manholes.  See ECF No. 349-2, at ¶
5.  Jim Downey, the Sanitary Board's project engineer, testified
during his deposition that the defective manholes did not
conform with the drawings for the approved submittals and
further stated that he, John Moore (a Burgess & Niple resident
project representative), and Timm Utt (an engineer of Burgess &
Niple) inspected the nonconforming manholes, while Moore and Utt

were responsible for informing Tri-State that they would be rejected.  See ECF No. 343-3, at 168:13-169:12.  Tim Haapala, the Sanitary Board's Operations Manager and Rule 30(b)(6) designee, stated during his testimony that Tri-State rejected the nonconforming manholes.  See ECF No. 351-20, at 115:6-21.

The minutes of the job progress meeting held on March 7, 2017, indicate that, after 5 months under the 12-month contract, less than 1% of pipe installation was complete.  As of that date, 317 of 29,176 linear feet of pipe, including service lateral pipe, for Contract 15-1 had been installed while 96 of 25,198 linear feet of pipe for Contract 15-2, including service lateral pipe, had been installed.  ECF No. 358-3, at 24.  This equates to .76% of the total pipe to be installed during the project.

A March 7, 2017 memorandum for the "Porters Hollow Sewer Replacement Project File" composed by Downey documents a discussion held following the job progress meeting that same date.  It states, in relevant part:

> Tim Haapala, PE (CSB); Timm Utt (B&N); and Jim Downey
> (CSB) had a private meeting with Eric Taylor following
> the project progress meeting.  The meeting was in the
> Engineering Department Map Room at approximately 1:00
> p.m.
>
> . . .

> Tim let Eric know that we are all concerned that
> almost half of the contract time has expired and
> only 1% of the work has been done. Tim told Eric that
> if he had been delayed by actions of B&N or by the CSB
> that there were clauses in the contract that would
> allow him to submit claims and regain the time.  Eric
> told Tim that all of the delays to date had been of
> either Eric's own doing or due to Foster Supply not
> delivering acceptable manhole bases.  He said that
> there was nothing he could claim and neither B&N or
> the CSB had anything to do with the delays.
>
> . . .
>
> Eric assured us that he has the means and ability to
> complete the work within the contract time and while
> he is getting a late start on it, he will be adding
> crews and laying a lot of pipe starting very soon.

ECF No. 343-6, at 10 (internal footnote added).

    After reading this memorandum during his deposition,
Taylor conceded that Haapala, the Sanitary Board's Operations
Manager and Rule 30(b)(6) designee, had expressed concerns over
Tri-State's work on the project during the March 7, 2017 meeting
and that Haapala had advised him that the contract contained
provisions to allow Tri-State to submit claims and "regain
time."  ECF No. 343-6, at 384:14-24.  During his deposition,
Taylor stated that he had "no way of knowing" whether he advised
the Sanitary Board and Burgess & Niple that Tri-State "had the
means and ability to complete the work within the contract time"
as of that meeting and likewise testified that he could not
recall stating during the meeting that there was nothing to

7

claim and that he could not recall stating that the manhole-delivery problems were not the fault of the Sanitary Board or Burgess & Niple.  Id. at 385:13-22.  Taylor did not deny either statement in his deposition.

The manhole problems are estimated by Tri-State's expert, Bryon L. Willoughby, P.E., to have caused 115 days' worth of delays to the project.  ECF No. 351-6, at 46.  Assuming Tri-State began working on February 1, 2017, as testified by Utt, ECF No. 343-2, at 212:11-13, 114 days would have elapsed between the October 10, 2016 start date for the project and February 1, 2017.

The late start was also occasioned by the delayed submission by Tri-State of preconstruction videos to document the condition of areas of work prior to the beginning of pipe installation in those areas.  See ECF No. 343-2, at 211:12-18. Taylor acknowledged during his deposition that such videos were required by the contract, which provided specifications for the videos.  ECF No. 343-2, at 22:5-7, 23:6-8.  Taylor also noted that the videos "[h]ad to be done before [we] got to work in the area."  Id. at 21:16-17.  The first batch of preconstruction videos, which were created by a third-party hired by Tri-State, were rejected by Burgess & Niple.  See id. at 21:21-23.  Taylor stated that "[i]t's possible" that the videos were rejected for

8

not conforming with the contract's specifications, although he did not remember for certain why they were rejected. See id. at 21:24-22:11.  Tri-State itself re-filmed the preconstruction videos, whereupon they were ultimately accepted by Burgess & Niple.  See id. at 22:17-24:9; ECF No. 343-2, at 211:10-21.

Downey and Utt testified that the video issue resulted in a delay of Tri-State's ability to begin work on the project. ECF No. 343-2, at 211:4-8; ECF No. 343-3, at 166:18-22.  The exact length of the delay is not clear from the record, although Willoughby indicates that Moore, of Burgess & Niple, testified that Tri-State could not begin work until "February 2017" due to the lack of acceptable preconstruction videos.  See ECF No. 351-6, at 46.  This would roughly correspond with the delay he attributed to the manhole submittal and delivery problems.  It would also account for Tri-State's failure to proceed promptly with the manholes received December 1, 2016 that were deemed acceptable.[2]

---

[2]     As discussed in the court's Companion Opinion entered this same date, any delay at the outset of the project attributable to the submittal process for pipe and stone supplies was minimal. See Memorandum Opinion and Order Sanitary Board's Motion for Summary Judgment Against Tri-State (hereinafter "Companion Opinion"), at 36 n. 9.

In addition to Tri-State's slow start, Tri-State was issued six stop work orders during its work on the project, which are summarized as follows:

>    1. City of Charleston Building Permit Violation – 6/12/17, non-compliance with Road Restoration on Porter Road and Woodcliff Drive[,] effective 6/13/17. This is a violation of City Code (Building Permit).
>
>    2. Charleston Sanitary Board – 8/4/17, non-compliance with WV/NPDES General Water Pollution Control Permit[,] effective 8/7/17.  [Porter Road]
>
>    3. Charleston Sanitary Board – 8/18/17, non-compliance with timeliness of pavement replacement[,] effective 8/19/17. This is a violation of City Code (Building Permit).  [Callie Road and Louden Heights Road]
>
>    4. Charleston Sanitary Board – 10/4/17, non-compliance with dust control effective 10/5/17.  [Near Holz Elementary School]
>
>    5. Charleston Sanitary Board – 10/20/17, non-compliance with timeliness of pavement replacement effective 10/21/17. This is a violation of City Code (Building Permit).  [Callie Road, Bendview Drive/Woodcliff Drive, and Hampton Road]
>
>    6. Charleston Sanitary Board – 11/10/17, defective work associate with restoration of pavement replacement[,] effective 11/10/17. This was a modification to the Stop Work Order issued on 10/20/17. This is a violation of City Code (Building Permit).  [Hampton Road]

See ECF No. 341-33, at 3, 5; see also ECF No. 341-16 through ECF No. 341-26.  The June 12, 2017 stop work order was issued by the City of Charleston ("the City") while the remaining five were issued by Burgess & Niple.  See ECF No. 341-16 through ECF No. 341-26.

Two change orders formally altered the time to complete the project and total contract price.  The first, entered on July 11, 2017, and revised on November 6, 2017, increased the time to complete the project by two days, and increased the contract price by $4,162.41 to $9,880,348.85, which included a $2,269.91 increase of the contract price for costs associated with locating existing sewer line "AH9" ((later referred to herein as "Claim 2").   See ECF No. 341-13; ECF No. 341-36; ECF No. 358-3, at 62.  This set a September 7, 2017 substantial completion deadline and an October 6, 2017 final completion deadline.  ECF No. 341-13.  The second change order, issued November 7, 2017, decreased the contract price by $788.00 to $9,879,560.85.  ECF No. 341-14.

The minutes for a July 11, 2017 job progress meeting prepared by Timm Utt, a professional engineer of Burgess & Niple, state that a June 6, 2017 revised schedule, which was submitted by Tri-State following the meeting on that date, forecasted completion of Contract 15-1 71 days past the substantial completion deadline and completion of Contract 15-2 77 days past the substantial completion deadline.  ECF No. 341-28, at 2.

In letters dated June 30, 2017 and August 3, 2017, Burgess & Niple requested assurances from Tri-State that the

project would be completed in accordance with the contract, and in particular, the substantial completion deadline.  ECF No. 341-29; ECF No. 341-30.  Burgess & Niple thereafter notified Tri-State on September 7, 2017, that the Sanitary Board would exercise its rights under the contract to deduct $2,000 per day in liquidated damages from payments to Tri-State since, inter alia, no assurances were given and Tri-State had failed to meet the substantial completion deadline.  ECF No. 341-31.  The Sanitary Board asserts that Tri-State did not respond to any of these letters.  ECF No. 342, at 8.

On November 29, 2017, the Sanitary Board sent Tri-State a notice of intent to terminate for cause, which contained 6 1/2 single-spaced pages of reasons justifying for-cause termination.  ECF No. 341-33.  Among the many reasons given, the notice cited the stop work orders and failure to meet the substantial completion and final completion deadlines as justifications for termination.  Id. at 3, 5, 7.  In a December 6, 2017 response, Tri-State disputed the reasons purportedly justifying for-cause termination and indicated that it was "attempting to correct alleged failures" in accordance with the General Conditions.  ECF No. 349-1, at 2.  The Sanitary Board terminated the contract with Tri-State on December 8, 2017, a date that fell three months past the contract's substantial

completion date and two months past the final completion date, with roughly 40.6% of the work done.  ECF No. 341-34; ECF No. 358-3, at 118-19.  In total, $3,225,323.42 was paid to Tri-State prior to termination.  ECF No. 341-38, at 5.  The Sanitary Board would ultimately be required to pay another contractor, Pipe Plus, Inc. ("Pipe Plus"), $6,598,595.39 to finish the job, and to pay substantial additional sums for the prolonged work to its Engineer and others.

By letter dated February 26, 2018, Tri-State delivered to Burgess & Niple a notice of "Formalization/Substantiation of Claims/Change Order Requests."  ECF No. 341-36.  This document included 57 claims for additional costs, totaling $3,646,314.69, and additional time, totaling 456.20 days, all of which related to problems allegedly encountered during Tri-state's work on the project.  Id. at 4.  Tri-State alleged in the letter that "both B&N and CSB were on actual notice of the cause for each claim as well as the fact that each would result in additional costs to Tri-State as well as delays."  Id. at 2.

Burgess & Niple responded on March 23, 2018.  ECF No. 341-37.  The Engineer stated that no consideration was given to Claims 1 through 7 inasmuch as they had already been considered and "discharged by Engineer, prior to Owner's Contract Termination, in accordance with Subarticle 10.05 of the General

13

Conditions of the Contract." Id.  Claim 2, which sought an additional $2,269.91 and a one-day extension, was granted by the July 11, 2017 change order.  See ECF No. 341-13; ECF No. 341-36; ECF No. 358-3, at 62.  With respect to the remaining 50 claims, Burgess & Niple provided individual responses, denying them as untimely.  See ECF No. 341-19, at 60:16-61:8; ECF No. 341-37.

Burgess & Niple also stated in the March 23, 2018 letter that, generally speaking:

> Engineer notes that Contractor appears to disagree with Owner's correspondence dated December 8, 2017 that the contract was terminated for cause pursuant to subarticle 15.02B.  Under Article 15, specifically subarticle 15.02C, Contractor is entitled to no further payment until the Work is completed and only if there is money remaining in the contract.

ECF No. 341-37.

The Sanitary Board thereafter re-bid the project on June 28, 2018, and a contract was awarded to Pipe Plus for a bid of $7,440,522.75. See ECF No. 342, at 10.  Pipe Plus completed the project for $6,598,595.39.  ECF No. 341-38, at 5.  The exact date of the project's completion is not entirely clear, although it appears that Pipe Plus finished work shortly after September 28, 2020.  See ECF No. 341-7, at 3; ECF No. 351-20, at 56:21-57:1; ECF No. 351-21, at 308:1-309:21.

The Sanitary Board filed this action against Colonial Surety Company, surety for Tri-State, and PartnerRe Insurance Company of New York, co-surety and/or reinsurer, on June 29, 2018.  ECF No. 1.  Colonial then filed a third-party complaint claim against Tri-State and Taylor for breach of an indemnity agreement, as well as exoneration, subrogation, and common law indemnification claims against Tri-State.  See ECF No. 16. Tri-State thereafter asserted a crossclaim for breach of contract against the Sanitary Board, and the Sanitary Board responded in-kind with a counterclaim for breach of contract against Tri-State.  See ECF No. 22; ECF No. 76.  Tri-State also filed a fourth-party complaint asserting, as earlier noted, a professional negligence claim against Burgess & Niple.  See ECF No. 22.

The court has addressed the aspects of the Sanitary Board's motion for summary judgment (ECF No. 341) concerning breach of contract as between the Sanitary Board and Tri-State. See Companion Opinion.  In doing so, the court found that notwithstanding any issues concerning the time for completing the project, the Sanitary Board properly terminated Tri-State on account of the six stop work orders and the violations of contractual provisions, including persistent failure to perform, and the law underlying them.  Id. at 57.  The court noted that

Tri-State did, in fact, complete only 40% of the project prior to its termination, which occurred three months after the substantial completion deadline and two months after its final completion deadline.  Id. at 57-60.  The court further found that summary judgment in favor of the Sanitary Board was appropriate on Tri-State's crossclaim insofar as it asserted a contractual right to payment and additional time on account of the 57 claims that it submitted on February 26, 2018, with the exception of Claims 1 and 3.  Id. at 91-92.

This opinion addresses Burgess & Niple's motion for summary judgment and motion for partial summary judgment.

## II.  Legal Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving

party, a reasonable fact-finder could return a verdict for the non-moving party.  <u>Anderson</u>, 477 U.S. at 248.

Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).  A party is entitled to summary judgment if the record, as a whole, could not lead a rational trier of fact to find for the non-moving party.  <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).  Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at 248.

### III.  Analysis

#### A.  The Motion for Summary Judgment as to Tri-State's Professional Negligence Claim

##### 1.  Refining the Duty of Care

It is undisputed that engineers, such as Burgess & Niple, owe duties of care to contractors working on the projects:

> A design professional (<u>e.g.</u> an architect or engineer) owes a duty of care to a contractor, who has been employed by the same project owner as the design professional and who has relied upon the design professional's work product in carrying out his or her obligations to the owner, notwithstanding the absence of privity of contract between the contractor and the

17

> design professional, due to the special relationship
> that exists between the two . . . .

Syl. Pt. 6, <u>Eastern Steel Constructors, Inc. v. City of Salem</u>,

549 S.E.2d 266 (W. Va. 2001).  This is so inasmuch as:

> The contractor is a member of a limited class compiled
> of those contractors bidding on a particular project.
> Moreover, the facts that the contractor must rely on
> design documents to calculate his or her bid and, if
> successful in bidding, to construct the project, and
> may be further subject to oversight by the design
> professional during actual construction of the
> project, fulfills the requirement of the
> foreseeability of harm that would result from
> negligence on the part of the design professional.
> Finally, this resolution properly places the duty of
> care on the party who is in the best position to guard
> against the type of negligence herein asserted.

<u>Id.</u> at 275.

Generally speaking, "the duty of care owed by a design

professional to a contractor with whom he or she has a special

relationship is to render his or her professional services with

the ordinary skill, care and diligence commensurate with that

rendered by members of his or her profession in the same or

similar circumstances." <u>Id.</u>  However, the precise contours of

the duty are determined on a case-by-case basis and may "be

impacted by provisions contained in the various contracts

entered among the parties (e.g. the contract between the owner

and the design professional, and the contract between the owner

and the contractor), provided that such contractual provisions

do not conflict with the law," as well as the "rules of professional conduct promulgated by the agencies charged with overseeing the specific profession of which a defendant is a member." Id.

Burgess & Niple argues that the contract documents in this case, and in particular, the General Conditions, govern the standard of care it owed to Tri-State. ECF No. 335, at 16-18, 23. Specifically, Burgess & Niple asserts that the applicable standard is found in General Conditions Article 9.08, which provides:

A. Engineer will be the initial interpreter of the requirements of the Contract Documents and judge of the acceptability of the Work thereunder. All matters in question and other matters between Owner and Contractor arising prior to the date final payment is due relating to the acceptability of the Work, and the interpretation of the requirements of the Contract Documents pertaining to the performance of the Work, will be referred initially to Engineer in writing within 30 days of the event giving rise to the question.

B. Engineer will, with reasonable promptness, render a written decision on the issue referred. If Owner or Contractor believes that any such decision entitles them to an adjustment in the Contract Price or Contract Times or both, a Claim may be made under Paragraph 10.05. The date of Engineer's decision shall be the date of the event giving rise to the issues referenced for the purposes of Paragraph 10.05.B.

C. Engineer's written decision on the issue referred will be final and binding on Owner and Contractor, subject to the provisions of Paragraph 10.05.

19

> D. When functioning as interpreter and judge under
>    this Paragraph 9.08, Engineer will not show
>    partiality to Owner or Contractor and will not be
>    liable in connection with any interpretation or
>    decision rendered in good faith in such capacity.

ECF No. 343, at 45.  Burgess & Niple contends that Article

9.08(D) prescribes a duty to act with impartiality and in good

faith and asserts that it cannot be held liable absent a showing

a bad faith.  ECF No. 335, at 7, 23.

     Tri-State offers two primary arguments in response.

First, it argues that Article 9.08(D) is an exculpatory clause

and void for public policy reasons.  Tri-State contends that W.

Va. Code § 55-8-14, "prohibits any agreement relative to the

construction, alteration, repair, addition, detraction from,

improvement, or maintenance of any building or public

improvement that would act to cause a party to the agreement to

be indemnified against its own, sole negligence. Such an

agreement is against public policy, void, and therefore

unenforceable."  ECF No. 348, at 12.

     Tri-State also points to various other provisions of

the West Virginia Code and Code of State Rules to suggest that

Article 9.08(D) is a void exculpatory clause.  These include: W.

Va. Code § 30-13-2, which declares that the practice of

engineering is "subject to regulation in the public interest" to

"safeguard life, health and property, and to promote the public welfare"; W. Va. Code § 30-13-3(b), which provides the following definition of a "consulting engineer":  "a professional engineer whose principal occupation is the independent practice of engineering; whose livelihood is obtained by offering engineering services to the public; who serves clients as an independent fiduciary; who is devoid of public, commercial and product affiliation that might tend to infer a conflict of interest; and who is cognizant of their public and legal responsibilities and is capable of discharging them"; W. Va. C.S.R. § 7-1-12.2, which provides that the West Virginia Board of Registration for Professional Engineers has developed rules of professional responsibility to, _inter alia_, "maintain a high standard of integrity and practice"; W. Va. C.S.R. § 7-1-12.2, which, as a part of the rules of professional responsibility, requires registered engineers "full prior disclosures to their employers or clients of potential conflicts of interest or other circumstances which could influence or appear to influence their judgment or the quality of their service"; W. Va. Code § 30-13-21(a)(2), which permits the Board of Registration for Professional Engineers to impose penalties for professional engineers that have "[b]een negligent, incompetent or committed an act of misconduct in the practice of engineering"; and W. Va. C.S.R. § 7-1-15.1, which relatedly entitles the Board of

Registration for Professional Engineers to impose a $1,000 civil

penalty for "[p]rofessional misconduct, negligence, or

incompetence."  ECF No. 348, at 15-16.

        Second, Tri-State offers its own affirmative arguments

for shaping the standard of care.  It argues that under Article

4.04(B) of the General Conditions, "B&N owed a duty to review

and initiate change orders when it had notice that Tri-State had

encountered unmarked or mismarked existing underground

facilities that interfered with its work."  ECF No. 348, at 9.

Article 4.04(B) reads as follows:

> 1.  If an Underground Facility is uncovered or
> revealed at or contiguous to the site which was not
> shown or indicated, or not shown or indicated with
> reasonable accuracy in the Contract Documents,
> Contractor shall, promptly after becoming aware
> thereof and before further disturbing conditions
> affected thereby or performing any Work in connection
> therewith (except in an emergency as required by
> Paragraph 6.16.A), identify the owner of such
> Underground Facility and give written notice to that
> owner and to Owner and Engineer. Engineer will
> promptly review the Underground Facility and determine
> the extent, if any, to which a change is required in
> the Contract Documents to reflect and document the
> consequences of the existence or location of the
> Underground Facility. During such time Contractor
> shall be responsible for the safety and protection of
> such Underground Facility.
>
> 2. If Engineer concludes that a change in the Contract
> Documents is required, a Work Change Directive or a
> Change Order will be issued to reflect and document
> such consequences. An equitable adjustment shall be
> made in the Contract Price or Contract Times, or both,
> to the extent that they are attributable to the
> existence or location of any Underground Facility that

> was not shown or not shown indicated with reasonable
> accuracy in the Contract Documents and that Contractor
> did not know of and could not reasonably have been
> expected to be aware of or to have anticipated. If
> Owner and Contractor are unable to agree on
> entitlement to or on the amount or extent, if any, of
> any adjustment in the Contract Price or Contract
> Times, Owner or Contractor may make a Claim therefor
> as provided in Paragraph 10.05.

ECF No. 343, at 19-20.  Tri-State also argues that Article

9.08(D) imposes a duty to act as an impartial arbiter and in a

good faith manner when assessing claims.  Id. at 10-11.

With respect to the exculpatory clause argument, the

court notes that it has already invalidated one provision,

Article 9.09(A), of the General Conditions as an exculpatory

clause in its May 29, 2019 opinion addressing Burgess & Niple's

motion to dismiss the fourth-party complaint.  See ECF No. 72.

Article 9.09(A) reads:

> (A) Neither Engineer's authority or responsibility
> under this Article 9 or under any other provision of
> the Contract Documents nor any decision made by
> Engineer in good faith either to exercise or not
> exercise such authority of responsibility or the
> undertaking, exercise, or performance of any authority
> or responsibility by Engineer shall create, impose, or
> give rise to any duty in contract, tort, or otherwise
> owed by Engineer to Contractor[.]

ECF No. 343, at 45-46.

In invalidating this provision, the court relied upon

the Supreme Court of Appeals of West Virginia's decision in

Murphy v. N. Am. Runners, 412 S.E.2d 504 (W. Va. 1991).  ECF No.

72, at 14-15.  The Murphy court observed that, generally speaking, "[w]hen [] an express agreement [to accept a risk of harm arising from a defendant's negligent conduct] is freely and fairly made, between parties who are in an equal bargaining position, and there is no public interest with which the agreement interferes," the agreement will be upheld.  Murphy, 412 S.E.2d at 509.  However, Murphy held that "[w]hen a statute imposes a standard of conduct, a clause in an agreement purporting to exempt a party from tort liability to a member of the protected class for the failure to conform to that statutory standard is unenforceable."  Id. at Syl. Pt. 1.  Murphy explained:

> a plaintiff's express agreement to assume the risk of
> a defendant's violation of a safety statute enacted
> for the purpose of protecting the public will not be
> enforced; the safety obligation created by the statute
> for such purpose is an obligation owed to the public
> at large and is not within the power of any private
> individual to waive.

Id. at 510 (citation omitted).

Along similar lines, exculpatory clauses may also be invalidated where they excuse conduct that is regulated by provisions of the Code of State Rules pertaining to professionals.  See Finch v. Inspectech, LLC, 727 S.E.2d 823, 833 (2012) (exculpatory clause as to home inspectors void under provisions of the West Virginia Code of State Rules: "From the

plain language of these home inspector regulations, it is clear that there exists in this State an established standard of conduct with which home inspectors are expected to comply in performing home inspections and in preparing reports for their clients. This standard of conduct renders unenforceable exculpatory clauses in home inspection contracts that purport to exempt home inspectors for their failure to comply with such conduct standards.") (citing Syl. Pt. 1, <u>Murphy</u>, 412 S.E.2d 504).

Here, the first statute cited by Tri-State, W. Va. Code § 55-8-14, is of no consequence.  That statute only voids a

> covenant, promise, agreement or understanding in or in connection with or collateral to a contract or agreement . . . relative to the construction . . . of any sewer . . . purporting to indemnify against liability for damages arising out of bodily injury to persons or damage to property caused by or resulting from the sole negligence of the indemnitee . . . .

W. Va. Code § 55-8-14.  Tri-State claims no "damages arising out of bodily injury to persons or damage to property."  Moreover, Article 9.08(D) does not purport to limit liability for such damages — it limits liability for actions of judging claims and interpreting the contract under Article 9.08.

However, two other provisions cited by Tri-State suggest that Article 9.08(D)'s restriction of liability for "any interpretation or decision rendered in good faith" is contrary

to public policy.  Specifically, W. Va. Code § 30-13-21(a)(2)
entitles the Board of Registration for Professional Engineers to
impose penalties for the negligent conduct of professional
engineers, and W. Va. C.S.R. § 7-1-15.1 provides that the Board
may impose a civil penalty for negligent conduct.

        While arguing that Tri-State must show bad faith to
establish a breach of the standard of care, Burgess & Niple
concedes that "[a]s a general rule, a finding of negligence and
a finding of bad faith are brought about by separate causes of
action and are governed by two separate standards."  ECF No.
335, at 23.  In support of this proposition, Burgess & Niple
cites Shamblin v. Nationwide Mut. Ins. Co., 396 S.E.2d 766, 774
(W. Va. 1990), a case in which the Supreme Court of Appeals
observed in the context of an insurance law bad faith claim that
a negligence standard involves an insurer's breach of the duty
of good faith and fair dealing with an insured while a bad faith
standard requires a showing "of recklessness, indifference, or
intentional disregard of the insured's interest."  Burgess &
Niple also cites Atkins Nuclear Secured, LLC v. Aptim Fed.
Servs., LLC, No. 1:18-cv-1112 (AJT/JFA), 2019 WL 1793137, at *5
(E.D. Va. Apr. 24, 2019), a case in which the court observed
that bad faith conduct involved "willful or wanton behavior" and
subjective intent "beyond negligence or even recklessness" in

the context of assessing the court's inherent power to sanction bad faith conduct by counsel.

These cases are not particularly applicable to bad faith in the present context, but the point is well-taken. It is axiomatic that bad faith involves a higher standard of culpability than negligence. Compare Bad Faith, Black's Law Dictionary (11th ed. 2019) ("Dishonesty of belief, purpose, or motive"), with Negligence, Black's Law Dictionary (11th ed. 2019) ("The failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation; any conduct that falls below the legal standard established to protect others against unreasonable risk of harm, except for conduct that is intentionally, wantonly, or willfully disregardful of others' rights"). Inasmuch as W. Va. Code § 30-13-21(a)(2) and W. Va. C.S.R. § 7-1-15.1 provide for civil sanctions against professional engineers who are negligent, the court declines to construe Article 9.08(D) to preclude liability in tort absent an express showing of bad faith.

The parties agree that Article 9.08(D)'s requirement that the engineer act impartially when exercising its obligations under Article 9.08 informs the standard of care in this case. And even Tri-State acknowledges in its response brief that good faith considerations are relevant to the

standard of care while discussing the import of Article 9.08(D) to its claim:

> After completion of the work [i.e., Tri-State's termination], when the impact of delays and extra work could be analyzed and quantified, Tri-State submitted its claim for equitable adjustment to Burgess and Niple for review and action in its role as impartial arbiter. Rather than review the merits of the claim in an impartial and good faith manner it summarily refused to address the claim and returned it to Tri-State without decision.

ECF No. 348, at 10-11 (emphasis added).  Accordingly, the court finds that Article 9.08(D) shapes the standard of care for the professional negligence claim insofar as it is concerned with Burgess & Niple's actions relating to the denial of the 57 claims by requiring a showing that the engineer either acted partially or in bad faith.

As for Article 4.04(B), its reach is not so broad as Tri-State contends.  It does not impose on the engineer an affirmative duty to implement change orders whenever it has notice of unmarked or mismarked underground facilities.  It provides for a prompt review of underground facilities and the implementation of a change order or work change directive if the engineer determines such action to be necessary.  It also provides that in the event of any disagreement between the contractor and the owner, i.e., the Sanitary Board, as to entitlement to an adjustment in Contract Price or Contract

Times, those parties may file a claim as set forth in the claim protocols contained in Article 10.05.  The court will accordingly take this understanding of Article 4.04(B) into account when evaluating whether summary judgment is appropriate on the issue of breach of the duty of care.

Finally, the court observes that Tri-State's expert, Charles Dutill, II, P.E., D.F.E., has offered opinions concerning the standard of care according to the terms of the "[t]he Agreement for Professional Services between Burgess & Niple and the Sanitary Board of the City of Charleston for Porter's Hollow Area Wastewater System Improvements dated February 2014," i.e., the contract between the Sanitary Board and Burgess & Niple providing for the engineer's services on this project.  ECF No. 348-14, at 5.  Of particular note is Section 6.01-I of this agreement, which, according to Dutill,[3] states: "Engineer shall not at any time supervise, direct, or have control over Contractor's work nor shall Engineer have authority over or responsibility for the means, methods, techniques, sequences, or procedures of construction selected or used by Contractor . . . ."  Id.

---

[3]    The parties have not produced the contract between the Sanitary Board and Burgess & Niple in connection with the motion for summary judgment.

As Tri-State notes, ECF No. 348, at 8-9, <u>Eastern Steel</u> does not narrowly define the standard of care according to the terms of the contract between an owner and contractor.  <u>See</u> 549 S.E.2d at 275.  Indeed, <u>Eastern Steel</u> explicitly contemplates that the contract between the owner and the engineer be considered when assessing the standard of care.  <u>Id.</u>  As discussed in the succeeding section, there is some disagreement as to whether Burgess & Niple breached its duty of care by improperly dictating the means and methods of Tri-State's work on the project.  Insofar as the parties do not dispute that Section 6.01-I of the contract between Burgess & Niple and the Sanitary Board precluded Burgess & Niple from dictating the means and methods of Tri-State's work, the standard of care with respect to allegations of improper dictation of means and methods will be informed by this provision.

## 2.  Breach of the Duty of Care

Burgess & Niple contends that summary judgment is appropriate on Tri-State's professional negligence claim inasmuch as Burgess & Niple required Tri-State to adhere to the terms of its contract with the Sanitary Board regarding claim protocols set forth in the General Conditions.  ECF No. 335, at 22.  This protocol is set forth in Article 10.05 of the conditions:

A. Engineer's Decision Required: All Claims, except those waived pursuant to Paragraph 14.09,[4] shall be referred to the Engineer for decision.  A decision by Engineer shall be required as a condition precedent to any exercise by Owner or Contractor of any rights or remedies either may otherwise have under the Contract Documents or by Laws and Regulations in respect of such Claims.

B. Notice: Written notice stating the general nature of each Claim shall be delivered by the claimant to Engineer and the other party to the Contract promptly (but in no event later than 30 days) after the start of the event giving rise thereto.  The responsibility to substantiate a Claim shall rest with the party making the Claim. Notice of the amount or extent of the Claim, with supporting data shall be delivered to the Engineer and the other party to the Contract within 60 days after the start of such event (unless Engineer allows additional time for claimant to submit additional or more accurate data in support of such Claim) . . . . The opposing party shall submit any response to Engineer and the claimant within 30 days after receipt of the claimant's last submittal (unless Engineer allows additional time).

C.  Engineer's Action: Engineer will review each claim and, within 30 days after receipt of the last submittal of the claimant or the last submittal of the opposing party, if any, take one of the following actions in writing:

    1.  deny the Claim in whole or in part;

    2.  approve the claim; or

    3.  notify the parties that the Engineer is unable to resolve the Claim if, in the Engineer's sole discretion, it would be inappropriate for the Engineer to do so.  For purposes of further

---

[4]    Article 14.09, entitled "Waiver of Claims," provides only that "[t]he making and acceptance of final payment will constitute" waiver of certain claims by the Sanitary Board against Tri-State and vice-versa.  ECF No. 341-10, at 24. Inasmuch as final payment was not made, this provision is not relevant to the present analysis.

> resolution of the Claim, such notice shall be
> deemed a denial.

D.  In the event that Engineer does not take action on
a Claim within said 30 days, the Claim shall be deemed
denied.

E.  Engineer's . . . action . . . or denial . . . will
be final and binding upon Owner and Contractor, unless
Owner or Contractor invoke the dispute resolution
procedure set forth in Article 16 within 30 days of
such action or denial.

F. No Claim for an adjustment in Contract Price or
Contract Times will be valid if not submitted in
accordance with this Paragraph 10.05.

ECF No. 343, at 47-48 (emphasis added).

Burgess & Niple points out that Taylor testified

during his deposition that he was generally familiar with the

General Conditions based on work on previous projects using them

and that he was familiar with the claim protocols under the

General Conditions. ECF No. 343-6, at 24:10-23.  The Engineer

further cites the deposition testimony of Kyle Kelley, a

Tri-State employee, who admitted the 57 claims submitted on

February 26, 2018 were "filled out" after Tri-State was

terminated from the project.  Id. at 72:8-15.

The Engineer also contends that Taylor and Tri-State

were advised to comply with the formal claims process set forth

in the General Conditions.  The Engineer cites the March 7, 2017

memorandum prepared by Downey, which indicated that Haapala

expressed concerns over the progress of the project and told

Taylor that Tri-State could submit claims for additional time lost to delays at the project's outset.  ECF No. 335, at 19.  The memorandum likewise documented Taylor's representations that Tri-State could not claim anything, the delays were occasioned by Taylor's own conduct or that of Foster Supply, and Tri-State had the ability to complete the project within the time specified by the contract.  As indicated above, Taylor did not expressly deny any of these points during his deposition and conceded that the conversation documented in the memorandum occurred, during which Haapala advised Taylor of concerns about Tri-State's minimal progress as of March 7, 2017, as well as the ability of Tri-State to submit claims under the contract to recoup time lost at the outset of the project.

Burgess & Niple similarly points out that the minutes of monthly job progress indicate that Tri-State was continually advised to adhere to the claim protocols of the contract.  The February 21, 2017 minutes state: "Contractor asked to submit paperwork for claims in accordance with Contract Documents."  ECF No. 358-3, at 20.  The March 7, 2017 minutes state "Contractor directed to provide written documentation of claims in accordance with the Contract Document General Conditions."  ECF No. 343-6, at 15.  The job progress meeting minutes for April 6, 2017, May 2, 2017, June 6, 2017, July 11, 2017, August

3, 2017, September 12, 2017, October 3, 2017, November 7, 2017, and December 5, 2017, contain the following: "Contractor directed to provide written documentation of claims in accordance with the Contract Document General Conditions. Written protocol for filling a claim must be followed, within the specified time frame, and claims not made in accordance with the protocol & specified time will be denied." Id. at 25, 35, 44; ECF No. 358-3, at 62, 73, 85, 97, 111, 121.  The minutes for all of these job progress meetings were distributed to Tri-State employees, including Taylor. See ECF No. 358-3, at 21, 28, 37, 46, 55, 65, 77, 89, 101, 113, 123.

Burgess & Niple asserts that Taylor has admitted during his deposition that the Engineer did not require Tri-State to "do any more [than] what the plans and specs on the Project required." ECF No. 335, at 24.  When asked during his deposition about whether Tri-State was "required to do more than the plans and specs required," Taylor responded that he was "not saying that" and indicated that Burgess & Niple was "nitpicky" and "would dig at certain little things," such as directing the contractor "to take the silt fence down to get [Tri-State's] machine up and down the road." ECF No. 343-3, at 68:2-16.  When pressed further on the "nitpicky" comment, Taylor responded that there "may have been some valid non[-]compliance issues [on

Tri-State's part]," and he agreed that "[i]t's the engineer's job to say you're not doing this according to the plans and specs" and that it was Tri-State's job to fix issues of noncompliance with "plans and specs."  ECF No. 358-1, at 86:1-23.

Burgess & Niple further contends that Tri-State lacks a competent expert to opine about breach of the duty of care. The Engineer argues that the contractor's expert, Dutill, is not qualified to be an expert and has not reviewed the relevant contract documents prescribing the standard of care, i.e., the General Conditions.  ECF No. 335, at 26-28.

Dutill's expert report is based on a review of the following documents: "Agreement for Professional Services, Porter's Hollow Area Wastewater System Improvements, between Burgess & Niple, Inc. and The Sanitary Board of the City of Charleston, Kanawha County, West Virginia (February 2014)"; "Summary of Project prepared by Eric Taylor of Tri-State"; "Submitted claims and response by Burgess & Niple"; "Letter to Tri-State Pipeline, Inc. from Burgess & Niple regarding Written Claim Nos. 1 through 57 (March 23, 2018)"; "Letter to Johnstone & Gabhart, LLP from Jackson Kelly, PLLC regarding Termination for Cause of Tri-State Pipeline, Inc. Project (May 2, 2018)";

and "Tri-State Pipeline, Inc.'s Fourth Party Complaint Against Burgess & Niple, Inc."  ECF No. 343-7, at 37.

Dutill agreed during his deposition that he did not review the contract between the Sanitary Board and Tri-State, including the "plans, spec[ifications], the general conditions, [and] the supplementary general conditions" incorporated by reference therein, prior to issuing his report.  ECF No. 343-8, at 88:24-89:15.  Dutill further stated that the standard of care would be based on the "contract between the parties," although the court notes that the transcript does not clearly indicate whether he was referring to the contract between the Sanitary Board and Tri-State, which he did not review, or the separate contract between the Sanitary Board and Burgess & Niple, which he did review.  ECF No. 343-8, at 123:14-124:12.  At any rate, Burgess & Niple contends that Dutill is not qualified to offer opinions regarding the contract between Burgess & Niple and the Sanitary Board since he is not licensed as an engineer in the State of West Virginia.  ECF No. 335, at 27.

Tri-State responds that there is sufficient evidence to create triable issues of fact with respect to Burgess & Niple "improperly directing Tri-State's work, failing to recommend compensation to Tri-State with respect to matters as to which it had actual, contemporaneous notice, and by failing and refusing

to review and, where appropriate, recommend payment upon claims submitted by Tri-State." ECF No. 348, at 19.

As evidence of the former, Tri-State offers the deposition testimony and April 5, 2021 affidavit of Taylor. Taylor, in his affidavit, states that:

> Burgess & Niple and its resident project representatives improperly directed Tri-State's work throughout the course of its performance resulting in additional costs, lost efficiency and delays.
>
> . . .
>
> During the performance of Tri-State's work Burgess & Niple maintained multiple resident project representatives onsite daily to observe and record the progress of the work. These RPRs maintained daily, written reports documenting problems encountered during construction of the work. Such issues were also discussed with RPRs on-site. As such, B&N had actual contemporaneous knowledge of the circumstances giving rise to each of Tri-State's claims including, but not limited to, change in extra work, mismarked, unmarked, or leaking existing underground utilities, subsurface obstructions and rock encountered, and restricted access to work areas.
>
> Burgess & Niple commonly required Tri-State to proceed with changed and extra work without properly executed work change directives or approved change orders but repeatedly advised Tri-State's onsite personnel that Tri-State would be paid for changed or extra work.

ECF No. 348-2, at ¶¶ 8, 10-11. In Taylor's July 7, 2020 deposition, the following exchange occurred:

> Q. Tell me how it's different.

A.  Well, on this job [the Burgess & Niple resident project representative] would let you install it and then they would tell you [that] you need to dig it back up the next day, maybe scoot a manhole back an inch around a bunch of utilities and things when he knew he was going to reject it the next day. Yes, very different on this project than any one I've ever been on.

Q. Okay.  So when you say when [he] knew he was going to reject it the next day, how do you know that or is that just your opinion?  For example, did [the] RPR say, yeah, I knew about this yesterday and I was going to reject it, but I thought I'd let you cover it up so you could dig it up again?

A. If there was something like that it was just you guys got to dig that up. Standing right there watching your back [and the] fellows put it in. Next morning [he'd] be out there when you got to work, you all got to dig that up and scoot it back an inch.

Q.  Okay.

A.  Kind of smile and drive off.

ECF No. 348-5, at 32:2-22.


        Tri-State also points to the following exchange to demonstrate improper direction of Tri-State's work through management of its "means and methods" of working on the project:

A.  It was daily. Anything we did.

Q.  Okay, so I guess we start at day one, how did they do it?

A.  I can't answer that.

Q.  Are you going to be able to answer any specific day or any specific time that they directed your means and methods?

A. I can't answer that. I don't know. I can tell you one right now. The lateral up there, 1440 on Callie Road.

Q. Okay. How did they direct your means and methods there.

A. We were instructed to install a certain way and when we did it was wrong and he wanted it fixed.

. . .

Q.  Okay. Any other specifics because you're the one . . .

A.  It was all the time.

Q. Okay.

A. It was endless.

Q. Okay, so I guess you're the one that's got to tell the jury every time they did it and this is my one opportunity to ask you when they did it.

A. Best of my knowledge, I mean, I'm telling you everything I can tell you, you know, as far as telling you every time they did it, no. I mean, I can't tell you every single time they did it, but it was daily. Had a meeting with Mr. Richards about it early on in this contract about conduct from his RPRs and them telling us our means and methods on the project?

Q. Okay.

A. There was suppose[d] to be an investigation made. There was never anything made.

Q. Never anything made or never anything reported back to you?

A.  Ain't nothing reported back to us.

Id. at 289:7-290:23.

Tri-State further cites the report of Dutill, who, opines after reviewing the "Summary of Project prepared by Eric Taylor of Tri-State" that:

> There is a May 22, 2017 entry [in Taylor's summary] that states, "CONTRACTOR discusses ENGINEER/RPR dictating CONTRACTORS MEANS AND METHODS AND ENGINEER/RPR CONDUCT TOWARD CONTRACTOR EMPLOYEES - CONTRACTOR INFORMS ENGINEER THAT ANOTHER SUPERVISOR HAS QUIT HIS JOB OVER BEING TALKED TO LIKE A DOG ON THE PROJECT." This entry supports my preliminary conclusion that the Engineer was dictating methods and means for the construction to a noteworthy degree, in contradiction to their agreement with the City Board as well as to the Standard of Care for such construction projects.

ECF No. 348-14, at 10.  Dutill also asserts in his report that Claims 16, 53, 54, 55, 56, and 57 are examples of Burgess & Niple improperly dictating the means and methods of Tri-State's work on the Project.  Id. at 7-8.  With respect to additional work generally, Dutill states:

> It is my opinion that one of the most inappropriate actions of Burgess & Niple was to require additional work from Tri-State without recommending associated additional compensation nor with associated recognition of project delays resulting from such additional work.  This would include but not necessarily be limited to Claims #1, #3, #4, #6, #7, #8, #9, #14, #15, #16, #17, #19, #20, #21, #26, #27, #28, #31, #33, #34, #40, #43, #48, #49, #50, #53, #54, #55, #56, and #57.

Id. at 7.

Tri-State further argues that Burgess & Niple had actual and contemporaneous knowledge of circumstances causing delays and warranting additional compensation.  On the issues concerning the manhole submittals and delivery, Tri-State cites the affidavit of Taylor, which states:

> Tri-State's progress was delayed by the Sanitary Board and Burgess & Niple's failure to timely review and approve submittals for the project. For example, manhole submittals were not approved until 40 days after the submittal was presented and pipe and related material submittals were not approved until at least 60 days after presentation.
>
> Even after approval of submittals for manholes Tri-State's commencement of its work was significantly delayed by the repeated and improper rejection of manholes delivered to the site by Tri-State's suppliers. These materials were rejected by Burgess & Niple's representatives, not by Tri-State Pipeline. As a result of these repeated and unjustified rejections, Foster Supply, Inc., a regular supplier of precast manholes to the Sanitary Board for use on other projects and one of Tri-State's primary suppliers on this project, withdrew and refused to supply manholes for the project.
>
> As a result of delayed approval of submittals and improper rejection of materials delivered to the project, Tri-State's commencement of its installation work was delayed by nearly 4 months.[5]

ECF No. 348-2, at ¶¶ 4-6.  Tri-State cites the deposition testimony of Taylor, who stated that prior to March of 2017, he asked Craig D. Richards, Director of Engineering Services for

---

[5]    The court takes this four-month delay to refer to the period between the October 10, 2016 start date for the project as set forth in the notice to proceed and the February 1, 2017, date on which pipe installation began.

Burgess & Niple, to suspend or "freeze" the contract due to the delays incurred by the nonconforming manhole problem and that Richards responded that Burgess & Niple would rather not suspend the contract.  ECF No. 348-3, at 277:4-23.

The contractor also points to the affidavit and deposition testimony of Taylor to establish other matters causing delay.  In his affidavit, Taylor states:

> During Tri-State's performance of its work on the project it suffered additional costs and delays as a result of, among other things, the following:
>
> • Changes in the work.
> • Extra work.
> • Mismarked or unmarked, or leaking existing underground utilities.
> • A landslide in the area of Anderson Heights Road that affected access to portions of the work.
> • Other conditions restricting access to portions of the work.
> • The lack of necessary easements.
> • Improper work stoppages.
> • Improper rejection of materials delivered to the project.
> • Mandated work sequence changes and other improper direction of Tri-State's work by the Project Engineer.
> • Underground obstructions and subsurface conditions found different, including far more hard rock than could have been anticipated.

ECF No. 348-2, at ¶ 7.  Some of these issues causing delays were also addressed in Taylor's deposition, including the Sanitary Board's failure to procure three easements (two on "15W10, Parcel 3 and 4" and one behind a house on Brittany Woods Road),

ECF No. 348-4, at 393:12-394:1, the stop work orders, id. at 394:23-395:15, the lack of access to portions of city streets, id. at 395:20-396:3, mismarked or unmarked utility lines, id. at 399:8-401:13, a prior leak from an existing sewer line, id. at 402:17-403:4, and a gas leak, id. at 404:21-407:23.  As noted above, Taylor avers in his affidavit that Burgess & Niple's resident project representatives had actual and contemporaneous knowledge of the events constituting its claims for extra time and additional compensation.

Tri-State argues that Burgess & Niple's failure to investigate unmarked and mismarked underground facilities and implement change orders constituted a breach of its duty of care inasmuch as its resident project representatives documented these conditions and were required to further investigate the facilities and, if necessary, implement change orders increasing the Contract Times and Contract Price under Article 4.04(B) of the General Conditions.  ECF No. 348, at 9-10.  Tri-State also argues that Burgess & Niple breached the duty of care with respect to its obligations under Article 9.08(D):

> After completion of the work, when the impact of delays and extra work could be analyzed and quantified, Tri-State submitted its claim for equitable adjustment to Burgess and Niple for review and action in its role as impartial arbiter. Rather than review the merits of the claim in an impartial and good faith manner it summarily refused to address

the claim and returned it to Tri-State without
decision.[6] In defense of its failure to perform its
function as impartial arbiter, B&N argues that it was
justified by Tri-State's failure to strictly adhere to
the formal notice provisions of the contract. This
does not excuse B&N's failure under the facts and law
applicable to this case.

The claims asserted in its Request for Equitable
Adjustment were issues as to which B&N had notice
during construction of the Project. It was only after
completion of the work that Tri-State was in a
position to quantify the losses it incurred as a
result of the many delays incurred and the extra work
required during construction of the Project. B&N owed
a duty to address those matters as to which it had
actual notice during the performance of the work and
owed a continuing duty to address those claims when
submitted after completion of the work. Its failure to
do so constituted a failure to adhere to the standard
of care applicable to other engineers in similar
circumstances.

ECF No. 348, at 10-11.

Tri-State also cites Dutill's report and deposition

testimony opinions that Burgess & Niple's conduct fell outside

the standard of care.  Dutill generally opines that while the

submission of the 57 claims by Tri-State on February 26, 2018,

may not have complied with the claim protocols for the project,

the claims "met the spirit of the cont[r]act documents."  ECF

No. 348-14, at 4.  He goes on to describe how various of the 57

---

[6]    The court notes that Tri-State does not describe or cite to
this "claim for equitable adjustment."  However, it appears from
the context of this argument that Tri-State refers to the
February 26, 2018, "Formalization/Substantiation of
Claims/Change Order Requests," in which it submitted the 57
claims to Burgess & Niple.

claims implicate deviations from the relevant standard of care
by Burgess & Niple and asserts that the 57 claims should have
been substantively considered by the Engineer.  Id. at 4-11.

    In one portion of deposition testimony cited by
Tri-State, Dutill stated that while, at the time of his expert
report's composition, he "didn't know that [he] had much
information such that [he] knew that there were aspects of the
construction that Burgess & Niple was aware of where Tri-State
was due additional money" and that although the contractor would
ordinarily have to provide a cost estimate and additional time
estimate for claims, he had reviewed the 57 claims and in his
professional opinion, Burgess & Niple would have had notice of
certain conditions underlying the claims, including road
closures, mismarked and unmarked utilities, and the Anderson
Heights Road landslide, such that it could determine that
additional compensation was necessary.  ECF No. 348-15, at
115:11-117:20.  In another cited portion, Dutill indicated that,
based on his experience, it was "significantly outside the
standard of care for the engineer to decide that they're not
going to consider those [57] claims at all in their entirely
[sic]," due to untimeliness, although he allowed that the
untimeliness could be considered and used to reduce the amount

of additional compensation claimed by the contractor.  ECF No. 348-15, at 133:13-135:21.

Tri-State does not respond to Burgess & Niple's challenges to Dutill other than to say that he is sufficiently qualified to offer opinions on the relevant standard of care and breach of the duty of care.  ECF No. 348, at 16-19.

The court observes that analysis of breach of the duty of care cannot be isolated from the prior determination that Tri-State was properly terminated for cause.  As the court noted in its Companion Opinion on the matter, Tri-State was not entitled to any additional time after it was terminated.  <u>See</u> Companion Opinion, at 61-62.  This is so inasmuch as Articles 15.02(B)(1) and (3) of the General Conditions provide that following an event justifying for-cause termination, "Owner may after giving Contractor (and surety) seven days written notice of its intent to terminate the services of the Contractor": "exclude Contractor from the Site . . . ."; and "complete the Work as Owner may deem expedient" without specifying any procedure for re-instatement or time adjustments following for-cause termination.  ECF No. 343, at 65.  And more importantly, Article 15.02(C) provides that:

> Contractor shall not be entitled to receive any
> further payment until the Work is completed.  If the
> unpaid balance of the Contract Price exceeds all

> claims, costs, losses, and damages (including but not
> limited to all fees and charges of engineers,
> architects, attorneys, and other professionals and all
> court or arbitration, or other dispute resolution
> costs) sustained by the Owner arising out of or
> relating to completing the Work, such excess will be
> paid to the Contractor.  If such claims, losses, and
> damages exceed such unpaid balance, Contractor shall
> pay the difference to Owner.  Such claims, costs,
> losses, and damages incurred by Owner will be reviewed
> by Engineer as to their reasonableness and, when so
> approved by Engineer, incorporated by Change Order.
> When exercising any rights or remedies under this
> Paragraph, Owner shall not be required to obtain the
> lowest price for the Work performed.

Id. at 65-66.  Burgess & Niple plainly recognized this issue

when it denied the 57 February 26, 2018 claims in its March 23,

2018 letter denying the claims when it stated:

> Engineer notes that Contractor appears to disagree
> with Owner's correspondence dated December 8, 2017
> that the contract was terminated for cause pursuant to
> subarticle 15.02B.  Under Article 15, specifically
> subarticle 15.02C, Contractor is entitled to no
> further payment until the Work is completed and only
> if there is money remaining in the contract.

ECF No. 341-37.

        Simply put, the General Conditions prohibited

Tri-State from obtaining additional time or compensation at the

time the 57 claims were submitted on February 26, 2018 since

Tri-State was properly terminated for cause.  There is no

evidence to the contrary.  Dutill's opinion briefly mentions

that Tri-State was terminated for cause, and he apparently

reviewed the March 23, 2018 letter from Burgess & Niple that

cites Article 15.02(C).  But the expert does not analyze this issue, nor could he — he did not review the contract between the Sanitary Board and Tri-State or the General Conditions incorporated thereby prior to offering his report.

Since Tri-State was unable to obtain additional time after proper for-cause termination, it cannot be said that Burgess & Niple breached the duty of care by acting partially when it denied the claims on March 23, 2018 insofar as entitlement to additional time is contemplated by the claims. And since Tri-State was unable to obtain additional compensation after proper for-cause termination until the project was completed, which occurred in 2020, it cannot be said that Burgess & Niple breached the duty of care by denying the claims on March 23, 2018, particularly where the Engineer explicitly informed the contractor that it could not presently obtain further payment under Article 15.02(C).  Thus, to the extent Tri-State's claims are premised on Burgess & Niple's failure to accommodate the contractor after for-cause termination, summary judgment is appropriate.

Insofar as Burgess & Niple's conduct prior to termination is contemplated by Tri-State's professional negligence claim, the court observes that the February 21, 2017 meeting minutes reflect that Tri-State was advised to comply

with the claim protocols found in the General Conditions.  The
job progress meeting minutes for March 7, 2017, April 6, 2017,
May 2, 2017, June 6, 2017, July 11, 2017, August 3, 2017,
September 12, 2017, October 3, 2017, November 7, 2017, and
December 5, 2017 likewise indicate that Tri-State was informed
that it should comply with the requirements of the claim
protocols found in the General Conditions.  Downey's March 7,
2017 memorandum indicates that Haapala, the Sanitary Board's
employee, informed Taylor during the March 7, 2017 meeting that
he could submit claims and "regain time" for delays at the
outset of the project, such as the manhole delays, if Burgess &
Niple or the Sanitary Board was at fault.

          Moreover, Article 9.08(D), which both parties
acknowledge to apply, required Burgess & Niple to act
impartially toward both Tri-State and the Sanitary Board when
assessing claims.  The Sanitary Board requested compliance with
the Article 10.05 claim protocols applicable to both itself and
Tri-State.  If Burgess & Niple were to have ignored the Sanitary
Board's affirmative requests for compliance with terms of the
contract, it could conceivably be argued that the Engineer was
acting partially in violation of its Article 9.08(D) obligations
by allowing, to the detriment of the Sanitary Board, Tri-State

to obtain additional time and compensation without formally
noticing and substantiating claims under Article 10.05(B).

Thus, it appears that Burgess & Niple, for the most
part, acted impartially by forcing compliance with the
contractual claim protocols in Article 10.05 of the General
Conditions.  Tri-State agreed to comply with the General
Conditions when it entered into the contract and was aware of
its requirements while working on the project.

However, Claims 1 through 7 were originally submitted
by Tri-State prior to its December 8, 2017 termination, as set
forth in the court's Companion Opinion on the matter.  See
Companion Opinion, at 77-91.  As described therein, Claims 2, 4,
5, and 7 were either appropriately granted by the Engineer or
appropriately denied under the claim protocols of Article 10.05,
including the substantiation requirement.  See id.  Claim 2,
"Line AH9 – Hand Work - Proposed Main Marked Incorrectly," which
sought $2,269.91 and one day of additional time to be added to
the contract, ECF No. 341-36, at 4, was incorporated in the
first change order entered on July 11, 2017, and revised on
November 6, 2017.  See ECF No. 341-13; ECF No. 341-36; ECF No.
358-3, at 62.  Claim 2 was thus resolved and discharged.

Claim 4, "Line CR2 – Cease Use of McKnoll Lane –
Coalmine under Road," which sought $215,219.34 and 16 additional
days in relation to McKnoll Road access problems caused by a
coalmine entrance under the road, ECF No. 341-36, at 4, is
reflected in the minutes of a July 11, 2017 job progress
meeting.  ECF No. 358-3, at 61.  Tri-State has produced no
evidence of Claim 4's timely written substantiation or any other
negotiations regarding this claim.  Burgess & Niple's failure to
grant this claim accordingly does not reflect partiality in
breach of its duty of care.

The July 11, 2017 job progress meeting minutes
indicate that substantiation for Claim 5, "Line AH9 – Field
Order No. 5 – Hand Work, Work Stopped due to Unsigned/Modified
Easements," ECF No. 341-36, at 4, was submitted but that it was
the "same document used on Claim No. 2."  ECF No. 358-3, at 61.
Notably, Claim 2 and Claim 5 each concern Line AH9 and request
$2,269.91 as well as a single day extension, and the written
substantiation submitted on February 26, 2018, was the same for
both claims even though they appear to address different issues
concerning Line AH9.  See ECF No. 341-36, at 4; ECF No. 343-5,
at 9-12, 23-26.  Assuming they are different claims, there is no
evidence that Tri-State submitted substantiation that was not a

duplicate of that submitted for Claim 2 such that Burgess & Niple's failure to grant the claim could be considered partial.

Claim 7, "Line PB1, PB4, PB5, PB6 Chatsworth Lane Ingress/Egress Cease & Desist Order & Emails," which sought $483,388.59 and 36 additional days, ECF No. 341-36, at 4, is referenced in the minutes of an August 3, 2017 job progress meeting.  ECF No. 358-3, at 73.  Kelley requested an extension of the substantiation deadline for Claim 7 on September 5, 2017, which was denied by Utt inasmuch as the written notice for that claim was untimely.  ECF No. 358-2, at 3-4.  The substantiation deadline would have elapsed on August 1, 2017, if Tri-State's assertion that the claim arose on June 2, 2017 is correct.  See ECF No. 452, at 7.  Moreover, Willoughby, Tri-State's own expert, determined that Claim 7 was "not justified."  ECF No. 351-6, at 25 (emphasis added).  This is supported by the testimony of Haapala and Utt.  See ECF No. 351-1, at 70:16-20; ECF No. 351-25, at 122:5-7.  Accordingly, the Engineer did not breach its duty to act impartially by failing to grant Claim 7.

On the other hand, Claim 1, "Line SB1 – Mobilization & Demobilization," which sought $43,233.62 and 30 additional days, ECF No. 341-36, at 4, is discussed in the minutes of a June 6, 2017 job progress meeting.  ECF No. 358-3, at 53.  The August 3, 2017 minutes state that "Engineer has completed review for Claim

No. 1 – Substantiation for Claim," although this notation is not further explained.  Id. at 73.  Tri-State has provided an undated "Written Summary of Contractor Claim No. 1," in which Burgess & Niple concluded that Claim 1 was worth $10,247.71 and three additional days of contract time.[7]  ECF No. 452-1.  This document indicates that Burgess & Niple requested demobilization on Line SB1 on April 23, 2017 so that the Sanitary Board "could secure revised easements/right[s] of entry for affected parcels of land," whereupon Tri-State moved the crew assigned to Line SB1 on April 24, 2017 and was subsequently notified that it could remobilize to Line SB1 on May 22, 2017.  Id. at 1, 3.  The document is stamped as a draft, and it is not clear whether it was conveyed to Tri-State while it was working on the project.  See id.

Ultimately, Burgess & Niple informed Tri-State by letter dated August 10, 2017, that Claim 1 would not be

---

[7]    The Written Summary is not signed by a Burgess & Niple employee, but it is apparent that it was drafted by the Engineer.  For example, it uses language granting additional compensation and additional days, e.g., "Total Compensation awarded for Contractor Written Claim No. 1 is $10,247.71" and "Total Days granted for Contractor Written Claim No. 1 is 3 days," which is the province of the Engineer under Article 10.05.  ECF No. 453-1, at 2-3.  In addition, it cites to the reports of Burgess & Niple's resident project representatives as sources for its determination.  See id. at 3.

reviewed.  See ECF No. 452-2.  The letter noted that the Engineer had prompted Tri-State's demobilization from Line SB1:

> On Sunday April 23, 2017 the Engineer, by email communication, requested consideration by the Contractor to relocate a Work Crew that was working on Contract 15-1, Line SBl to another line segment on the referenced project . . . . Contractor confirmed, by email communication, on Sunday April 23, 2017, the Work Crew on Line SBI would mobilize to Contract 15-2, Line AH2 on Monday April 24, 2017.

Id.  Nevertheless, Burgess & Niple declined to review the claim inasmuch as the event giving rise to it occurred on April 23, 2017, the date of demobilization from Line SB1, and the notice of the claim was not received until June 6, 2017, more than 30 days after the claim arose, during the job progress meeting on that date.  ECF No. 452-2.

This letter did not reject Claim 1 on the basis of failure to timely substantiate the claim.  See id.  The exact date of Claim 1's substantiation prior to Tri-State's termination is unclear, but the substantiation for this claim submitted by Tri-State on February 26, 2018, bears a June 6, 2017 date.  See ECF No. 343-5, at 9.  June 6, 2017 would fall within the 60-day window to substantiate the claim inasmuch as it arose on April 23, 2017.

Viewing the evidence in the light most favorable to Tri-State, the court finds there to be a dispute of material fact regarding the partiality of the Engineer in denying Claim 1.  The Engineer initiated the circumstances underlying the claim by requesting that Tri-State demobilize from Line SB1. This appears to have been done in the interests of the Sanitary Board, which needed to secure revised easements.  Tri-State complied and demobilized on April 24, 2017.  Tri-State thereafter submitted a notice of the claim and written substantiation.  Burgess & Niple contemplated granting $10,247.71 and three additional days of contract time but ultimately rejected it inasmuch as the written notice was untimely.

Why Burgess & Niple ultimately changed course is not clear from the record.  But given that actual notice of the circumstances underlying the claim was afforded to the Sanitary Board and Burgess & Niple, the claim was substantiated in writing, and Burgess & Niple itself instigated Tri-State's demobilization from Line SB1 (ostensibly for the benefit of the Sanitary Board, which needed to procure revised easements), the court finds that the professional negligence claim may proceed insofar as it concerns the partiality of Burgess & Niple's decision to deny Claim 1.

Claim 3, "Line AH1 – Anderson Heights (Land Slide/Slip)," which sought $347,549.76 and 31.50 additional days, ECF No. 341-36, at 4, is reflected in the minutes of a July 11, 2017 job progress meeting.  ECF No. 358-3, at 62.  An internal August 8, 2017 memorandum composed by Utt states that Burgess & Niple received the substantiation for Claim 3 on July 20, 2017.  ECF No. 452-3.  Utt also sent an August 10, 2017 email to Downey of the Sanitary Board conveying "his comments . . . to date" on Claim 3.  ECF No. 452-4, at 1.  This email states that written substantiation was submitted in accordance with Article 10.05(B).  Id.  Utt noted that the substantiation included supporting documentation providing a summary and calculation for the $347,549.76 requested in Claim 3 but did not, however, include a summary or calculation for the additional 31.50 days requested therein.  Id.  The email proceeds to note how the substantiation's supporting documentation did not provide justifications for various issues, e.g., 225 hours claimed for 2 laborers, 2 drivers, a pipe layer, and a supervisor, which would ostensibly pertain to both the costs and additional time claimed by Tri-State.  See id.  In any event, the record does not reflect any communication from Burgess & Niple to Tri-State as to whether Claim 3 was granted or denied or whether the substantiation it deemed to be filed in accordance with Article 10.05(B) was inadequate.  It appears the

claim would have been deemed denied under Article 10.05(D) on August 19, 2017, i.e., 30 days after the submission of the July 20, 2017 substantiation.

Utt may have had legitimate reasons for his skepticism of the relief sought in Claim 3 given the documents provided by Tri-State.  However, he acknowledged Tri-State's compliance with the claim protocols of Article 10.05.  Moreover, the August 10, 2017 email to Downey conveying Utt's "comments" on the claim could be construed to evidence some partiality of Burgess & Niple toward the Sanitary Board inasmuch as it does not appear that Utt communicated his concerns to Tri-State as well.  Thus, the court concludes that sufficient evidence of partiality exists such that the professional negligence claim may proceed insofar as it concerns Burgess & Niple's handling of Claim 3.

Claim 6, "Line AH1 Gas Line Relocation (Work Stopped/Safety Issue/Gas Company)," which sought $42,937.94 and 8 additional days in relation to a gas leak, is referenced in the minutes of an August 3, 2017 job progress meeting.  ECF No. 358-3, at 73.  Tri-State employee Kyle Kelley requested an extension of time to substantiate Claim 6 by email on September 5, 2017.  ECF No. 358-2, at 3-4.  Utt responded by email on September 7, 2017, granting an extension to 5:00 p.m. on September 13, 2017.  Id. at 3.  Kelley submitted substantiation

for Claim 6 by email on September 13, 2017 at 6:47 p.m., approximately an hour-and-a-half after the new substantiation deadline.  ECF No. 358-2, at 5.  Nevertheless, Burgess & Niple declined to review Claim 6 by letter dated September 13, 2021 inasmuch as the claim was not submitted by the 5:00 p.m. deadline.  ECF No. 452-6.

The refusal to review Claim 6 after it was submitted a short time following the new substantiation deadline arguably demonstrates partiality on the part of Burgess & Niple.  This is so even if Tri-State did not later request dispute resolution under Article 16, rendering the Sanitary Board not liable for breach of contract based on a failure to pay Claim 6.  See Companion Opinion, at 89.  Accordingly, the court concludes that sufficient evidence exists such that the professional negligence claim may proceed insofar as it concerns Burgess & Niple's handling of Claim 6.

As for Article 4.04, there is no indication that Burgess & Niple breached any obligation imposed thereby. Tri-State admits that Burgess & Niple's resident project engineers documented the unmarked and mismarked underground facilities.  This would seem to satisfy any obligations of the Engineer under that provision.  The decision to implement a change order based on unmarked or mismarked underground

facilities is ostensibly grounded in the Engineer's discretion, and the provision explicitly instructs the contractor to comply with the claim protocols of Article 10.05 if, after failing to reach agreement with the Sanitary Board, it believes it is entitled to an adjustment of Contract Times or Contract Price.

With respect to the issue of changed or extra work, Taylor has testified during his deposition that the Engineer did not require work outside the scope of the contract's plans and specifications but only that the Engineer was "nitpicky." Taylor's later affidavit asserts that Burgess & Niple improperly directed changed or extra work, though he is unable to cite and substantiate particular instances.

As Burgess & Niple argues, ECF No. 355, at 10-12, the relevant statements of Taylor's affidavit run afoul of the sham-affidavit rule.  Under the sham-affidavit rule, statements made in an affidavit may be disregarded where there is a bona fide inconsistency between the averments of the affiant and his prior deposition testimony.  See, e.g., Kinser v. United Methodist Agency for the Retarded — W. N.C., Inc., 613 F. App'x 209, 210-11 (4th Cir. 2015); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 n. 7 (4th Cir. 2001).  Here, the earlier deposition testimony of Taylor plainly indicates that Tri-State was not required to do more than the contract plans and

specifications required, that it was appropriate for the
Engineer to require compliance with the plans and
specifications, and that it was Tri-State's obligation to comply
with the Engineer's directives.  Taylor's later affidavit is
inconsistent with this testimony and cannot be relied upon to
create a dispute of material fact.

In addition, Dutill's opinions regarding claims that
involve "additional work" ordered by Burgess & Niple cannot
create a dispute of material fact on such an issue.  As noted
above, Dutill did not review the plans or specifications for the
project, which were incorporated by reference in the contract
between Tri-State and the Sanitary Board, see ECF No. 341-7, at
5-6, just as he did not review the General Conditions.  It is
difficult to ascertain how he could form an opinion about
"additional work" to be performed by Tri-State outside the scope
of the contract without reference to the actual plans and
specifications incorporated in the contract itself.

Thus, apart from the evidence regarding Burgess &
Niple's handling of Claim 1, there is not sufficient evidence to
support the professional negligence claim on the basis of
changed or extra work.

Finally, there is the related issue of improperly
dictating the means and methods of Tri-State's work on the

60

project.  Taylor has offered deposition testimony that this
occurred, and Dutill has opined on this issue as it relates to
Section 6.01-I of the contract between Burgess & Niple and the
Sanitary Board in his expert report.[8]

    Burgess & Niple claims that Dutill is not qualified to
opine about the implications of the contract between the
Engineer and the Sanitary Board inasmuch as he is not licensed
as an engineer in West Virginia.  Federal Rule of Evidence
702(a) provides: "A witness who is qualified as an expert by
knowledge, skill, experience, training, or education may testify
in the form of an opinion or otherwise if . . . the expert's
scientific, technical, or other specialized knowledge will help
the trier of fact to understand the evidence or to determine a
fact in issue . . . ."  In J. F. Allen Corp. v. Sanitary Bd. of
Charleston, 2020 W. Va. LEXIS 701 (W. Va. 2020) (unpublished
memorandum opinion), the Supreme Court of Appeals considered a
nearly identical argument from Burgess & Niple regarding the
admissibility of Dutill's testimony for the contractor in that

---

[8]    Unlike his opinions on "additional work," which would
ostensibly require some basis in the work required to be
performed under the contract between Tri-State and the Sanitary
Board, Dutill's opinions on the improper dictation of the means
and methods of the contractor is tethered to a document he
actually reviewed, the contract between Burgess & Niple and the
Sanitary Board, and does not appear to be dependent on any
unreviewed document pertaining to the unreviewed contract
between Tri-State and the Sanitary Board.

case under West Virginia Rule of Evidence 702(a), which is worded similarly to Federal Rule of Evidence 702(a). The court rejected Burgess & Niple's argument, concluding that the fact that he is not licensed in West Virginia does not preclude him from offering expert testimony in a court of law and indicated that disputes over his qualifications were best left for cross-examination. Id. at *33-36. The court finds this reasoning persuasive, and Dutill will not be precluded from offering expert testimony with respect to the contract between Burgess & Niple and the Sanitary Board.[9]

Inasmuch as Taylor and Dutill have provided evidence concerning the improper dictation of means and methods in violation of the duty of care, the court finds that there is a dispute as to material facts on this specific issue. Thus, the court declines to dismiss the fourth-party complaint's professional negligence claim insofar as it concerns the improper dictation of means and methods and damages pertaining thereto.

---

[9]    Insofar as Burgess & Niple makes other qualifications-based arguments with respect to Dutill, the court has already addressed the admissibility of his testimony as it pertains to the motion in limine filed by Burgess & Niple and the Sanitary Board (ECF No. 380) during the pretrial conference held on June 11, 2021.

The court notes that while the dictation of means and methods issue may underlie some of the 57 claims asserted on February 26, 2018, including, according to Dutill, Claims 16, 53, 54, 55, 56, and 57, the substantive legal issues are distinct.  Even though the evidence supports summary judgment on the issue of Burgess & Niple's failure to authorize the extensions of time and additional compensation sought by Tri-State after termination, there is evidence sufficient to survive summary judgment on the matter of whether Burgess & Niple's conduct dictating means and methods, which underlies these claims, breached its duty of care as informed by its contract with the Sanitary Board.

In addition, the potential liability of Burgess & Niple for the conduct relating to the direction of means and methods is distinct from the liability of the Sanitary Board for the claims themselves.  As stated in the court's Companion Opinion, the Sanitary Board is not contractually liable to pay any of Claims 8-57 inasmuch as Tri-State did not comply with the claim protocols found in Article 10.05(B), which included a substantiation requirement that cannot be said to have been waived or otherwise modified.  See Companion Opinion, at 74, 76-77.  However, if Claims 16, 53, 54, 55, 56, and 57 were prompted by the conduct of Burgess & Niple directing means and

methods of Tri-State, which subsequently incurred costs for Tri-State, Burgess & Niple may be liable for professional negligence insofar as Section 6.01-I of the contract between Burgess & Niple and the Sanitary Board forbids the Engineer's dictation of means and methods of the contractor.

Thus, Tri-State's professional negligence claim may proceed on a limited basis. Tri-State may pursue the professional negligence claim insofar as it concerns Burgess & Niple's potentially partial handling of Claims 1, 3 and 6 and the Engineer's dictation of Tri-State's means and methods for the circumstances underlying Claims 16, 53, 54, 55, 56, and 57,[10] as well as the Callie Road "lateral" incident testified to by Taylor. Of course, Tri-State will have to prove damages pertaining to specific breaches of the duty of care at trial.

## B. The Motion for Partial Summary Judgment as to Taylor's Claims

Burgess & Niple's motion for partial summary judgment seeks summary judgment on the claims of fourth-party plaintiff

---

[10] The following amounts were requested by Tri-State in these claims: $43,233.62 (Claim 1); $347,549.76 (Claim 3); $42,937.94 (Claim 6); $204,892.38 (Claim 16); $45,368.44 (Claim 53); $6,182.72 (Claim 54); $17,640.46 (Claim 55); $5,556.52 (Claim 56); and $19,404.39 (Claim 57). ECF No. 343-5, at 4. Willoughby values these claims as follows: $42,063 (Claim 1); $317,317 (Claim 3); $12,536 (Claim 6); $203,659 (Claim 16); $40,352 (Claim 53); $5,408 (Claim 54); $9,470 (Claim 55); $4,905 (Claim 56); and $16,712 (Claim 57). ECF No. 351-6, at 22, 24, 29, 44-45.

Eric Taylor.  <u>See</u> ECF No. 337.  The fourth-party complaint filed by Tri-State, entitled "Tri-State Pipeline, Inc.'s Fourth-Party Complaint Against Burgess & Niple, Inc.," does not list Taylor as a party to the professional negligence claim or otherwise indicate that he brings any claims on his own behalf.  <u>See</u> ECF No. 22.  In addition, Taylor does not respond to Burgess & Niple's motion or otherwise indicate that he maintains claims against the Engineer.  As such, there is no claim upon which summary judgment may be granted, and the motion is denied.

## IV.   Conclusion

Accordingly, it is ORDERED that fourth-party defendant Burgess & Niple, Inc.'s motion for summary judgment (ECF No. 334) be, and it hereby is, GRANTED to the extent set forth herein.  Tri-State's fourth-party complaint professional negligence claim may proceed only with respect to the claimed breaches of the duty of care for the Engineer's handling of Claims 1, 3, and 6 as well as its dictation of the means and methods of Tri-State's work, namely, the circumstances underlying Claims 16, 53, 54, 55, 56, and 57, as well as the Callie Road "lateral" incident.  It is further ORDERED that Burgess & Niple's motion for partial summary judgment as to Taylor (ECF No. 336) be, and it hereby is, DENIED.

The Clerk is directed to transmit copies of this memorandum opinion and order to all counsel of record and any unrepresented parties.

ENTER:  August 27, 2021

John T. Copenhaver, Jr.
Senior United States District Judge